

# Exhibit "A"

# FLYNN & ASSOCIATES, P. C.

### ATTORNEYS AT LAW

189 STATE STREET
SIXTH FLOOR
BOSTON, MASSACHUSETTS 02109
TELEPHONE (617) 722-8253
FACSIMILE (617) 722-8254
E-MAIL: *flynnlaw@flynnassoc.com*

MICHAEL B. FLYNN*
RICHARD A. DAVIDSON, JR.
LORI A. MCCARTHY⁺
JOHN E. YOUNG, IV
WILLIAM ROA

*also admitted in NY*
⁺*also admitted in CT*

OF COUNSEL:
DURKIN, MCDONNELL, CLIFTON,
O'DONNELL & MOORE

DETROIT OFFICE:

PENOBSCOT BUILDING
645 GRISWOLD STREET
SUITE 3253
DETROIT, MICHIGAN 48226
TELEPHONE (313) 963-3033
FACSIMILE (313) 963-3011

September 8, 2003

Gerald M. Moody, Esq.
Town Counsel
Legal Department
52 Main Street
Milford, MA  01757-2622

RE:    GRAFTON & UPTON RAILROAD COMPANY

Dear Attorney Moody:

Please be advised that my firm represents the Grafton & Upton Railroad Company ("GU").

The GU's representatives have approached the town concerning its desire to better utilize its Milford yard that is located near Depot Street and consists of 5.65 acres of land and about 2,000 feet of track. The GU is in negotiations to relocate the operations of the Boston Railway Terminal Company ("BRT") from South Boston to the Milford yard which will require improvements to the property such as, but not limited to, ingress and egress for truck traffic to Depot Street, construction of a building on the property, improvements of the tracks, and the clearing of some of the land. The BRT will conduct its operations at the Milford yard using its own locomotives and accepting industry cars containing shipments of steel from the GU's interchange with CSX, unloading of the steel, and then shipping the steel to customers. The purpose of this letter is to outline the GU's positions concerning a number of issues which have arisen as a result of discussions between the GU's representatives and the town.

It is the position of the GU that the town is preempted from asserting and/or invoking its zoning by-laws against the GU thereby refusing to issue the necessary permits to the GU for improvements of its Milford yard for railroad operations; the GU's use of its property is grandfathered as a non-conforming prior use; and, the GU could ultimately petition the Department of Telecommunications and Energy for an exemption to the Zoning By-Laws of the Town of Milford ("By-Laws"), pursuant to G.L. c. 40A, § 3, asserting that the proposed improvements are "reasonably necessary for the convenience or welfare of the public."

Gerald M. Moody, Esq.
September 8, 2003
Page 2

## I.    FACTUAL BACKGROUND

### A.    Grafton & Upton Railroad

On October 22, 1873, the Grafton Center Railroad was incorporated under the General Laws of the Commonwealth of Massachusetts. Survey and construction of the line was commenced shortly thereafter and by April 1874 narrow gauge rails were laid in place. The railroad commenced operations on August 24, 1874, mostly as a passenger line.

On or about March 26, 1887, the railroad was re-built to standard gauge and its name was changed to the Grafton & Upton Railroad Company ("GU"). Thereafter, and within the next decade, the tracks were extended to Upton, Hopedale and Milford. The railroad has been operating its 15 mile line from Milford to North Grafton since the mid-1890's and has evolved from a passenger to a freight railroad.

The GU interchanges with the CSX railroad at the CSX's Milford Secondary Branch in Milford. The terminal in West Upton has a trestle for hopper car unloading and buildings for trans-loading of boxcars. The terminal in North Grafton can accommodate boxcars and flatcars for trans-loading. The GU has never ceased operations. It has never sought or received a certificate of public convenience and necessity from the federal government for the abandonment of its track rights.

### B.    Boston Railway Terminal Company

The BRT currently operates from South Boston on the tacks of and under an agreement with CSX. It now desires to re-locate its operations to the GU's Milford yard. The BRT is a fully functioning railroad owning and operating its own locomotives. In order for the BRT to move its operations to the GU's Milford yard improvements to the property will be required such as, but not limited to, ingress and egress for truck traffic to Depot Street, construction of a building on the property, improvements of the tracks, and the clearing of some of the land. BRT will conduct its operations at the Milford yard, under an agreement with the GU, operating its own locomotives and accepting industry cars with shipments of steel at the GU's interchange with CSX.

### C.    Milford Zoning By-Laws

The Town of Milford ("Milford") first enacted its By-Laws on September 11, 1945, which became effective May 3, 1946. As a result of the zoning scheme employed by Milford, the GU's Milford yard is located in a district as has been classified as General Residential (RA). The GU's use of its property is a non-conforming prior use (presently not allowed as classified in RA) due to the fact that the railroad operations were ongoing for at least fifty (50) years before the By-Laws were first enacted.

Gerald M. Moody, Esq.
September 8, 2003
Page 3

## II.    DETAILS AND SPECIFICS OF THE GU'S POSITIONS

### A.    MILFORD IS PREEMPTED FROM ASSERTING AND/OR INVOKING ITS ZONING BY-LAWS AGAINST THE GU TO PROHIBIT THE GU FROM USING ITS MILFORD YARD AND TRACKS IN RAILROAD OPERATIONS

The GU and the railroad industry are and have been regulated by the federal government since the late 19th and early 20th centuries when the railroads exercised a virtual monopoly over transportation. H. Rep. No. 104-311, 90 (1995), U.S. Code Cong. & Admin. News 1996, p. 793. To protect against the power of the railroads, Congress asserted federal authority over the railroads, passing the Interstate Commerce Act, c. 104, 24 Stat. 379 (1887), which, as amended, still governs federal regulation of railroads. It has been recognized as "among the most pervasive and comprehensive of federal regulatory schemes." Chicago & North Western Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 318 (1981). Congressional exemption of rail carriers from state and municipal regulation was "clear, broad and unqualified." Norfolk & Western Ry. Co. v. American Train Dispatchers Ass'n, 499 U.S. 117, 127-134 (1991).

In 1995, Congress eliminated what little remained of state and local regulatory authority over railroad operations through enactment of the Interstate Commerce Commission Termination Act ("the Act"), which has been codified at 49 U.S.C. § 701, et seq. The courts have held that "it is difficult to imagine a broader statement of Congress' intent to preempt state regulatory authority over railroad operations." CSX Transp., Inc. v. Georgia Public Service Comm'n, 944 F. Supp. 1573, 1581 (N.D.Ga. 1996).

### 1.    The law of preemption

Preemption of state and local law by federal law is required by the Supremacy Clause of the U.S. Constitution, which provides that "the Laws of the United States...shall be the Supreme Law of the Land." U.S. Const. Art. XI, cl. 2. Any state or local law that conflicts with federal law is "without effect" and must give way. Cipollone v. Liggett Group, Inc., 505 U.S. 504, 515 (1992); see also Teper v. Miller, 82 F.3d 989, 993 (11th Cir. 1996). The principles of federalism dictate that preemption should not be found unless preemption is "the clear and manifest purpose of Congress." Teper, 82 F.3d at 993. To be "clear and manifest," however, does not necessarily require Congress's intent to be "express;" congressional intent can be implied from the structure and purpose of a statute. Id.

Preemption exists in three forms: (1) "express," where Congress defines explicitly the extent to which its enactments preempt state law; (2) "field," in which Congress's regulation of a field is so pervasive or the federal interest is so dominant that an intent for federal law to occupy the field exclusively can be inferred; and (3) "conflict" preemption, where federal and state law

Gerald M. Moody, Esq.
September 8, 2003
Page 4

so conflict that is impossible for a party simultaneously to comply with both, or where state law prevents the accomplishment of the full purposes and objectives of federal law. *See* Teper, 82 F.3d at 993. Determining the preemptive effect of the Act on the town's zoning and licensing requirements requires juxtaposing these provisions, demarcating their respective scopes, and evaluating the extent to which they are in tension. Id. The Act expressly provides for exemption of state law as the Surface Transportation Board has jurisdiction over transportation by rail carrier when the transportation is under common control, management, or arrangement for a continuous carriage or shipment. 49 U.S.C. § 10501(a)(1). Further, the Board's jurisdiction includes transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules, interchange, practices, routes, services, and facilities of such carriers; and the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State, is exclusive. 49 U.S.C. § 10501(b). The remedies provided with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law. Id.

The expansive reach of this preemption clause covers matters "with respect to regulation of rail transportation" and the stated purposes of the Act are also suggestive of field preemption. Although one need not go beyond the language of § 10501 to determine whether Congress intended the Act to preempt at least some state law, one must nevertheless "identify the domain expressly pre-empted" by that language. Medtronic, Inc. v. Lohr, 518 U.S. 470, 484 (1996). Although this analysis begins with the Act's text, the interpretation of the text "does not occur in a contextual vacuum." Id, at 485. The interpretation is informed by two presumptions: first; there is a presumption, especially in fields where the states have traditionally reigned, that "the historic police powers of the State were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." Id. This approach comports with notions of federalism and the historic place held by the states in the regulation of health and safety. Id. However, this principle gives way where what is at issue is regulation of an area where there has been a history of significant federal presence as is the case herein with the regulation of the railroad industry. United States v. Locke, 529 U.S. 89 (2000).

Second, the analysis of a statute's preemptive scope is guided by the principle that "the purpose of Congress is the ultimate touchstone" in every preemption case. Medtronic, 518 U.S. at 485. Congress's intent is discerned primarily from the statute's language and its "statutory framework." Id, at 486. Also relevant are the "structure and purpose of the statute as a whole," Id, *see also* Felder v. Casey, 487 U.S. 131, 138 (1988). The intent or purpose of the law said to be preempted, however, is immaterial; its effect governs. Teper, 82 F.3d at 995. Under the Supremacy Clause, if the state or local law "in effect substantially impedes or frustrates federal regulation, or trespasses on a field occupied by federal law," it "must yield, no matter how admirable or unrelated the purpose of that law." Id.

Gerald M. Moody, Esq.
September 8, 2003
Page 5

The GU's use of its property is protected from the application of the local zoning regulations which are preempted by the federal regulations. The Board has the sole authority to regulate the GU's use of the Milford yard or the yard's operation under an agreement with the BRT. The GU plans to allow BRT to use and operate its Milford yard under an agreement which will involve the use of the switch, at the CSX's Milford Secondary Branch, tracks, the yard and ground for transportation of property by rail. *See*: 49 U.S.C. § 10102(6) and 49 U.S.C. § 10501. There already exist in the yard at least four sets of tracks, two of which follow the perimeter of the yard that re-connect by Depot Street and the other two sets of tracks terminate in the yard.

If Milford were permitted to prohibit or regulate the use of the GU's Milford yard, then the application of the By-Laws would substantially impede or frustrate federal regulations and trespass on a field occupied by federal law. The authority and affect of the By-Laws must yield to the federal regulations due to the fact that the effect of the By-Law would be to prohibit the GU from conducting railroad operations or entering into agreements with other railroads to conduct railroad operations at its Milford yard. *See*: Felder, 487 U.S. at 138. With all due respect to Milford, the By-Laws are preempted by the federal regulations and the GU must be permitted to conduct railroad operations on its property in accordance therewith.

**B.      THE GU'S USE OF ITS PROPERTY IS GRANDFATHERED AS A NON-CONFORMING PRIOR USE**

Even if the By-Laws are not preempted by the federal regulations, the GU is still entitled to use the Milford yard for railroad operations. The By-Laws do not apply to the GU's use of the Milford yard for railroad operations due to the fact that said use was existing at the time of the enactment of the By-Laws in 1946. § 3.1. of the By-Laws; and G.L. c. 40A, § 6.

The Supreme Judicial Court has decided a number of cases which questioned whether a use being made of premises which was not expressly authorized under the applicable zoning ordinance or by-law was nevertheless protected as a lawful nonconforming use. Cochran v. Roemer, 287 Mass. 500, 507-508 (1934)(use "is not different in kind . . . simply because it is bigger.") Building Commr. of Medford v. McGrath, 312 Mass. 461, 462 (1942)("a nonconforming use of the same premises may be not only continued but also increased in volume.") Medford v. Marinucci Bros. & Co. Inc., 344 Mass. 50, 60 (1962)("The distinction is between an increase in the amount of business, even a great increase, which does not work a change in use, and an enlargement of a nonconforming business so as to be different in kind in its effect on the neighborhood.").

The Supreme Judicial Court, in Bridgewater v. Chuckran, 351 Mass. 20, 23 (1966) set forth that three tests should be utilized for determining whether current use of property fits within the exemption granted to nonconforming uses: (1) whether the use reflects the nature and purpose of the use prevailing when the zoning by-law took effect; (2) whether there is a difference in the quality or character, as well as the degree, of use (3) whether the current use is

Gerald M. Moody, Esq.
September 8, 2003
Page 6

different in kind in its effect on the neighborhood. The intended use of the Milford yard by the GU is for railroad operations which was and has been its use since the By-Law took effect. The use of the property will be of the same quality and character and be an increase in use, but will not be a use that exceeds the area of the outer two tracks which surround the yard as presently laid out. *See* Medford v. Marinucci Bros. & Co. Inc., 344 Mass. at 51-53(the disputed use consisted of the laying of a new fifty-car side track parallel to a railroad's existing and allegedly nonconforming tracks, and the use of the siding for the unloading of large quantities of fill transported from New Hampshire for use in highway construction in this Commonwealth); McAleer v. Board of Appeals of Barnstable, 361 Mass. 317, 322-324 (1972).

### C. THE GU COULD PETITION, PURSUANT TO G.L. C. 40A, § 3, THE DEPARTMENT OF TELECOMMUNICATIONS AND ENERGY FOR AN EXEMPTION

Should the foregoing arguments fail the GU, then it will be forced to petition the Department of Telecommunications and Energy as a "public service corporation" pursuant to G.L. c. 40A, § 3 and c. 3, § 5, for an exemption from the By-Laws in order to build the necessary structures required to conduct its operations. The GU believes that it will most likely be able to establish that the proposed improvements are "reasonably necessary for the convenience or welfare of the public." G.L. c. 40A, § 3. This procedure is rather lengthy and would cause the GU a significant delay in being able to utilize the property for a use that is ongoing.

### III. CONCLUSIONS

Milford is preempted by the application of the applicable federal regulations from asserting its By-Laws and preventing the GU from conducting its railroad operations (and improvements) at its Milford yard. The GU is proposing to continue to use its property for railroad operations which was and has been the property's use from the time of the enactment of the By-Laws, therefore said use is grandfathered as a prior non-conforming use. Last, the GU has the ability to petition the Commonwealth for an exemption from the requirements of the By-Law, but does not believe that such petition is necessary given the preemptive effect of the federal regulations and the prior non-conforming use of the property.

Once you have had an opportunity to review the foregoing, would you kindly contact me to discuss Milford's position. We look forward to working with the town in an effort to resolve these issues and to improving the Milford yard.

Sincerely,

Richard A. Davidson, Jr.

pc:    Bridget Lucey
       Bonnie Cohen



# Exhibit "B"

**TOWN OF MILFORD, MASSACHUSETTS**
LEGAL DEPARTMENT
TOWN HALL
52 MAIN STREET
MILFORD, MASSACHUSETTS 01757-2622

(508) 634-2302
FAX (508) 634-2324



GERALD M. MOODY
TOWN COUNSEL

October 10, 2003

Richard A. Davidson, Jr., Esq.
Flynn & Associates, P.C.
189 State Street, 6th Floor
Boston, MA  02019

RE:    Boston Railway Terminal Company and Grafton & Upton Railroad

Dear Attorney Davidson:

This is in response to your letter of September 8, 2003.  I also spoke with Robert Krafty who sent me additional information in relation to the proposed use of the Grafton & Upton (GU) property by the Boston Railway Terminal Company (BRT).

I have reviewed facts as I know them, your memorandum and have done my own research in relation to applicable law.  In sum, based upon available information, I cannot conclude as you do that the proposed activity at the Milford GU property is exempt from application of local zoning by-laws under the Interstate Commerce Commission Termination Act (ICCTA).  Additionally, I must respectfully disagree with your conclusion that the proposed operations of BRT are "grandfathered" under M.G.L. c. 40A, Section 6 and applicable provisions of the Milford Zoning By-Law.

I will address the zoning issue first.  The subject property has been zoned residentially since the inception of zoning in Milford.  The locus has not been utilized for any railroad, or other commercial activity, for well in excess of twenty years.  To my knowledge, the locus has never been used as a terminal/trucking operation at any time in the past.  I realize that from the perspective of applicable federal law the GU tracks have not been "abandoned".  However, from a zoning perspective, the fact that the tracks may be re-activated and utilized for railroad purposes does not result in the protection of M.G.L. c. 40A, Section 6 for ancillary commercial activity which had never taken place on the site in any event.

I am fully cognizant of the breadth of the ICCTA and of the preemption provisions of 49 USC Section 10501(b).  I have reviewed decisions of the Federal Courts and of the

Page 2

Surface Transportation Board (STB). Although federal preemption is broad, the law has not been held to absolutely exempt railroad property or railroad owned real estate from application of local zoning regulations. In a First Circuit decision Boston and Main Corporation vs. Ayer, 330 F3rd 12, the Court cited an STB Decision referring to it as "finely crafted". The Court favorably referred to the STB position that state and local regulation is permissible "where it does not interfere with interstate rail operations,…" Id. at 16. The Court went on to further cite the STB position as follows:

> All local regulation, in the STB's view, is subject to the same test; whether the statue or regulation is being applied to "unduly restrict the railroad from conducting its operations, or unreasonably burden interstate commerce." This, said the STB, was a fact bound question.
>
> Id.

From the facts as I understand them the GU/BRT proposal is comparable to the uses at issue in the case of Florida East Coast Railway Company vs. City of West Palm Beach, 110 F. Supp. 2nd 1367, aff'd. 266 F. 3rd 1324 (2001). In this case a company known as Rinker Materials Corporation was proposing to lease facilities of the Florida East Coast Railway (FEC) and establish a facility to receive aggregate materials by rail, and then to distribute from that point by truck. Citing the STB's Riverdale decision (See STB Fin. docket number 33466) the District Court held that "….activities and facilities not integrally related to the provisions of interstate rail are not subject to (STB) jurisdiction or to federal preemption." 110 F. Supp. 2nd at 1378. In upholding the lower court decision the Eleventh Circuit Court of Appeals held that "….Rinker's use of the property at the 15th Street Yard and the activities there performed by Rinker serve no public function and provide no valuable service to FEC; rather, the arrangement between FEC and Rinker merely facilitates Rinker's operation of a private distribution facility on FEC – owned premises." 266 F. 3rd at 1336.

Again, in summary, I cannot, based on the information available to me and my understanding of the applicable law, agree with your position that the ICCTA preempts Town of Milford enforcement of its zoning by-law in relation to the proposed BRT facility.

If you have any questions in relation to the above please feel free to call me.

Very truly yours,

Gerald M. Moody

GMM/jlg
cc:     Board of Selectmen
        Town Administrator
        Robert Krafty



# Exhibit "C"

# FLYNN & ASSOCIATES, P.C.

### ATTORNEYS AT LAW

189 STATE STREET
SIXTH FLOOR
BOSTON, MASSACHUSETTS 02109
TELEPHONE (617) 722-8253
FACSIMILE (617) 722-8254
E-MAIL: *flynnlaw@flynnassoc.com*

*FILE COPY*

DETROIT OFFICE:

PENOBSCOT BUILDING
645 GRISWOLD STREET
SUITE 3253
DETROIT, MICHIGAN 48226
TELEPHONE (313) 963-3033
FACSIMILE (313) 963-3011

MICHAEL B. FLYNN*
RICHARD A. DAVIDSON, JR.
LORI A. MCCARTHY⁺
JOHN E. YOUNG, IV
WILLIAM ROA

OF COUNSEL:
DURKIN, MCDONNELL, CLIFTON,
& O'DONNELL

*also admitted in NY
⁺also admitted in CT

November 12, 2003

**VIA FACSIMILE & OVERNIGHT MAIL**
Gerald M. Moody, Esq.
Town Counsel Legal Department
Town of Milford
52 Main Street
Milford, MA 01757-2622

RE:    Grafton and Upton Railroad Company – Milford Yard
        Proposed Lease to Boston Railway Terminal Company

Dear Attorney Moody:

As you know, my firm represents the Grafton and Upton Railroad Company ("GU"), which is preparing to lease its property known as the Milford Yard to the Boston Railway Terminal Company ("BRT"). The Town has taken the position that GU/BRT's proposed use of the Milford Yard would be in violation of its zoning by-laws.

On September 8, 2003, we sent you a detailed letter in which we generally explained the relevant law on the issue of federal preemption. The Interstate Commerce Commission Termination Act ("ICCTA") vests exclusive jurisdiction in the Surface Transportation Board ("STB") over the type of operations the GU and BRT are planning to conduct at the Milford Yard, as well as the construction activities which will be necessary to carry out these operations. Consequently, the Town's zoning by-laws, to the extent they prohibit the GU/BRT's planned operations, are preempted.

You responded to us via correspondence dated October 10, 2003, in which, relying on the case of Florida East Coast Railway Co. v. The City of West Palm Beach, 266 F.3d 1324 (2001), you communicated the Town's position that the zoning by-laws do apply to the activities proposed by the GU and BRT. For the reasons discussed, *infra*, this case is not applicable to our factual scenario.

George M. Moody, Esq.
November 10, 2003
Page 2

The purpose of this letter is to further supplement our earlier discussion of the relevant substantive law, explain why the Florida East Coast case is distinguishable from ours and present you with a further amplification of the GU's position in advance of our meeting, which has been scheduled to take place on Friday, November 14, 2003, at 11:00 a.m.  Please note that the GU continues to be willing to work with the Town in this matter, but is prepared to exercise its considerable rights under federal law.

## I.    FACTUAL BACKGROUND:

Our September 8, 2003 letter to you contained a great deal of information about the history of the GU and its operations in Milford.  The September 8, 2003 letter also contains detailed information about BRT and the operations and activities the GU and BRT plan to conduct at the Milford Yard.  The factual background portion of the September 8, 2003 letter, a copy of which is enclosed herewith, is incorporated herein by this reference. The GU and BRT plan to bring freight (specifically, shipments of steel) into the Milford Yard, via an interchange with CSX Transportation, Inc., a larger freight railroad.  These shipments of steel will originate in other states.  The operations that the GU and BRT plan to conduct in the Milford Yard have an impact on interstate commerce and clearly pertain to "railroad transportation" as that term is defined in the ICCTA.  *See infra*, at p. 3-4.  In addition, the improvements the GU and BRT plan to make to the property (including the construction of a building, track improvements and the clearing of some of the land) will be necessary to carry out these operations.

## II.    DISCUSSION OF LAW:

### A.    A Brief History of Applicable Federal Law:

In 1887, Congress passed the Interstate Commerce Act ("ICA"), which established a statutory scheme for regulating the nation's railroads. The ICA was originally codified at 49 USC §1, *et seq.*  The ICA established the Interstate Commerce Commission ("ICC") as the federal regulatory agency responsible for overseeing railroad transportation.  Although the ICA has been changed and amended numerous times since its inception, it continues (in its present form) to govern interstate commerce.

In 1995, Congress abolished the ICC by enacting the ICCTA.  Pub. L. No. 104-88, Dec. 29, 1995, 109 Stat. 803.  The ICCTA established the STB to take the place of the ICC and granted the Board jurisdiction over certain rail functions and proceedings.  *See* 49 USC §701(a).  The ICCTA was passed in an effort to substantially reduce the regulation of railroads and other modes of surface transportation .  *See* 49 U.S.C. §10101; *see also* H.R. Rep. No. 104-311, at 82 (1995); Sen. Rep. No. 104-176, at 2 (1995); Pejepscot Industrial Park Ind. Pk. v. Maine Central RR. Co., 215 F.3d 195 (1st CLR. 2003).

George M. Moody, Esq.
November 10, 2003
Page 3

**B.     The Town's Zoning By-laws are Preempted by the ICCTA and the Federal Law Construing It:**

The Supremacy Clause of the United States Constitution provides that the laws of the United States "shall be the supreme Law of the Land...any Thing in the constitution of Laws of any state to the contrary notwithstanding." Art. VI, cl. 2. "Where a state statute conflicts with or frustrates federal law, the former must give way." CSX Transportation v. Easterwood, 507 U.S. 658, 663 (1993), *citing* U.S. Const., Art. VI, cl. 2; *see also* Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516 (1992); Maryland v. Louisiana, 457 U.S. 7254, 746, (1981). State and local laws can be preempted in three ways: (1) where they directly conflict with a federal law (conflict preemption); (2) where they are preempted by an expressed provision in the federal law (expressed preemption); or (3) where Congress intended that the federal law occupy the field of the subject matter covered by the local law (field or implied preemption). Although all three types of preemption may apply to the situation at the Milford Yard, our discussion here focuses only on "expressed preemption."

**1.     Express Preemption under the ICCTA:**

When the statute being construed contains an expressed preemption clause, such as §10501(b), "the task in statutory construction must in the first instance focus on the plain wording of the clause...," Easterwood, 507 U.S. at 664. The ICCTA contains a clearly expressed preemption clause which grants to the STB exclusive jurisdiction over all railroad transportation; specifically, subsection 10501(b) states:

> (b) the jurisdiction of the Board over –
> (1) transportation by rail carriers, and the remedies  provided in this part with respect to rates, classifications, rules..., practices, routes, services and facilities of such carriers; and
> (2) the construction, acquisition, operation, abandonment or discontinuance of spur, industrial, team, switching, or sidetracks, or facilities, even if the tracks are located, or intended to be located entirely in one state, is exclusive.  Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. §10501(b).  As one court has observed, "it is difficult to imagine a broader statement of Congress' intent to preempt state regulatory authority over railroad operations." CSX Transportation, Inc. v. Georgia Pub. Serve. Comm'n., 944 F. Supp. 1573, 1581 (N.D. Ga. 1996).

Congress and the courts have long recognized a need to regulate railroad operations at the federal level.  Congress' authority under the Commerce Clause to regulate the railroads is well-established, *see, e.g.*, Houston, E. & W. Tex. Ry. V. United States, 234 U.S. 342, 350-52 (1914); Pittsburgh v. Lake Erie R.R. v. Railway Labor Executives' Ass'n, 491 U.S. 490, 510 (1989), and

George M. Moody, Esq.
November 10, 2003
Page 4

the Supreme Court repeatedly has recognized the preclusive effect of federal legislation in this area. *See, e.g.*, Colorado v. United States, 271 U.S. 153, 165-66 (1926) (ICC abandonment authority is plenary and exclusive); Transit Comm'n v. United States, 289 U.S. 121, 127-128 (1933) (ICC authority over interstates rail construction is exclusive); City of Chicago v. Atchison, T. & S.F. Ry., 357 U.S. 77, 88-89 (1958) (local authorities have no power to regulate interstate rail passengers).

The broad nature of Congress' preemption under the ICTA is further evidenced by the expansive definitions for the terms "railroad" and "transportation." The Act defines "railroad" as including, in pertinent part:

> (B) the road used by a rail carrier and owned by it or operated under an agreement; and
> (C) a switch, spur, track, terminal, terminal facility, and a freight depot, yard and ground, used or necessary for transportation.

49 U.S.C. §10102(6). Here, it is important to note that the tracks which will be used as part of the BRT's operations, clearly meet this definition of "railroad". The definition of "transportation" includes:

> (A) a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use; and
> (B) services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling and interchange of passengers and property.

49 U.S.C. §10102(9). "It is clear…that Congress intended the preemptive net of the (ICCTA) to be broad by extending exclusive jurisdiction to the STB over anything included within the general and all inclusive term 'transportation by rail carriers.'" Georgia Pub. Serv. Comm'n, 944 F. Supp. at 1582. "By preempting state regulation of railroad operations, and granting exclusive jurisdiction over almost all aspects of railroad operations to the STB, Congress removes the ability of states to frustrate its policy of deregulating and reviving the railroad industry." Id. at 1583. Thus, when §10501(b) grants the STB exclusive jurisdiction over "transportation by rail carriers" it logically includes the yard, property, tracks, buildings, facilities, freight yards and any equipment used in connection with the railroad or related to the movement of property (i.e. freight), including the Milford Yard and the steel which will be delivered by rail to the BRT at the yard. Consequently the ICCTA, by its clearly expressed terms, preempts any zoning by-laws with the respect to the railroad operations which the GU and BRT plan to conduct at the Milford Yard.

The anticipated operations at the Milford Yard fall under this definition of transportation. It should be noted, in this regard, that the BRT is a railroad company and that it will be moving the steel in and around the yard with its own locomotives, that it will be making shipments on

George M. Moody, Esq.
November 10, 2003
Page 5

rail cars, that it will be handling and interchanging these shipments at the Milford Yard and that the buildings and facilities it plans to construct will be used for the movement of these shipments.

### 2.    Cases Involving ICCTA Preemption of Local Zoning By-laws:

A number of recent decisions have determined that §10501(b) preempts local zoning by-laws (and other similar ordinances) and that the STB's authority to regulate railroad operations is exclusive. In City of Auburn v. United States, several cities in the state of Washington sought judicial review of several STB decisions which found that state and local environmental review laws were preempted by the ICCTA. 154 F. 3d 1025, 1027-28 (1999).   In City of Auburn, the Burlington Northern Santa Fe Corporation ("BNSF") sought approval from the STB to reopen for passenger service a rail line (known as the Stampede Pass route) which it had recently reacquired. Id. In order to restore the Stampede Pass route, the BNSF was required to repair and improve the line, including the replacement of track sidings and buildings, tunnel improvements and the construction of communication towers, and sought STB approval to do so (after taking the position during local proceedings that local by-laws were preempted by the ICCTA). Id. The cities then petitioned the STB for an opinion on the ICCTA's preemptive effect. Id. The STB issued a formal opinion that the local by-laws were preempted and the Ninth Circuit Court of Appeals upheld the STB determination.

The Ninth Circuit found that the congressional intent to preempt this kind of local regulation of rail lines was explicit in the plain language of the ICCTA and the statutory framework surrounding it: "we find that the plain language of two sections of the ICCTA (§§10501 and 11323-25) explicitly grant the STB authority over railway projects like Stampede Pass." Id. at 1030. The court noted that "all the cases cited by the parties find a broad reading of Congress' preemption intent, not a narrow one..." and that "[p]re-ICCTA case law addressing federal preemption over railroad operations also supports a broad reading of the statute." Id. (citations omitted). Finally, the Ninth Circuit rejected the cities' argument that the ICCTA applies only to "economic" regulation of railroads: "if local authorities have the ability to impose 'environmental' permitting regulations on the railroad, such power will in fact amount to 'economic regulation' if the carrier is prevented from constructing, acquiring, operating, abandoning, or discontinuing a line." Id. at 1031.

In the case of Friberg , et al. v. Kansas City Southern Ry. Co., the Fifth Circuit Court of Appeals reversed a jury verdict in favor of the plaintiffs, property owners who claimed that the defendant railroad caused them to go out of business by continuously blocking a grade crossing on a road which led to their business, in violation of Texas' Anti-Blocking Statute. 267 F.3d 439 (2001). The track in question was a sidetrack which the Kansas City Southern ("KCS") had begun using with more frequency after it was significantly lengthened to accommodate longer trains. In determining that the ICCTA preempted any local ordinances affecting rail operations, the Fifth Circuit stated that "[t]he language of the statute could not be more precise, and it is beyond peradventure that regulation of KCS train operations, as well as the construction and

George M. Moody, Esq.
November 10, 2003
Page 6

operation of the KCS side tracks, is under the exclusive jurisdiction of the STB...." Id. at 443. Echoing the sentiment expressed by the Ninth Circuit in City of Auburn, the Friberg court further noted that "[t]he regulation of railroad operations has long been a traditionally federal endeavor, to better establish uniformity in such operations and expediency in commerce, and it appears manifest that Congress intended the ICCTA to further that exclusively federal effort...." Id.

A trial judge in the United States District Court for the District of Minnesota, in the case of Soo Line Railroad Co. v. City of Minneapolis, granted summary judgment in favor of the railroad, where it had sued the City for declaratory judgment and injunctive relief arising from the City's refusal to grant it demolition permits. 38 F. Supp. 1096 (D. Minn. 1998). The railroad had, pursuant to the City's "Code of Ordinances," applied for (and were denied) permits to demolish several buildings in a rail yard which was located in the City. The demolition was a necessary part of the railroad's redevelopment of the yard. One of the City's departments had denied the permit application on the grounds that the buildings which had been scheduled for demolition may have had historic value. Id. at 1097-1098. In granting the railroad's motion, the court determined that the ICCTA preempted the City's authority to regulate the railroad's proposed activities, finding that:

> [t]he language of the Act expresses Congress' clear intent to preempt state and local regulatory authority over the construction, development, and operation of railroad facilities.... (The) demolition of the five buildings and subsequent construction, development, and operation of the proposed bulk transfer facility is subject only to such regulations and requirements as may be imposed by the STB pursuant to the ICCTA.

Id. at 1101.

In Village of Ridgefield Park v. N.Y. Susq. & Western Ry. Corp., the plaintiff Village sought to enjoin a nuisance and to regulate the defendant railroad's facility pursuant to, _inter alia_, the Village's zoning by-laws. 163 N.J. 446 (2000). The railroad had begun construction of a maintenance facility without first applying for zoning or construction permits. Id. at 450. The Village ultimately sued the railroad, seeking to require it to apply for permits and to shut down the facility. A trial judge granted the railroad's motion for summary judgment and dismissed the Village's lawsuit. The judge's ruling was upheld by New Jersey's Appellate Division and was ultimately affirmed by the New Jersey Supreme Court. In finding that the ICCTA preempted the Village's attempts to regulate the railroad, the New Jersey Supreme Court reasoned that:

> [b]ecause zoning regulations imposed by the Village "clearly could be used to defeat [the Railroad's] maintenance and upgrading activities, thus interfering with the efficiency of railroad operations that are part of interstate commerce,"...the Village may not dictate the location on its right-of-way of the Railroad's maintenance facility.

Id. at 462.

George M. Moody, Esq.
November 10, 2003
Page 7

Finally, in Norfolk Southern Ry. Co. v. City of Austell, the federal court in the Northern District of Georgia granted summary judgment on behalf of the plaintiff railroad where it had brought an action for declaratory relief regarding the application, to the construction of an intermodal facility, of the City's zoning by-laws. 1997 U.S. Dist. LEXIS 17236 (Aug. 18, 1997). In so doing, the court determined that the ICCTA preempted the City's by-laws and land use permitting requirements because they prevented the construction and operation of the railroad's facility. Id. "Based upon the clear and unambiguous language of the ICCTA, the court concludes that the instant intermodal facility comes within the ICCTA's definition of 'transportation by rail carriers' over which the STB is given exclusive jurisdiction under... §10501(b)(1)." Id.

### 3.    The STB's Own Interpretation of Its Authority and ICCTA Preemption:

The STB's rulings on the preemptive effect of the ICCTA are also an important consideration (although not dispositive), since "[a]s the agency with authority delegated from Congress to implement the provisions of the [ICCTA], the STB is 'uniquely qualified to determine whether state law...should be preempted.'" Georgia Pub. Serv. Comm'n, 944 F. Supp. at 1584. In this regard, the STB has, since its inception, taken the position that it has exclusive authority over the type of railroad operations that the GU and BRT plan to conduct at the Milford Yard. For instance, shortly after it was created, the STB issued a public notice which stated "that the authority of certain states to regulate intrastate rail matters was terminated by the (ICCTA), effective January 1, 1996." *STB Public Notice*, Ex Parte No. 388, April 3, 1996.

In the underlying decision which was ultimately appealed to the Ninth Circuit in City of Auburn, the STB stated that:

> [A] state or local permitting process for prior approval of this project, or of any aspect of it related to interstate transportation by rail,...is preempted....The Board now has exclusive authority over the construction and operation of rail lines that are part of the interstate rail network....Local law is preempted when the challenged state statute "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Cities of Auburn and Kent, WA*, Petition for Declaratory Order, STB Finance Docket No. 33200, 1997 WL 362017 at *4-6 (I.C.C.) (July 1, 1997).

Two years later, the STB reiterated its position that the ICCTA preempts local zoning by laws:

> [I]t is well-settled that...the Borough can not apply its local zoning ordinances to property used for NYSW's railroad operations....Zoning regulations that the Borough would impose clearly could be used to defeat (the railroad's) maintenance and upgrading activities, thus interfering with the efficiency of railroad operations that are part of

George M. Moody, Esq.
November 10, 2003
Page 8

interstate commerce…This is the type of interference that Congress sought to avoid in enacting §10501(b).

*Borough of Riverdale Petition for Declaratory Order, The New York Susquehanna and Western Railway Corporation*, 1999 WL 715272 at * 7 (S.T.B. Sept. 9, 1999). The STB further determined that "local entities…can not require that railroads seek building permits prior to constructing or using railroad facilities because of the inherent delay and interference with interstate commerce that such requirements would cause." Id. at *8.

### 4.    ICCTA Preemption of the Town's By-laws:

The case law, as well as the STB's own decisions, holds that the Town's zoning by-laws are preempted, at least to the extent they interfere with the GU/BRT's ability to conduct "railroad transportation" at the Milford Yard. The Town cannot prevent the GU and BRT from moving shipments of steel into and through the Yard, and it also cannot prohibit the construction activities necessary to improve the Yard in order to accommodate these services. The Town likewise cannot require the GU or BRT to submit to any permitting process in this regard.

The GU does not dispute that the Town's by laws, to the extent they pertain to matters of "public health and safety," may not be specifically preempted. Nevertheless, the Town cannot use any such by laws or ordinances as an obstacle to the GU/BRT's attempts to provide the contemplated "railroad transportation" services at the Milford Yard.

### 5.    The <u>Florida East Coast</u> Case Does Not Apply:

The <u>Florida East Coast</u> case is not applicable to the GU/BRT's plans for the Milford Yard, because the factual scenario here is completely different and because the Eleventh Circuit very narrowly tailored its holding to apply only to the facts of that case. On this first point, in your October 10, 2003 letter you stated that the "GU/BRT proposal is comparable to the uses at issue in" <u>Florida East Coast</u>. This is not true. In <u>Florida East Coast</u>, the arrangement between the railroad and its tenant (Rinker) was essentially a land swap, and Rinker leased the railroad's premises in order to conduct its own distribution services. The services provided by Rinker had nothing to do with providing "railroad transportation" as that term is defined in the ICCTA. As you yourself have noted, the Eleventh Circuit held that "Rinker's use of the property…and the activities there performed by Rinker serve no public function and provide no valuable services to FEC; rather, the arrangement between FEC and Rinker merely facilitates Rinker's operation of a private distribution facility on FEC-owned premises." <u>Florida East Coast</u>, 266 F. 3d at 1336, as quoted in your letter.

In direct contrast, the activities that the GU and BRT plan to conduct at the Milford Yard at the same time serve the important public function of facilitating the interstate shipment of steel, are "integrally related" to the provision of interstate rail transportation and also provide valuable services to the GU – specifically, the provision of income, the restoration and

George M. Moody, Esq.
November 10, 2003
Page 9

improvement of the use of a vital rail yard, the ability to conduct interchanges with the CSX and the reopening of a profitable rail line. On these points alone, the facts of our situation differ dramatically from the crucial facts upon which the <u>Florida East Coast</u> case was decided – circumstances without which the decision, by the court's own admission, would have been considerably different.

Indeed, the Eleventh Circuit took great pains to narrowly tailor its decision so that it has remarkably limited application. As discussed *supra* (and as you noted), the Eleventh Circuit's decision hinges upon its determination that the arrangement between Rinker and FEC served a "purely private function" – specifically, the "operation of a private distribution facility on FEC-owned premises." <u>Id</u>. at 1336. Based on this finding, the Eleventh Circuit held that "because West Palm Beach's application of its ordinances <u>does not constitute 'regulation of rail transportation</u>,' 49 U.S.C. §10501(b), the ICCTA does not preempt the City's actions." <u>Id</u>. at 1326 (emphasis supplied). The court further limited the scope of its holding by stating that "existing zoning ordinances of general applicability, which are enforced against a private entity leasing property from a railroad for non-rail transportation purposes, <u>are not sufficiently linked to rules governing the operation of the railroad so as to constitute laws 'with respect to regulation of rail transportation.'</u>" <u>Id</u>. at 1331 (emphasis supplied). The Eleventh Circuit also specifically noted that:

> [b]oth parties agree that the City does not impose its generally applicable zoning ordinances against FEC thereby preventing FEC from operating in the otherwise residential neighborhood….[w]e are not called upon to decide whether federal law would constrain the City's power…to limit FEC's operations should it engage in an aggregate distribution business in exactly the same manner as Rinker.

<u>Id</u>. at 1331-32 (emphasis supplied).

Thus, given the narrowly defined scope of the <u>Florida East Coast</u> holding, zoning ordinances which do affect "rail transportation" as that term is defined in the ICCTA (*see, supra* at p. 4) are preempted by the Act, even under the Eleventh Circuit's analysis. The Eleventh Circuit recognized this implication by taking note that its holding would have been different if the City's ordinance had been applied to the railroad ("certain actions…which might or might not be preempted if taken against FEC, do not violate the Supremacy Clause when applied against Rinker") or a third party which actually conducted railroad operations ("[c]ertain local regulations applied against a third-party may be so intertwined with the provision of rail transportation services to the public as to frustrate the objectives of federal railroad regulation."). <u>Id</u>. at 1336-37 and n. 9.

The linchpin of the Eleventh Circuit's decision is whether or not the local by-law affects "railroad transportation." In our case, it clearly does - the factors which were not present in <u>Florida East Coast</u> clearly prevail in our situation. BRT is, as is evident from its name ("Boston Railway Terminal Company"), a railroad company. It is quite different from Rinker. Whereas

George M. Moody, Esq.
November 10, 2003
Page 10

Rinker was conducting an <u>intrastate</u> trucking distribution facility, BRT will be moving shipments of freight, in <u>interstate</u> commerce, into, around and out of the Milford Yard. Shipments will be accepted on railroad cars in interchange from CSX. BRT will be moving the freight about the yard with its own locomotives. The tracks and facilities in and around the Yard are integral to the movement of these cars. Clearly, the activities which will be performed by BRT at the Milford Yard meet the ICCTA's definition of "railroad transportation" and the Town is precluded from attempting to regulate these operations through the use of its by laws. This is an entirely different situation from the one encountered by the Eleventh Circuit in <u>Florida East Coast</u> and that decision has no relevance to our case.

### III.    CONCLUSION:

It is the GU's position, as expressed herein, that the Town cannot prevent it and the BRT from improving the Milford Yard and thereafter moving shipments of freight through the Yard. This position is supported by the language of the ICCTA and its statutory framework, the clear weight of the applicable case law and the STB's own determination of the Act's preemptive effect. The GU would like the Town to reconsider its position on this issue, given that the GU and BRT plan to proceed with their railroad activities. We look forward to further discussing this situation with you at our meeting on the 14th. At that time, we will be seeking a date certain for the Town to respond to us in writing in this regard.

Thank you for your attention to this matter.

Sincerely,

Michael B. Flynn

MBF/peg
Enclosure
cc:    Bonnie Cohen
       Bridget Lucey
       Robert C. Krafty
       Richard A. Davidson, Jr.

G:\F & A\CASE FILES\Grafton & Upton RR\milford secondary-allen marsh\correspondence\Ltr to Atty\Moody Ltr -11-7-03.peg.doc