UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

FILED
IN CLERK'S OFFICE
2003 DEC 29 A 11: 16
U.S. DISTRICT COURT
DISTRICT OF MASS.

GRAFTON AND UPTON RAILROAD COMPANY,
        Plaintiff,

v.

TOWN OF MILFORD,
        Defendant.

C.A. No.:

03-40291

## MEMORANDUM OF LAW IN SUPPORT OF THE PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

The plaintiff Grafton and Upton Railroad Company (the "GU") submits this *Memorandum of Law* in support of its *Motion for a Preliminary Injunction*. The GU states that: (1) there is a substantial likelihood that it will succeed on the merits; (2) it will be irreparably injured if the relief is not granted; (3) the relief sought will not substantially injure the defendant; and (4) the public interest will be furthered by an injunction.

As grounds therefore, the GU states as follows:

### I. FACTUAL BACKGROUND:

The GU expressly incorporates herein by this reference, and makes a part of this *Memorandum*, the "Factual Background" section of its *Verified Complaint for Declaratory Judgment*, as well as the *Affidavit of Bridget Lucey*, which is attached hereto as Exhibit "1." This *Memorandum* also makes reference to a *Petition* that the Town of Milford (the "Town") recently filed with the Surface Transportation Board (the "*Petition*"), a copy of which is attached to the plaintiff's *Verified Complaint* as Exhibit "E."

## II. DISCUSSION OF LAW:

### A. Preliminary Injunctive Relief:

There are four well-established factors that the GU must satisfy in order to obtain a preliminary injunction. The GU must show that: (1) it will likely succeed on the merits of the underlying action; (2) it will suffer irreparable injury if the injunction is not granted; (3) such injury outweighs any harm which granting injunctive relief would inflict on the defendant; and (4) the public interest will not be adversely affected by the granting of the injunction. Planned Parenthood League of Massachusetts v. Bellotti, 641 F.2d 1006, 1009 (1st Cir. 1981); Merrill Lynch v. Bennert, 980 F. Supp. 73, 74 (D.Me. 1997). These four factors are not considered in isolation from one another, and no one factor is necessarily dispositive as to whether preliminary injunctive relief is warranted. CityFed Financial Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C.Cir. 1995). Rather, these factors "interrelate on a sliding scale and must be balanced against each other." Davenport v. International Brotherhood of Teamsters, 166 F.3d 356, 361(D.C.Cir. 1999). In other words, a particularly strong showing on one factor may compensate for a weak showing on one or more of the other factors. Serono Labs. v. Shalala, 158 F.3d 1313, 1318 (D.C.Cir. 1998). For instance, a strong showing of likely success on the merits may warrant issuance of preliminary injunctive relief even if the plaintiff makes a less compelling showing on the other three factors. Virginia Petroleum Jobbers Ass'n v. FPC, 259 F.2d 921, 925 (D.C.Cir. 1958); Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 19 (1st Cir. 1996). The key issue in determining whether injunctive relief should be granted is whether the plaintiff can demonstrate a likelihood of success on the merits. Ross-Simons, 102 F.3d at 15; *see also* Gately v. Commonwealth, 2 F.3d 1221, 1225 (1st Cir. 1993); Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993).

1.  **The GU Can Demonstrate A Strong Likelihood Of Success On The Merits Because Both The Town's *Zoning By-Laws* and the State *Environmental Protection Act* Are Preempted By Federal Law:**

The Supremacy Clause of the United States Constitution provides that the laws of the United States "shall be the supreme Law of the Land...any Thing in the constitution or Laws of any state to the contrary notwithstanding." Art. VI, cl. 2. "Where a state statute conflicts with or frustrates federal law, the former must give way." CSX Transportation v. Easterwood, 507 U.S. 658, 663 (1993), *citing* U.S. Const., Art. VI, cl. 2; *see also* Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516 (1992); Maryland v. Louisiana, 457 U.S. 7254, 746, (1981). The Town's *By-Laws*, as well as any other state or local statute or ordinance, conflict with the provisions of the federal *Interstate Commerce Commission Termination Act* ("ICCTA") and are therefore preempted.

    a.    **Expressed Preemption Under The ICCTA:**

In 1887, Congress passed the Interstate Commerce Act ("ICA"), which established a statutory scheme for regulating the nation's railroads. The ICA was originally codified at 49 U.S.C. §1, *et seq*. The ICA established the Interstate Commerce Commission ("ICC") as the federal regulatory agency responsible for overseeing railroad transportation. Although the ICA has been changed and amended numerous times since its inception, it continues (in its present form) to govern interstate commerce. In 1995, Congress abolished the ICC by enacting the ICCTA. Pub. L. No. 104-88, Dec. 29, 1995, 109 Stat. 803. The ICCTA established the Surface Transportation Board ("STB") to take the place of the ICC and granted the STB exclusive jurisdiction over rail functions and proceedings. *See* 49 U.S.C. §701(a). Congress' purpose in passing the ICCTA was to substantially reduce the regulation of railroads and other modes of surface transportation. *See* 49 U.S.C. §10101; *see also* H.R. Rep. No. 104-311, at 82 (1995);

Sen. Rep. No. 104-176, at 2 (1995); <u>Pejepscot Industrial Park Ind. Pk. v. Maine Central RR. Co.</u>, 215 F.3d 195 (1st Cir. 2003).

When the statute being construed contains an expressed preemption clause, such as §10501(b), "the task in statutory construction must in the first instance focus on the plain wording of the clause...." <u>Easterwood</u>, 507 U.S. at 664. The ICCTA contains a clearly expressed preemption clause which grants to the STB exclusive jurisdiction over all railroad transportation:

> (b)  the jurisdiction of the Board over –
>
>> (1)  transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules...practices, routes, services and facilities of such carriers; and
>>
>> (2)  the construction, acquisition, operation, abandonment or discontinuance of spur, industrial, team, switching, or sidetracks, or facilities, even if the tracks are located, or intended to be located entirely in one state, is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. §10501(b). As one court has observed, "it is difficult to imagine a broader statement of Congress' intent to preempt state regulatory authority over railroad operations." <u>CSX Transportation, Inc. v. Georgia Pub. Serve. Comm'n.</u>, 944 F. Supp. 1573, 1581 (N.D. Ga. 1996).

Congress and the courts have long recognized a need to regulate railroad operations at the federal level. Congress' authority under the Commerce Clause to regulate the railroads is well-established [*see, e.g.,* <u>Houston, E. & W. Tex. Ry. V. United States</u>, 234 U.S. 342, 350-52 (1914); <u>Pittsburgh v. Lake Erie R.R. v. Railway Labor Executives' Ass'n</u>, 491 U.S. 490, 510 (1989)] and the Supreme Court repeatedly has recognized the preclusive effect of federal legislation in this area. *See, e.g.,* <u>Colorado v. United States</u>, 271 U.S. 153, 165-66 (1926) (ICC abandonment

4

authority is plenary and exclusive); Transit Comm'n v. United States, 289 U.S. 121, 127-128 (1933) (ICC authority over interstates rail construction is exclusive); City of Chicago v. Atchison, T. & S.F. Ry., 357 U.S. 77, 88-89 (1958) (local authorities have no power to regulate interstate rail passengers).

The broad nature of Congress' preemption under the ICCTA is further evidenced by the Act's expansive definitions of the terms "railroad" and "transportation." The Act defines "railroad" as including, in pertinent part:

> (B) the road used by a rail carrier and owned by it or operated under an agreement; and
>
> (C) a switch, spur, track, terminal, terminal facility, and a freight depot, yard and ground, used or necessary for transportation.

49 U.S.C. §10102(6). The tracks, yard and equipment that the GU proposes to use for its joint operation with BRT will be used for railroad operations, and therefore clearly meet the statutory definition of "railroad." The ICCTA's definition of "transportation" includes:

> (A) a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, <u>regardless of ownership or an agreement concerning use</u>; and
>
> (B) services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, <u>handling and interchange of passengers and property</u>.

49 U.S.C. §10102(9) (emphasis added). "It is clear...that Congress intended the preemptive net of the (ICCTA) to be broad by extending exclusive jurisdiction to the STB over anything included within the general and all inclusive term 'transportation by rail carriers.'" Georgia Pub. Serv. Comm'n, 944 F. Supp. at 1582. "By preempting state regulation of railroad operations, and granting exclusive jurisdiction over almost all aspects of railroad operations to the STB, Congress removes the ability of states to frustrate its policy of deregulating and reviving the

5

railroad industry." Id. at 1583. Thus, when §10501(b) grants the STB exclusive jurisdiction over "transportation by rail carriers" it includes the yard, property, tracks, buildings, facilities, freight yards and any equipment used in connection with the railroad or related to the movement of property (i.e. freight), including the Yard and the rail cars of steel which will be interchanged to the GU and delivered by rail to the BRT at the Yard.

Consequently the ICCTA, by its clearly expressed terms, preempts the application and/or enforcement of the Town's *Zoning By-laws* with the respect to the railroad operations that the GU and BRT plan to conduct at the Yard. The proposed railroad operations fall under the statutory definition of "transportation." It should be noted, in this regard, that the GU is a railroad company and that it will be moving the steel in and around the Yard, that it will be receiving shipments on railcars, that it will be handling and interchanging these shipments at the Yard, and that the buildings and facilities the BRT plans to construct will be used for the movement of freight.

      **b.**    **ICCTA Preemption of Local Zoning By-laws and Environmental Protection Laws:**

A number of recent decisions have determined that §10501(b) preempts local zoning by-laws and any state environmental protection laws, and that the STB's authority to regulate railroad operations is exclusive. In City of Auburn v. United States, 154 F. 3d 1025, 1027-28 (1999), several cities in the state of Washington sought judicial review of STB decisions which found that state and local environmental review laws were preempted by the ICCTA. The Burlington Northern Santa Fe Corporation ("BNSF") sought approval from the STB to reopen for passenger service a rail line route which it had recently reacquired. Id. In order to restore this route, the BNSF was required to repair and improve the line (including the replacement of track sidings and buildings and the construction of communication towers) and sought STB

approval to do so (after taking the position during local proceedings that local by-laws were preempted by the ICCTA). Id. The cities then petitioned the STB for an opinion on the ICCTA's preemptive effect. Id. The STB issued a formal opinion that the local by-laws were preempted and the Court of Appeals for the Ninth Circuit upheld the STB determination.

The Ninth Circuit found that Congress' intent to preempt this kind of local regulation of rail lines was explicit in the plain language of the ICCTA and the statutory framework surrounding it: "we find that the plain language of two sections of the ICCTA (§§10501 and 11323-25) explicitly grant the STB authority over railway projects like (this one)." Id. at 1030. The court noted that "all the cases cited by the parties find a broad reading of Congress' preemption intent, not a narrow one…" and that "[p]re-ICCTA case law addressing federal preemption over railroad operations also supports a broad reading of the statute." Id. Finally, the Ninth Circuit rejected the cities' argument that the ICCTA applies only to "economic" regulation of railroads: "if local authorities have the ability to impose 'environmental' permitting regulations on the railroad, such power will in fact amount to 'economic regulation' if the carrier is prevented from constructing, acquiring, operating, abandoning, or discontinuing a line." Id. at 1031.

In the case of Friberg, et al. v. Kansas City Southern Ry. Co., 267 F.3d 439 (2001), the Court of Appeals for the Fifth Circuit reversed a jury verdict in favor of the plaintiffs, property owners who claimed that the defendant railroad caused them to go out of business by continuously blocking a grade crossing on a road which led to their business, in violation of Texas' Anti-Blocking Statute. The track in question was a sidetrack which the Kansas City Southern ("KCS") had begun using with more frequency after it was significantly lengthened to accommodate longer trains. In determining that the ICCTA preempted any local ordinances

affecting rail operations, the Fifth Circuit stated that "[t]he language of the statute could not be more precise, and it is beyond peradventure that regulation of KCS train operations, as well as the construction and operation of the KCS side tracks, is under the exclusive jurisdiction of the STB...." Id. at 443. Echoing the sentiment expressed by the Ninth Circuit in City of Auburn, the Friberg court further noted that "[t]he regulation of railroad operations has long been a traditionally federal endeavor, to better establish uniformity in such operations and expediency in commerce, and it appears manifest that Congress intended the ICCTA to further that exclusively federal effort...." Id.

A trial judge in the United States District Court for the District of Minnesota, in the case of Soo Line Railroad Co. v. City of Minneapolis, 38 F. Supp. 1096 (D. Minn. 1998), granted summary judgment in favor of the railroad, where it had sued the City for declaratory judgment and injunctive relief arising from the City's refusal to grant it demolition permits. The railroad had, pursuant to the City's "Code of Ordinances," applied for (and were denied) permits to demolish several buildings in a rail yard. The demolition was a necessary part of the railroad's redevelopment of the yard. One of the City's departments had denied the permit application on the grounds that the buildings which had been scheduled for demolition may have had historic value. Id. at 1097-1098. In granting the railroad's motion, the court determined that the ICCTA preempted the City's authority to regulate the railroad's proposed activities, finding that:

> [t]he language of the Act expresses Congress' clear intent to preempt state and local regulatory authority over the construction, development, and operation of railroad facilities.... (The) demolition of the five buildings and subsequent construction, development, and operation of the proposed bulk transfer facility is subject only to such regulations and requirements as may be imposed by the STB pursuant to the ICCTA.

Id. at 1101.

In <u>Village of Ridgefield Park v. N.Y. Susq. & Western Ry. Corp.</u>, 163 N.J. 446 (2000), the plaintiff Village sought to enjoin a nuisance and to regulate the defendant railroad's facility pursuant to, *inter alia*, the Village's zoning by-laws. The railroad had begun construction of a maintenance facility without first applying for zoning or construction permits. <u>Id</u>. at 450. The Village ultimately sued the railroad, seeking to require it to apply for permits and to shut down the facility. A trial judge granted the railroad's motion for summary judgment and dismissed the Village's lawsuit. The judge's ruling was upheld by New Jersey's Appellate Division and was ultimately affirmed by the New Jersey Supreme Court. In finding that the ICCTA preempted the Village's attempts to regulate the railroad, the New Jersey Supreme Court reasoned that:

> [b]ecause zoning regulations imposed by the Village "clearly could be used to defeat [the Railroad's] maintenance and upgrading activities, thus interfering with the efficiency of railroad operations that are part of interstate commerce,"…the Village may not dictate the location on its right-of-way of the Railroad's maintenance facility.

<u>Id</u>. at 462.

Finally, in <u>Norfolk Southern Ry. Co. v. City of Austell</u>, 1997 U.S. Dist. LEXIS 17236 (Aug. 18, 1997), the federal court in the Northern District of Georgia granted summary judgment on behalf of the plaintiff railroad where it had brought an action for declaratory relief regarding the application, to the construction of an intermodal facility, of the City's zoning by-laws. In so doing, the court determined that the ICCTA preempted the City's by-laws and land use permitting requirements because they prevented the construction and operation of the railroad's facility. <u>Id</u>. "Based upon the clear and unambiguous language of the ICCTA, the court concludes that the instant intermodal facility comes within the ICCTA's definition of 'transportation by rail carriers' over which the STB is given exclusive jurisdiction under… §10501(b)(1)." <u>Id</u>.

The case that the Town, in its *Petition*, relied on most heavily, <u>Florida East Coast Railway Company</u>, 266 F. 3d 1324 (2001), is entirely distinct from the case at hand. In <u>Florida East Coast</u>, the arrangement between the railroad and its tenant (Rinker) was essentially a land swap. Rinker leased the railroad's premises in order to conduct its own distribution services. The services provided by Rinker had nothing to do with providing "railroad transportation" as that term is defined in the ICCTA. The Eleventh Circuit held that "Rinker's use of the property...and the activities there performed by Rinker serve no public function and provide no valuable services to FEC; rather, the arrangement between FEC and Rinker merely facilitates Rinker's operation of a private distribution facility on FEC-owned premises." <u>Id</u>. at 1336. Here, the GU will be intimately involved in the joint operations which are proposed for the Milford Yard and the operations, in turn, provide valuable services (such as car movements, revenue and the cash needed for further improvements and expansion) to the GU. In sum, the proposed use of the Milford Yard is much more than a "private distribution facility;" therefore, <u>Florida East Coast</u> simply does not apply.

       **c.     The STB's Own Interpretation of Its Authority and ICCTA Preemption:**

The STB's own rulings on the preemptive effect of the ICCTA support the GU's position.[1] The STB has, since its inception, taken the position that it has exclusive authority over

---

[1] Although the STB's rulings can be considered by the Court, they are not dispositive, nor are they necessarily entitled to deference. *See* <u>Georgia Pacific Serv. Comm'n</u>, 944 F. Supp. at 1584, n.8. The STB itself has recognized that, in cases such as the GU/BRT situation,

> railroads do not require authority from the Board to build or expand their facilities such as truck transfer facilities, weigh stations, or similar facilities, relating to their railroad operations, or to upgrade an existing line or to construct an unregulated spur or team track. In such cases, we can provide advice about how preemption applies but we have no direct involvement in the process. Thus, the interpretation of the preemption provisions has evolved largely through Court decisions in cases outside of our direct jurisdiction and in which we were not a party.

the type of railroad operations that the GU and BRT plan to conduct at the Yard. Shortly after it was created, the STB issued a public notice which stated "that the authority of certain states to regulate intrastate rail matters was terminated by the (ICCTA), effective January 1, 1996." *STB Public Notice*, Ex Parte No. 388, April 3, 1996. In the underlying decision which was ultimately appealed to the Ninth Circuit in City of Auburn, the STB stated that "a state or local permitting process for prior approval of this project, or of any aspect of it related to interstate transportation by rail,...is preempted.... The Board now has exclusive authority over the construction and operation of rail lines that are part of the interstate rail network" and also that "[l]ocal law is preempted when the challenged state statute 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Cities of Auburn and Kent, WA, Petition for Declaratory Order*, STB Finance Docket No. 33200, 1997 WL 362017 (July 1, 1997) at p. 7, 9 (as attached) (citations omitted). A copy of the STB's *City of Auburn* decision is attached as Exhibit "3."

Two years later, the STB reiterated its position that the ICCTA preempts local zoning by laws:

> [I]t is well-settled that...the Borough can not apply its local zoning ordinances to property used for NYSW's railroad operations... Zoning regulations that the Borough would impose clearly could be used to defeat (the railroad's) maintenance and upgrading activities, thus interfering with the efficiency of railroad operations that are part of interstate commerce... This is the type of interference that Congress sought to avoid in enacting §10501(b).

*Riverdale*, (Exh. 2) at *7. The STB further determined that "local entities...can not require that railroads seek building permits prior to constructing or using railroad facilities because of the

---

*Borough of Riverdale Petition for Declaratory Order, The New York Susquehanna and Western Railway Corporation*, STB Finance Docket No. 33466, 1999 WL 715272 at * 7 (Sept. 9, 1999). A copy of the STB's *Riverdale* decision is attached as Exhibit "2."

11

inherent delay and interference with interstate commerce that such requirements would cause."

Id. at *8.  The STB made a similar ruling with respect to environmental laws:

> Recent precedent has made it clear that, to the extent that they
> set up legal processes that could frustrate or defeat railroad operations,
> state or local laws that would impose <u>a local permitting or environmental
> process</u> as a pre-requisite to the railroad's maintenance, use or
> upgrading of its facilities are preempted because they would, of necessity,
> impinge upon the federal regulation of interstate commerce.... actions (of
> local authority) must not have the effect of foreclosing or restricting the
> railroad's ability to conduct its operations or otherwise unreasonably
> burdening interstate commerce.

Id. at *5 - *6.

The STB has, in a case which arises from another Massachusetts dispute, recently echoed these sentiments.  In *Joint Petition for a Declaratory Order -Boston and Maine Corporation and Town of Ayer*, STB Finance Docket No. 33971, 2001 STB Lexis 435 (April 30, 2001) at *6, the STB noted that "[s]everal courts have held that this statutory preemption applies even in cases – such as the construction of ancillary facilities under (49 U.S.C. §10906)...- where we lack licensing and ancillary authority and therefore do not conduct our own environmental review."  A copy of the *Boston & Maine* decision is attached as Exhibit "4;" *see also* <u>Flynn v. Burlington Northern Santa Fe Corp.</u>, 98 F. Supp. 2d 1186 (E.D. Wash. 2000).  The facts of *Boston & Maine* are nearly identical to the case at hand – the Town of Ayer sought to prevent, through the enforcement of its zoning by-laws and local environmental regulations, the development of a yard (owned by a railroad) for the purposes of constructing a transloading facility which would off-load motor vehicles from rail cars to be carried by a trucking company to new car dealerships.  Id.  The STB noted that:

> even local environmental regulation is preempted where Congress
> intended to preempt all state and local law.  As explained in <u>City of Auburn</u>, 154
> F. 3d at 1030-31, congressional intent to preempt a state or local permitting
> process for prior approval of rail activities and facilities related to interstate

12

> transportation by rail is explicit in the plain language of §10501(b) and the statutory framework surrounding it.

Id. at *6, *17 (n. 24). The STB ultimately ruled that "state and local permitting…(including environmental requirements) are preempted because by their nature they unduly interfere with interstate commerce by giving the local body the ability to deny the carrier the right to construct facilities or conduct operations. Id. at *6.

The case law, as well as the STB's own decisions, hold that the Town's *Zoning By-laws* and the *Wetlands Protection Act* are preempted, at least to the extent they interfere with the GU and BRT's ability to conduct "railroad transportation" at the Yard. The Town cannot prevent the GU and BRT from moving shipments of steel into and through the Yard; it cannot prohibit the construction activities necessary to improve the Yard in order to accommodate these services; and it cannot require the GU or BRT to submit to any permitting process in this regard. The GU does not dispute that the Town's *By-laws*, to the extent they pertain to matters of "public health and safety," may not be specifically preempted. Nevertheless, the Town cannot use any by-law or ordinance to delay, obstruct or restrict the GU and BRT's attempts to provide the contemplated "railroad transportation" services at the Yard.[2]

---

[2] The Town has taken the position, in its STB *Petition*, that its *By-laws* and the *Wetlands Protection Act* are not preempted by the ICCTA because BRT is not a "rail carrier" over which the STB has jurisdiction. *See Petition*, at p. 9-14. In support of this position, the Town cited two recent STB decisions, *Hi Tech Trans, LLC – Petition For Declaratory Order*, STB Finance Docket No. 34192 (Sub-No.1) (Aug. 14, 2003) and *H&M International, Inc. – Petition for Declaratory Order*, STB Finance Docket No. 34277 (Nov. 10, 2003). Copies of these decisions are attached hereto as Exhibits "5" and "6." The Town's reliance on these decisions is misplaced because it has misrepresented (or perhaps misunderstood) the arrangement contemplated by the GU and BRT. This is likely a function of the Town's "jumping the gun" by prematurely filing its *Petition* before it had gained a complete understanding of the facts and before it had given the parties a full opportunity to reach an amicable resolution.

     Simply put, the proposed GU/BRT agreement is completely different from the operations which were the subject of *Hi Tech* and *H&M*. The STB in both of these decisions refused to extend its jurisdiction to preempt local ordinances over trucking companies which planned to use railroad yards for nothing more than transloading and trucking purposes. See *High Tech* at *2; *H&M* at 2. In both cases, the STB's decisions were based on a narrow interpretation of the definition of "rail carrier" [*see* 49 U.S.C. §10102(5)] and a finding that the trucking companies were not "rail carriers" subject to the STB's jurisdiction. *See, e.g.*, *H&M* at *2 ("to fall within the Board's

13

2. **The GU Continues To Suffer The Threat Of An Immediate Injury:**

The GU continues to suffer the threat of immediate injury because: (1) it is incurring the loss of income which would have been generated by the proposed operations; and (2) BRT

---

jurisdiction, the transportation activities must be performed by a rail carrier.... To be considered a rail carrier..., there must be a holding out to the public to provide common carrier service.").

The STB also noted that the determination of whether or not a particular operation falls under the jurisdiction of the ICCTA is a fact-specific determination. *H&M* at *2. Both decisions were based on facts which are not present here. First, the GU, unlike the petitioners in the STB decisions, is a rail carrier. Second, the petitions in *High Tech* and *H&M* pertained simply to the trucking companies' operation of transloading facilities within a railroad's yard, and did not seek the STB's determination as to whether it would have had jurisdiction over the entire yard itself or the railroad operations which were being conducted within the yard.

Third, the most crucial factor in each of these decisions was that the railroads involved had little (if anything) to do with the operation of the transloading facility. *See, e.g., H&M* at *4 ("Nor is there any evidence that [the railroad] has control over H&M's Tech's business operations. To the contrary, H&M has specifically stated that all car movements within its facility are 'at the direction of, or under the supervision of, and for the convenience of H&M'... Moreover, the record indicates that the [railroad's] obligations and common carrier duty begin and end at the delivery track at the H&M facility."); *Hi Tech* at *4 ("Hi Tech's relationship with [the railroad] is that of a shipper with a carrier....The parties all but eliminate [the railroad's] involvement in the operation of the transloading facility and its responsibility for it. [The railroad does not quote] rates or charge[ ] compensation for use of High Tech's transloading facility."). Here, to the contrary, the GU will be intimately involved in the joint operation between it and BRT. The GU will be leasing the BRT's locomotive, operating it with GU employees and moving shipments of steel by rail car over its mainline tracks, its yard tracks and at the portion of the Yard designated for transloading operations. The GU's insurance agreements will cover the potential liability of these operations. In addition, the GU will be receiving significant compensation for the use of its facility. Obviously, the GU's obligations and common carrier duties do not begin and end at the CSX interchange point and instead continue throughout the proposed operation. The Town has, by stating in its *Petition* that "BRT proposes to undertake in Milford the ***same receiving and trucking operations as it currently undertakes in South Boston***" (*see Petition* at p. 10) (emphasis added), simply missed the mark in attempting to draw an analogy between the GU/BRT's joint operation and the operations which were rejected by the STB in *High Tech* and *H&M*.

Finally, the railroads involved in the recent STB decisions are large Class I freight railroads with extensive holdings, large capital reserves and plenty of business opportunities. It was important to the STB that the operations over which it refused to exercise jurisdiction were not "considered an integral part of (the railroad's) common carrier service." Here, in stark contrast, the proposed operations are not only an integral part of the GU's service, but comprise the single most important part of its business operations and the most crucial component of ensuring the GU's future financial viability.

The Town, in its *Petition*, has inappropriately focused its entire argument on BRT. However, the GU is the truly affected party here and the operations proposed for the Milford Yard will be conducted jointly. Moreover, the Town has, by taking this position, essentially admitted that the ICCTA preempts any effort by the Town to prevent the GU/BRT's operations in this case – in its *Petition* (at p. 10) the Town stated that "[b]y the plain language used by Congress, it is the transportation, and related activities, undertaken by ***rail carriers*** that benefit from preemption, not activity which may be related to rail transportation which is provided and undertaken by non-rail carriers like BRT. As was stated in Fletcher Granite Company, LLC..., under the preemption provisions of the ICCTA, '...zoning ordinances and local land use permit requirements are preempted as to facilities that are an ***integral part of the railroad's interstate operations***.'" (citations omitted). Here, the GU's proposed use of the Yard is "railroad transportation" which will be undertaken by a "rail carrier" and is an "integral part" of the GU's operations. By the Town's own reasoning, then, its *By-laws* and any other local land use requirements are preempted.

14

could at any time find an alternative location. In order to make a suitable showing of irreparable injury, the GU must establish a colorable threat of immediate injury. *See* Massachusetts Coalition of Citizens With Disabilities v. Civil Defense Agency, 649 F.2d 71, 74 (1st Cir. 1981). To show that the alleged injury is "fairly traceable" to the challenged action, the GU must make a reasonable showing that "but for" the Town's action the alleged injury will not occur. Warth v. Seldin, 422 U.S. 490, 504 (1975). A future injury satisfies the "imminence" requirement only if the injury is "certainly impending." Lujan v. Defenders of Wildlife, 504 U.S. 555, 565 n. 2 (1992).

The BRT is under instructions from CSX to move its operations from South Boston and it has been actively seeking another location as a suitable destination for its operations. The BRT will most likely find another location if the dispute between the GU and the Town is not resolved quickly, thereby depriving the GU of this unique business opportunity. BRT and GU would by now have had an ongoing operational relationship, but for the threats from the Town that it will not permit the proposed railroad operations. If the Town's efforts continue, BRT will have no other choice but to relocate its business elsewhere. If the BRT locates alternative space, then the GU will be irreparably damaged by the loss of this unique business opportunity. The threat of BRT finding another location is "certainly impending" - the BRT is presently looking. The GU seeks this Court to prevent this harm from occurring, and cannot wait for the STB's determination.

3.      **The Potential Injury To The GU Outweighs Any Harm To The Town:**

The potential injury to the GU outweighs any harm that the Town might suffer if the injunction is granted. The agreement with BRT is unique to the GU due to the fact that there is no other terminal railroad seeking to relocate its operations. The GU is not presently using its

Yard. If BRT is not allowed to relocate its railroad operations to the Yard, then (at BRT's current business level) the GU will lose approximately $79,800.00 per year in income. At this time, the GU has no other proposed use for its Yard and knows of no other terminal railroad which is in need of the Yard. The potential injury to the GU is the loss of this unique tenant and the loss of the substantial income that the tenant can generate for it at this Yard.

The GU is unaware of any harm that the Town will suffer as a result of the relocation of BRT's operations to the Yard. Both the GU and BRT are willing to work within the scheme established by the applicable environmental regulations. The Town will obviously realize an increase in its tax base due to the improvements that will occur on the property and its local businesses will realize an increase in revenue from the ancillary needs of the GU's and BRT's employees, customers and agents. BRT has indicated that it will not allow its trucks to travel through downtown Milford. In that there already exist (and have existed for over one-hundred years) tracks upon the premises and the GU and BRT intend to refurbish the yard to a fully functioning and safe area, in full compliance with all railroad regulations, the Town will realize an improvement to a currently dormant parcel of land. The GU stands to lose this unique business opportunity if the Town succeeds in further delaying and/or preventing the BRT from relocating. The potential injury to the GU would be substantial. The balance of the equities in this instance clearly favors the GU.

### 4. The Public Interest Will Not Be Adversely Affected By The Granting Of The Injunction:

The public interest will not be adversely affected by the granting of the preliminary injunction. If anything the public interest will be served by the proposed operations (which will reduce transportation costs and expenses) to further enhance the development of the local and regional economy, thus making steel less expensive for construction and other purposes. BRT

has also voluntarily stated that it would keep its trucks from passing through the Town's center, thereby preventing congestion and any undue traffic problems. Finally, the entire region will benefit from reopening of the Milford Yard to commercial activity and the reestablishment of the GU as an alternative provider of commercial freight transportation.

### III.  CONCLUSION:

WHEREFORE, for all the above stated reasons, the plaintiff's Motion should be allowed and this Honorable Court should grant a preliminary injunction enjoining the Town from asserting, applying or enforcing its *Zoning By-laws* and the *Wetlands Protection Act* against the Grafton and Upton Railroad Company and/or the Boston Railway Terminal Corporation with respect to the proposed railroad operations at the Milford Yard. This Court should also order the Town to withdraw its STB *Petition* and/or order the STB to stay and/or dismiss the proceedings before it.

Respectfully submitted,
The GRAFTON AND UPTON RAILROAD CO.,
by its attorneys,

_____
Michael B. Flynn          BBO No.: 559023
Richard A. Davidson, Jr.  BBO No.: 552988
FLYNN & ASSOCIATES, P.C.
189 State Street
Sixth Floor
Boston, MA 02109
(617) 722-8253

DATED: 12/29/03

G:\F & A\CASE FILES\Grafton & Upton RR\milford secondary-allen marsh\Memorandum in Support of Motion for Temporary R.O. and Prelimary Injuction.doc