# EXHIBIT "1"

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

GRAFTON AND UPTON RAILROAD
COMPANY,
               Plaintiff,

           v.

TOWN OF MILFORD,
               Defendant.

C.A. No.:

## AFFIDAVIT OF BRIDGET LUCEY

Now comes Bridget Lucey to set forth the following:

1. My name is Bridget Lucey and I am the General Manager of the Grafton and Upton Railroad Company ("GU").

2. Grafton and Upton Railroad Company ("GU"), is a Massachusetts railroad corporation, whose principal place of business is located at 40 Pullman Street, Worcester, Worcester County, MA.

3. The GU is a privately-owned railroad which was incorporated as the Grafton Center Railroad in 1873 and changed its name to its current moniker in 1887.

4. The GU has a mainline that runs from North Grafton, MA to Milford, MA that has an overall length of approximately 15.5 miles.

5. The GU's main line track runs from North Grafton to Milford and also has railroad yards in Hopedale, Grafton, Upton and Milford as well as a number of sidetracks throughout its territory.

6. From 1894 to 1928, the GU was a significant passenger carrier.

7.     In the early 1900's the GU's freight business increased dramatically.

8.     By the 1930's, the GU had become a major regional freight carrier moving primarily cattle and motor vehicles.

9.     From its "heyday" in the 1930's and 40's, the volume of the GU's business has until recently steadily declined.

10.    Although it has never completely stopped doing business, the GU has until recently been relatively dormant.

11.    A number of its tracks have become underutilized, a number of its grade crossings have been paved over, there are a number of encroachers on its property and the customers it services are few in number.

12.    However, the GU has recently begun efforts to reestablish itself as a viable and profitable railroad, and has undertaken measures to improve its infrastructure, re-utilize its yards and increase the volume of freight it moves over its tracks.

13.    Unfortunately, the GU is not well-capitalized.

14.    The future economic health (and very existence) of the GU depends on generating cash flow through projects which can be carried out on the portions of its infrastructure which can currently support income-generating railroad operations.

15.    The GU intends to reinvest income so generated to improve its lines and develop more business.

16.    The prime location for conducting income-generating railroad operations is the GU's Milford Yard (the "Yard").

17.    The GU currently interchanges railcars with CSX Transportation, Inc. ("CSX") at North Grafton.

2

18.    "Interchange" is a railroad term which means the delivery, in interstate commerce, of railroad equipment from one railroad to another, and the acceptance thereof, for further carriage by rail.

19.    CSX is a Class I freight railroad with headquarters in Jacksonville, FL and which operates over tracks it owns in several states throughout the northeastern, midwestern, mid-atlantic and southeastern United States.   CSX is the primary carrier of freight between Massachusetts and the rest of the country.

20.    On the Milford side, the GU's tracks terminate at an intersection with a busy CSX freight line known as the "Milford Secondary Branch."

21.    The Milford Yard is located immediately west of the point of intersection between the GU's main line and CSX's Milford Secondary Branch.

22.    The GU's main line runs directly through the Milford Yard – the Yard is physically located on both sides of the main line track.

23.    The GU has desired to increase its business by developing the Milford Yard and increasing its ability to interchange with CSX.

24.    The Yard is a unique and ideal location since it connects almost directly to CSX's line.

25.    In order to enable the interchange of cars with CSX at the Yard, the GU (within the last four months) has had an old switch reinstalled at the point where the GU's tracks connect to CSX's Milford Secondary Branch.

26.    The GU has been attempting to develop new business with the assistance of railroad consultants, including Robert Krafty, the former Manager of Real Estate for the Consolidated Rail Corporation (CSX's predecessor in the northeast).

3

27.     Earlier this year, Mr. Krafty contacted Allen Marsh, the principal of a company called
        Boston Railway Terminal Corporation ("BRT"), with a proposal to move BRT's
        operations to the Milford Yard.

28.     It is my understanding and belief that BRT is a terminal railroad company, its
        principal business is the distribution of steel, and currently operates out of a facility
        located in South Boston which is owned by CSX.

29.     A "terminal railroad" runs over a short, fixed distance and operates for a singular
        purpose, such as the movement of freight within an industrial complex, or for a single
        industrial entity.

30.     BRT accepts shipments of steel via railcar at its facility, where railcars are moved
        about, the steel is off-loaded and placed onto trucks and then shipped to BRT's
        customers throughout the region.

31.     BRT owns and operates its own locomotive and conducts its own railroad switching
        operations at and within its South Boston facility.

32.     It is my understanding and belief, that CSX has advised BRT it must vacate the South
        Boston facility as soon as possible.

33.     The Milford Yard is uniquely located and configured to accommodate BRT's
        operations – it is connected almost directly to CSX, it is geographically located in the
        center of BRT's sphere of operations and it has roadway access via Route 140 to
        Route 495 (a desired route for the trucks which will haul steel to BRT's customers).
        The BRT also provides a unique opportunity for the GU.

34.     The Yard is a significant GU asset, but the GU currently can use it only for activities
        such as those conducted by BRT.

4

35.   There are few, if any, operating terminal railroads (or any other businesses) in Massachusetts which currently are looking to relocate their operations and which would be able to assist in the improvement, development and use of an entire railroad yard.

36.   The BRT represents the only current option available for the GU to increase its financial standing through the use of the Yard.  During this past spring, the GU and BRT reached an agreement that the BRT would move its operations to the GU's Milford Yard.

37.   The original agreement called for BRT to lease the Yard from GU.  However, the terms of the agreement have consistently evolved and changed over the last few months.

38.   As part of this agreement, the GU was required to reinstall the switch connecting its line to CSX's Milford Secondary Branch, a task the GU has already accomplished.

39.   BRT will be required to make physical improvements to the Yard and its tracks and once this is accomplished, CSX will start delivering shipments of steel via railcars to the GU's account at the Yard, where the shipments will be interchanged to the GU.

40.   The GU will be expected to enter into a separate *Interchange Agreement* with CSX in order to begin accepting cars at the Yard.  BRT will not be a party to the *Interchange Agreement*.

41.   GU will generate revenue from the interchange of these cars, all of which will have been shipped from other states.

42.   Steel shippers will pay the GU $250.00 for its services (the shipment of each railcar and the movement of the railcars at and within the Yard).  The terms of the proposed

5

GU-BRT agreement also require BRT to pay the GU $5,000.00 per month for the use of the Yard and the services provided by the GU, against which will be offset a $100.00 credit for each railcar brought into the Yard (not to exceed $5,000.00 per month).

43. The GU will also be required by its agreement with BRT to perform various operational activities regarding the interchange and movement of the railcars once they have been delivered by CSX.

44. For instance, GU employees will operate a locomotive leased from the BRT and will physically move the railcars from the point of interchange with CSX to locations within the Yard, using both the GU's main line track as well as another track which is also located within the confines of the Yard.

45. BRT employees will then off-load the steel and haul it to customers throughout New England.

46. The GU will then physically move the railcars back to the point of interchange and return them to CSX.

47. The GU will also be required to carry insurance which will cover the potential liability exposure presented by these operations.

48. The GU will retain the right to continue to use its main line for other traffic in addition to BRT's shipments of steel.

49. The proposed GU-BRT agreement is subject to the execution of an acceptable written contract and BRT's being able to commence railroad operations at the Yard.

50. The GU and BRT began, earlier this year, to negotiate and draft a contract which is intended to memorialize the terms and conditions of the BRT's use of the Yard as

6

well as the charge for the use of the Yard and the charges the GU will be paid for
delivering railcars to BRT.

51.   The GU and BRT have been ready, willing and able to commence railroad operations,
      subject to the execution of the written contract, since late spring/early summer [at
      least as of six (6) months ago].

52.   They have not done so due to the Town's position that the proposed railroad
      operations cannot legally occur at the Yard.

53.   In the early spring, the GU's representatives (including Mr. Krafty and myself)
      approached the Town to advise it of the GU's proposed use of the Yard.

54.   During late spring and early summer, Mr. Krafty and I met with Town officials, both
      at the Yard and at Town Hall, to discuss the proposed railroad operations.

55.   During those meetings, we were repeatedly advised by various Town officials that the
      Yard was, according to the Town's Zoning By-Laws, located in a district classified as
      "General Residential," the proposed use of the Yard was not allowed in a General
      Residential district and, therefore, the Town objected to and prohibited the GU and
      BRT from conducting the proposed railroad operations at the Yard.

56.   After informally attempting to resolve this dispute, the GU retained counsel to present
      its position to the Town.

57.   On November 14, 2003, Mr. Krafty, the GU's counsel, and I met with Town Counsel
      at Milford's Town Hall in an effort to resolve this dispute.

58.   At this meeting, Town Counsel indicated that the Town did not agree with the GU's
      position concerning the preemptive effect of the applicable federal law, but requested
      additional information concerning the BRT's assets and present operations, and he

7

also requested an opportunity to speak with the Board of Selectmen concerning the issue.

59. The GU's representatives asked the Town to reconsider its position and get back to them as soon as possible.

60. On November 25, 2003, the GU provided, in a letter from Attorney Richard Davidson, the information requested by Town Counsel.

61. Town Counsel never got back to the GU. Instead, GU's counsel telephoned Town Counsel on December 4, 2003 and was then informed, for the first time, that the Town intended to file a petition with the Surface Transportation Board ("STB") concerning the proposed use of the Yard.

62. On December 8, 2003, the Town filed its Petition with the STB, seeking a declaratory order that the proposed use of the Yard was prohibited by the Town's Zoning By-Laws, and was also subject to the Massachusetts Wetlands Protection Act, M.G.L. ch. 139 § 40.

63. The Town has already delayed [for at least six (6) months] and otherwise prevented the GU/BRT's ability to conduct railroad operations at the Yard.

64. The GU and BRT have been ready, willing and able to commence their use of the Yard since at least July 2003, and would have begun these operations but for the Town's position. Thus, the GU has suffered, and is at this moment continuing to suffer monetary damages and ongoing lost business opportunities. Six months of payments under the proposed terms of the GU/BRT agreement would have amounted to $30,000.00. In addition, at its current location, BRT has averaged the receipt of eleven (11) railcars per month for the last twelve (12) calendar months. Given this

8

same volume of traffic, BRT would have brought sixty-six (66) railcars into the Yard over the last six (6) months. Applying the credits for these railcars as per the proposed agreement, the total monthly payments would have been reduced to $23,400.00. The GU has also lost, and is continuing to lose, the $250.00 fee it is expected to collect from the shipper of each of these railcars. Given the loss of sixty-six (66) shipments over the last six (6) months, the GU has suffered additional lost revenues in the amount of $16,500.00. Thus, the total lost revenue to date amounts to $41,000.00. So long as the Town continues to obstruct the GU's ability to use its Yard, the GU will continue to lose $7,650.00 per month. Finally, the GU has incurred, and continues to incur, attorneys' fees and other costs associated with this dispute.

65.    The Town's STB Petition, if allowed to run its course through the STB's proceedings, will further delay, frustrate and prevent the GU from conducting railroad operations at the Yard.

66.    The Town's current position, and its' Petition, will also likely permanently and irrevocably damage the GU's ability to conduct its business, at the Yard or otherwise, since the BRT will most likely relocate its operations to another location, thereby depriving the GU of this unique business opportunity.

67.    The proposed agreement with BRT is extremely unique due to the fact that there are no other terminal railroads in the region that are in need of a rail yard and the services that the GU can provide at the Yard. If the GU does not resolve this dispute as soon as possible, and move the BRT into its Yard, then it will lose the BRT as a tenant and lose the income which results from having the BRT at the Yard. During the late

summer and into the fall the BRT advised the GU that, unless the GU could resolve

its dispute with the Town, it would need to find another location to relocate its

operations.  It is the GU's understanding and belief that the BRT has been actively

looking for another suitable location for its operations due to the GU's inability to

resolve its dispute with the Town.

68.     The BRT agreement, and the income it is expected to generate, is integral to the GU's

economic survival and its ability to finance further development.

SIGNED UNDER THE PENALTIES AND PAINS OF PERJURY THIS 26Th DAY OF
DECEMBER, 2003.

Bridget Lucey
General Manager
Grafton and Upton Railroad Company

G:\F & A\CASE FILES\Grafton & Upton RR\milford secondary-allen marsh\Affidavit of Bridget Lucey.memo of law.doc

10

# EXHIBIT "2"

**Case** (Released after 10:30 AM)

**Docket No.**  **Title**
FD 33466 0  BOROUGH OF RIVERDALE--PETITION FOR DECLARATORY ORDER--THE NEW YORK SUSQUEHANNA AND WESTERN RAILWAY CORPORATION

## Decision Summary

GRANTED THE BOROUGH'S REQUEST TO INSTITUTE A DECLARATORY ORDER AND ESTABLISHED A PROCEDURAL SCHEDULE.

## Download Files

The WordPerfect (WPD) version of this decision is provided as a courtesy and should not be used for citation purposes. The PDF file represents the official Board decision.

**WP Envoy (requires  WordPerfect viewer)**

⬜ - 29023.evy        ⬜ - 29023.wpd

If you are attempting to view a .EVY file and do not have an Envoy reader, you may download this free software from this link.

## Full Text of Decision

29023 SERVICE DATE - LATE RELEASE SEPTEMBER 10, 1999

EB

SURFACE TRANSPORTATION BOARD

DECISION

STB Finance Docket No. 33466

BOROUGH OF RIVERDALEPETITION FOR DECLARATORY ORDER

THE NEW YORK SUSQUEHANNA AND WESTERN RAILWAY CORPORATION

Decided: September 9, 1999

On September 8, 1997, the Borough of Riverdale (the Borough), a New Jersey municipal corporation, filed a petition for a declaratory order in this case. The Borough seeks a determination regarding the extent to which certain facilities constructed and operated in Riverdale by The New York, Susquehanna and Western Railway Corporation (NYSW) are covered by the federal preemption provisions contained in 49 U.S.C. 10501(b), as broadened by the ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803, 807 (1995) (ICCTA).

The Borough contends, among other things, that the railroad's construction of a truck terminal and corn processing plant in a residential zone in Riverdale without first obtaining approval from the municipal Planning Board raises health and safety concerns. It asks for a ruling regarding whether the facilities are subject to federal jurisdiction, and, if so, the extent to which local laws and regulations (specifically zoning ordinances) apply. NYSW did not file a reply.[1] As discussed below, we will (1) grant the Borough's request that we institute a declaratory order proceeding, (2) summarize relevant recent agency and court cases construing the ICCTA and its effect on state and local regulation, to assist the parties and the court in resolving some of the preemption questions raised in this case, and (3) establish a schedule for the submission of further pleadings by the Borough, NYSW and other interested persons.[2]

## BACKGROUND

This controversy arises from the Borough's opposition to NYSW's construction and use of certain facilities within or between two residential zones of Riverdale. The facts, as represented by the Borough in the material furnished to us (its complaint and other material from the Borough's civil action seeking injunctive relief in New Jersey State court),[3] are as follows.

The facilities in question, a truck terminal, weigh station, and corn processing plant, evidently were constructed either within NYSW's right-of-way or on property that it owns adjacent to the right-of-way. The right-of-way, which is 100 feet wide, is situated on 3.59 acres within Riverdale. In addition to the right-of-way, NYSW owns a small parcel of land immediately adjacent to and west of the northernmost portion of the right-of-way, with 28 feet of frontage on the Paterson-Hamburg Turnpike. An asphalt parking area provides access to a former railroad passenger depot located within the right-of-way. The 1,080-foot portion of the right-of-way to the north is within the Riverdale central business area, while the 485-foot portion of the right-of-way to the south is between two residential zones.[4]

A water pipe installed within the right-of-way apparently has 20 or more outlets to transfer hot water to standing railroad tank cars for the purpose of heating the materials inside the tank cars to facilitate transfer of the materials to trucks. The outlets are located on the west side of the track, and there is a 20-foot wide paved area to accommodate the trucks that separates the track from the adjacent residences. The Borough is concerned about the potential for spills and malfunctions in the heat transfer process that could result in adverse environmental impacts. The Borough further states that NYSW has also established a corn processing facility that would bring 10 to 20 tanker trucks to the site per day to off-load its rail cars. These activities allegedly violate Riverdale's land use and permissive zoning ordinances as prohibited uses within this residential district.

In addition to these activities, the truck weigh station, which is located adjacent to the eastern edge of NYSW's property approximately 158 feet from where the property intersects with the Paterson-Hamburg Turnpike, allegedly poses a risk of injury to the public because of the proximity of large tractor trailers to high tension power lines. Concern was also expressed that NYSW's construction activities may cause flooding, disrupt traffic, and produce unacceptable noise levels for the town's firehouse and library located next door.

According to the material filed by the Borough, NYSW's construction activities took place without appropriate municipal approvals and permits and have resulted in noncompliance with local ordinances. [5] The Borough states that NYSW's agents, asserting that their activities were permitted under Federal

law, opened local hydrants, filled its paver machines, and paved from Hamburg Turnpike to Post Lane, thereby connecting NYSW's property to local streets and county roads. The Borough also alleges that the improvements violate the landscaping buffer regulations that require 10-foot width buffer adjacent to and parallel with any street and provide for a buffer not less than 25 feet in width for lots contiguous to any residentially zoned lot.

In the Borough's civil suit, the court, by decision entered September 7, 1996, ordered: (1) NYSW to file a Site Plan Application with the Borough's Planning Board; (2) the Borough to review the application, subject to its standard procedures, but in a way that would not inappropriately obstruct the operation of NYSW's facility; and (3) the Borough to approve the application by January 31, 1997, or report back to the court for further proceedings. The court also directed NYSW to: (1) stop further construction except for emergency measures that were to be reported to Riverdale; and (2) comply with "applicable safety, health and welfare regulations." At the same time, the court determined that NYSW is not "bound by Local Zoning regulations as to Land Use and Utilization," which the court found to be preempted by the ICCTA. The court added that the Borough "shall not use regulatory measures regarding safety, environmental or health matters as a device for getting rid of NYSW's [Riverdale facilities]." Nor, in the court's words, can the Borough "preclude or interfere with [NYSW's] operation of the facilities."[6]

## DISCUSSION AND CONCLUSIONS

We will exercise our discretionary authority to institute a declaratory order proceeding pursuant to 5 U.S.C. 554(e) and 49 U.S.C. 721 to eliminate the controversy and remove uncertainty on the preemption questions raised in this case. We will express our understanding of the nature and effect of the preemption in 49 U.S.C. 10501(b) as it relates to the appropriate role of state and local regulation (including the application of local land use or zoning laws or regulations and other state and local regulation such as building codes, electrical codes, and environmental laws or regulations) regarding the construction and operation of NYSW's facilities in Riverdale.

We did not attempt to move this proceeding forward sooner because of the pendency of the "Stampede Pass" litigation.[7] Now that that litigation has concluded, we will establish in this decision a schedule for the submission of opening statements and replies by the Borough and the railroad.[8] We are providing the opportunity for further filings to ensure that we have the specific information we need to address the issues where interested parties may seek an answer. As noted, the record consists mainly of material from a state court proceeding decided in 1996, before many of the recent Board and court decisions addressing the reach of the ICCTA preemption provisions were issued. Moreover, the record before us at this point does not reflect what has taken place in Riverdale following the issuance of the New Jersey state court's September 1996 decision.

In any event, to provide guidance, we will summarize here recent relevant agency and court decisions concerning the reach of the express statutory preemption in section 10501(b). This precedent gives us a basis, with the material provided by the Borough, to now address certain issues raised by the Riverdale case where the law has become well settled as to how preemption applies. Other issues presented in this case involving what types of state and local regulation of railroad facilities and activities may be appropriate under the ICCTA have not yet been directly addressed by the agency or the courts. As to these types of issues, we are providing our preliminary conclusions, in light of the existing court precedent, as to how a court would likely apply the preemption provisions. Our preliminary conclusions, of course, could change depending on our understanding of the facts after we have reviewed the parties' comments, evidence and arguments. Finally, there may be additional unresolved preemption issues as to which parties believe the Board should provide clarification that involve the extent to which state and local governments may regulate a railroad's construction plans or the operation of its facilities.

I. Existing Precedent.

When it finds it necessary to do so, Congress has the authority to preempt, that is, to provide for the application of federal rather than state or local law. State and local railroad regulation has long been preempted to a significant extent. See Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 318 (1981) (historically, the Interstate Commerce Act was recognized as "among the most pervasive and comprehensive of federal regulatory schemes.").

In 1980, Congress adopted "an exclusive Federal standard, in order to assure uniform administration of the regulatory standards of the Staggers [Rail] Act of [1980]." H.R. Rep. No. 104-311, reprinted in 1995 U.S.C.C.A.N. 807-08 (ICCTA Conference Report). In 1995, in the ICCTA, Congress broadened the express preemption, so that both "the jurisdiction of the Board over transportation by rail carriers" and "the remedies provided under [49 U.S.C. 10101-11908] are exclusive and preempt the remedies provided under Federal or State law." 49 U.S.C. 10501(b). See City of Auburn, 154 F.3d at 1029-31.

A. Court Rulings. Many rail construction projects are outside of the Board's regulatory jurisdiction. For example, railroads do not require authority from the Board to build or expand facilities such as truck transfer facilities, weigh stations, or similar facilities ancillary to their railroad operations, or to upgrade an existing line or to construct unregulated spur or industrial team track.[9] In such cases, we can provide advice about how preemption applies, but we have no direct involvement in the process. Thus, the interpretation of the preemption provisions has evolved largely through court decisions in cases outside of our direct jurisdiction and in which we were not a party.

One court that has addressed the issue concluded that zoning ordinances and local land use permit requirements are preempted by 49 U.S.C. 10501(b) where the facilities are an integral part of the railroad's interstate operations. In particular, in Norfolk Southern Ry. v. City of Austell, No. 1:97-cv-1018-RLV, 1997 U.S. Dist. LEXIS 17236, at 17 n.6 (N.D. Ga. 1997) (Austell), the court found that a local land use permit was not required before a railroad could construct and operate an intermodal facility. The court held that "a city may not . . . attempt to regulate land use and planning via local laws when Congress' intent to preempt such local laws is clear and manifest." Similarly, other courts have viewed the preemption provisions broadly. See CSX Transp., Inc. v. Georgia Public Service Com'n, 944 F. Supp. 1573, 1581 (N.D. Ga. 1996) (Georgia) ["It is difficult to imagine a broader statement of Congress' intent to preempt state regulatory authority over railroad operations" than Congress provided in 49 U.S.C. 10501(b)]; Burlington N. Santa Fe Corp. v. Anderson, 959 F. Supp. 1288, 1294-95 (D. Mont. 1997) (the preemption provisions in ICCTA show an intent to occupy the entire field of regulation).[10]

B. Board Rulings. Where railroad activities have required Board approval, the Board has had occasion to address the scope of the Federal preemption law. In the Stampede Pass cases, the Board found that state and local permitting or pre-clearance requirements (including environmental requirements) are preempted because, by their nature, they interfere with interstate commerce by giving the state or local body the ability to delay or deny the carrier the right to construct facilities or conduct operations. The Ninth Circuit, in reviewing the matter, agreed and specifically rejected (as contrary to the statutory text and unworkable in practice) the argument that the statutory preemption in section 10501(b) is limited to state and local "economic" regulations. City of Auburn, 154 F.3d at 1029-31.[11]

At the same time, in Stampede Pass we expressed our view that not all state and local regulations that affect railroads are preempted.[12] In particular, we stated that state or local regulation is permissible where it does not interfere with interstate rail operations, and that localities retain certain police powers

to protect public health and safety.[13] We also explained that state and local agencies can play a significant role under many federal environmental statutes. We offered the following examples of state and local regulation that in our view would not be preempted:[14]

[E]ven in cases where we approve a construction or abandonment project, a local law prohibiting the railroad from dumping excavated earth into local waterways would appear to be a reasonable exercise of local police power. Similarly, . . . a state or local government could issue citations or seek damages if harmful substances were discharged during a railroad construction or upgrading project. A railroad that violated a local ordinance involving the dumping of waste could be fined or penalized for dumping by the state or local entity. The railroad also could be required to bear the cost of disposing of the waste from the construction in a way that did not harm the health or well being of the local community.

Finally, in the Stampede Pass cases we noted that, where Board authorization is required, state and local governments can participate in the Board's environmental review process under NEPA and related laws. We further concluded that Congress did not intend to preempt federal environmental statutes such as the Clean Air Act and the Clean Water Act.

II. The Application of This Precedent To Riverdale's Petition.

The Riverdale petition involves construction activities that do not require our regulatory approval. Nevertheless, we can issue a declaratory order explaining how we believe those issues might be analyzed by a court with appropriate jurisdiction.

A. Local Zoning Ordinances. The Borough has specifically requested that we address whether local zoning ordinances apply to the facilities constructed by NYSW in Riverdale. Given the broad language of section 10501(b) and the recent court and agency decisions construing it, it is well settled that, as the New Jersey state court determined, the Borough can not apply its local zoning ordinances to property used for NYSW's railroad operations. The Borough suggests in its petition that NYSW should have located its transloading facilities not in Riverdale but in a nearby industrial zone and that one of NYSW's alleged zoning violations is "non-permitted use of land." But as the court found, the zoning regulations that the Borough would impose clearly could be used to defeat NYSW's maintenance and upgrading activities, thus interfering with the efficiency of railroad operations that are part of interstate commerce. As the courts have found, this is the type of interference that Congress sought to avoid in enacting section 10501(b). See Austell, at 22 (local zoning ordinance and land use permitting requirements "frustrate and conflict with Congress' policy of deregulating and rejuvenating the railroad industry"); Georgia, 944 F. Supp. at 1583.

B. Local Land Use Restrictions. Local land use restrictions, like zoning requirements, can be used to frustrate transportation-related activities and interfere with interstate commerce. To the extent that they are used in this way (e.g., that restrictions are placed on where a railroad facility can be located), courts have found that the local regulations are preempted by the ICCTA. Austell; City of Auburn. Of course, whether a particular land use restriction interferes with interstate commerce is a fact-bound question. In that regard, the material provided by the Borough indicates that the Borough would require a 25-foot landscaped buffer between residential zones and NYSW's transportation facilities. As the railroad has not been involved in our proceeding, and as we know few specifics about the buffer issue, we cannot say at this time whether such a requirement, if applied in such a way as not to discriminate against railroads, would significantly interfere with NYSW's railroad operations and interstate commerce. Parties may file further information and comment on this issue.

C. Environmental and Other Public Health and Safety Issues. Similarly, recent precedent has made it

clear that, to the extent that they set up legal processes that could frustrate or defeat railroad operations, state or local laws that would impose a local permitting or environmental process as a prerequisite to the railroad's maintenance, use, or upgrading of its facilities are preempted because they would, of necessity, impinge upon the federal regulation of interstate commerce.[15] City of Auburn, 154 F.3d at 1029-31; Stampede Pass, slip op. at 6-7. That means that, while state and local government entities such as the Borough retain certain police powers and may apply non-discriminatory regulation to protect public health and safety, their actions must not have the effect of foreclosing or restricting the railroad's ability to conduct its operations or otherwise unreasonably burdening interstate commerce.[16] We cannot go beyond these general principles here without more information as to the particular police power issues that may be involved in this case. Parties may file further information and comment on these issues.

D. Building Codes. Given the broad language of 49 U.S.C. 10501(b) and the case law interpreting it, our preliminary view is that local entities such as the Borough can not require that railroads seek building permits prior to constructing or using railroad facilities because of the inherent delay and interference with interstate commerce that such requirements would cause.[17] At the same time, we believe local authorities can take actions that are necessary and appropriate to address any genuine emergency on railroad property, and that interstate railroads such as NYSW are not exempt from certain local fire, health, safety and construction regulations and inspections.

Specifically, under the law enacted by Congress, as interpreted by the courts, it appears to us that state and local entities can enforce in a non-discriminatory manner electrical and building codes, or fire and plumbing regulations, so long as they do not do so by requiring the obtaining of permits as a prerequisite to the construction or improvement of railroad facilities. With regard to the kinds of inspections that are permissible on property owned or used by interstate railroads, the potential for interference depends on the nature of the action by the state or local government and the effect on rail transportation and Board remedies; we see no simple, clear line of demarcation that has been or could be drawn, except that the inspection requirements or local regulations must be applied and enforced in a non-discriminatory manner and that preclearance permitting requirements plainly are preempted. E.g., City of Auburn; Stampede Pass. Again, we cannot go beyond these general principles here without more information about particular inspection and similar requirements that may be at issue in this case. Parties may file further information and comment on these issues.

E. Other Issues As to Which Comments May Be Filed. The Borough has also raised complaints about NYSW's facilities that concern surfacing, fence height, site distance for ingress and egress, roads, train utility stations, the truck weigh station, and the truck depot. We do not have enough information to determine whether the non-discriminatory application of state or local regulation regarding those matters would unduly restrict NYSW's ability to provide transportation-related facilities and service. Parties may file further information and comment as to these matters, and any other unresolved preemption issues as to which parties believe the Board should provide clarification.

F. Non-Transportation Facilities. Finally, it should be noted that manufacturing activities and facilities not integrally related to the provision of interstate rail service are not subject to our jurisdiction or subject to federal preemption. According to the Borough, NYSW has established a corn processing plant. If this facility is not integrally related to providing transportation services, but rather serves only a manufacturing or production purpose, then, like any non-railroad property, it would be subject to applicable state and local regulation. Our jurisdiction over railroad facilities, like that of the former ICC, is limited to those facilities that are part of a railroad's ability to provide transportation services, and even then the Board does not necessarily have direct involvement in the construction and maintenance of these facilities. See Growers Marketing Co. v. Pere Marquette Ry., 248 I.C.C. 215, 227 (1941). We

cannot determine from the current record whether this facility is actually a corn processing plant or some sort of transloading operation (for the transfer of corn syrup, for example) that is related to transportation services. Accordingly, NYSW, in its opening statement, should describe the exact nature of this facility.

G. Summary. In this decision, we have (1) expressed our views on the local zoning ordinance issues raised; (2) expressed some general views and authorized the filing of additional information as to certain local land use issues; (3) expressed some general views and authorized the filing of additional information about environmental and similar issues, and about building codes; (4) authorized the filing of further information about the physical characteristics of the NYSW facilities; and (5) sought additional information about the corn processing plant. The views that the Board has expressed are based primarily on the interpretation by the courts of the statutory provisions on preemption.

This action will not significantly affect either the quality of the human environment or the conservation of energy resources.

It is ordered:

1. A declaratory order proceeding is instituted. This proceeding will be handled under the modified procedure, on the basis of written statements submitted by interested persons. All persons submitting comments must comply with the Board's Rules of Practice.

2. NYSW must file an opening statement by November 9, 1999

3. The Borough must file an opening statement by November 9, 1999.

4. Other interested persons may file comments by December 9, 1999.

5. NYSW and the Borough may file replies by December 29, 1999.

6. This decision, which, along with the Borough's petition (including attachments), will be served on NYSW, is effective on its service date.

By the Board, Chairman Morgan, Vice Chairman Clyburn, and Commissioner Burkes.

Vernon A. Williams

Secretary

1. The Borough did not include in its petition a certificate showing service on NYSW. See 49 CFR 1104.12. We will serve a copy of the Borough's petition (including attachments) and a copy of this decision on NYSW.

2. The material we have before us at this point does not permit a resolution of every one of the many preemption issues raised. We have only the Borough's initial filing, which consists principally of copies of New Jersey State court records and related documents. Nevertheless, the filing is sufficient to permit

us to explain how certain preemption issues would be resolved under the statute; to support a determination that a question exists for which declaratory relief is appropriate; and to warrant institution of a declaratory order proceeding.

3. Borough of Riverdale v. NYSW, No. MRS-L-2297-96 (Superior Court of New Jersey, Law Division - Morris County) (Riverdale). The Board was not a party in that court case.

4. These residential zones evidently were established in September 1991 by Riverdale's Planning Board under its Master Plan. The boundary line between the two zones was set at the center of NYSW's right-of-way.

5. The Borough states that NYSW applied to the Morris County Soil Conservation Board for approval and that, after Morris County notified the Borough, the railroad informed the Borough that it wished to bring trailers to the site. Subsequently, a Borough engineer conducted a site inspection. The Borough then advised that the planned activities required a site plan and variances. The railroad evidently took the position that it could proceed with work construction pursuant to federal law.

6. The court also severed the Borough's complaint challenging NYSW's right to cross public roads, and transferred it to the Chancery Division of the Superior Court of New Jersey. This part of the complaint was predicated upon the theory that NYSW does not have an easement over these streets, which were termed "public rights-of-way." The complaint seeks an order directing NYSW to remove all rail and related fixtures "placed in the public domain without appropriate rights-of-way."

7. King County, WA--Petition for Declaratory Order--Burlington Northern Railroad Company--Stampede Pass Line, STB Finance Docket No. 33095 (STB served Sept. 25, 1996), clarified, Cities of Auburn and Kent, WA--Petition for Declaratory Order--Burlington Northern Railroad Company--Stampede Pass Line, STB Finance Docket No. 33200 (STB served July 2, 1997) (Stampede Pass), aff'd, City of Auburn v. STB, 154 F.3d 1025 (9th Cir. 1998), cert. denied, 119 S. Ct. 2367 (1999) (City of Auburn).

8. A notice that we are instituting this proceeding also will be published in the Federal Register.

9. See Nicholson v. ICC, 711 F.2d 364, 368-70 (D.C. Cir. 1983), cert. denied, 464 U.S. 1056 (1984).

10. See also Georgia Pub. Serv. Comm'n v. CSX Transp. Inc., 481 S.E.2d 799, 801 (Ga. Ct. App. 1997); In re Burlington N.R.R., 545 N.W.2d 749, 751 (Neb. 1996).

11. The court explained that ". . . if local authorities have the ability to impose 'environmental' permitting regulations on the railroad, such power will in fact amount to 'economic regulation' if the carrier is prevented from constructing, acquiring, operating, abandoning, or discontinuing a line." City of Auburn, 154 F.3d at 1031. Although it recognized that some statutes limit preemption as to state and local environmental regulation, the court found preemption under provisions such as section 10501(b) to be broad. Id.

12. We also determined in Stampede Pass that section 10501(b) does not nullify the Board's own obligation to follow the requirements of the National Environmental Policy Act, 42 U.S.C. 4321 et seq. (NEPA), and related federal environmental laws in contexts where they are applicable. See 49 CFR 1105.1. Because the Board itself controls the proceedings in which it applies those requirements, there is no risk of interference with our jurisdiction over rail transportation.

13. See H.R. Conf. Rep. No. 104-422 at 167, reprinted in 1995 U.S.C.A.A.N. 850, 852 (identifying criminal law prohibitions on bribery and extortion as examples of the police powers that the Act does not preempt); Robey et al. -- Petition for Declaratory Order -- Levin et al., STB Finance Docket No. 33420 (STB served June 17, 1998).

14. Stampede Pass, slip op. at 7.

15. Railroads are required to provide adequate facilities for their traffic. Interchange of Freight at Boston Piers, 253 I.C.C. 703, 707 (1942). Moreover, an incident of the right to construct and operate a line is the right to maintain it and keep it in good operating condition. See Detroit/Wayne v. ICC, 59 F.3d 1314, 1317 (D.C. Cir. 1995). Accordingly, interfering with such activities could interfere with a railroad's right to operate its lines.

16. Notwithstanding the usual presumption to the contrary [see Shanklin v. Norfolk Southern Ry., 173 F.3d 386, 394 (6th Cir. 1999), citing Hillsborough County v. Automated Med. Lab., Inc., 471 U.S. 707, 719 (1985); Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516 (1992)], even health and safety regulation is preempted where Congress intended to preempt all state and local law. As explained in City of Auburn, 154 F.3d at 1030-31, congressional intent to preempt a state or local permitting process for prior approval of rail activities and facilities related to interstate transportation by rail is explicit in the plain language of section 10501(b) and the statutory framework surrounding it.

17. The Borough evidently seeks to require NYSW to obtain building permits for all construction activity, and a certificate of occupancy for NYSW's depot.