# EXHIBIT "3"

STB Finance Docket No. 33200

21005
EB

SERVICE DATE - JULY 2, 1997

SURFACE TRANSPORTATION BOARD

DECISION

STB Finance Docket No. 33200

CITIES OF AUBURN AND KENT, WA--PETITION FOR DECLARATORY ORDER--
BURLINGTON NORTHERN RAILROAD COMPANY--
STAMPEDE PASS LINE

Decided: July 1, 1997

On October 11, 1996, the Cities of Auburn and Kent, WA (the Cities or petitioners) requested a declaratory order to the effect that state and local environmental, building, and land use permitting authority can be imposed on improvements associated with the modernization by the Burlington Northern Railroad Company (BN)[1] of its Stampede Pass railroad line in the state of Washington, and is not preempted by federal law. Specifically, the Cities contend that their local land use and environmental permitting authority is not preempted by the ICC Termination Act of 1995 (ICCTA) or the environmental review process undertaken by this agency pursuant to the National Environmental Policy Act (NEPA). BN replied, opposing the Cities' petition.[2] The Cities then responded to BN's reply, as did BN to the Cities' response.

BACKGROUND

1. *The Nature of the Case.* Because BN owned and operated two other main line routes serving the Seattle-Tacoma, WA area, BN sold the eastern portion of its Stampede Pass main line —a 151-mile segment between Cle Elum and Pasco, WA—and several branch lines to the Washington Central Railroad Company (WC) in 1986.[3] After the sale, BN continued to provide

---

[1] Now, The Burlington Northern and Santa Fe Railway Company.

[2] King County, WA filed a petition to intervene as an interested party. That request will be granted.

[3] *See Washington Central Railroad Company, Inc.--Exemption Acquisition and Operation--Certain Lines of Burlington Northern Railroad Company*, Finance Docket No. 30916

- 1 -

STB Finance Docket No. 33200

some local service over the western approximately 78-mile portion of the line between Auburn and Cle Elum. Due to increases in rail traffic after the sale, however, BN proposed to reacquire the Stampede Pass lines from WC and reestablish the Stampede Pass as a third main line route. Accordingly, in June 1996, BN and its affiliates sought our approval under 49 U.S.C. 11323-25 to acquire control of WC and operate WC's 151-mile segment of the Stampede Pass line in concert with its western portion.[4] That proceeding—which is not directly at issue here—was docketed as STB Finance Docket No. 32974.[5] See p. 5-6, infra.

After 12 years of limited use, the Stampede Pass line was in need of modernization, repairs, and improvements. This work included (1) replacement of track sidings, (2) replacement of maintenance-of-way buildings and snow sheds, (3) improvement of the Stampede Pass tunnels, and (4) installation of communication towers. BN initially submitted certain permit applications for these projects to local authorities. During the permit review process, however, BN suggested that any environmental review of the project should exclude railroad operations, which are regulated exclusively by the federal government.

In light of BN's position, King County, WA (the County), on May 8, 1996, asked the Surface Transportation Board (Board) for an informal opinion as to whether ICCTA preempts the County's authority to evaluate or condition BN's proposed operations of the Stampede Pass rail line within the County and to issue grading, building or conditional use permits for construction. BN joined in the County's request for an informal opinion on May 31, 1996, requesting

---

(ICC served Oct. 3, 1986).

[4] BN and its affiliates also proposed to acquire certain of WC's branch lines and assume WC's obligation to operate over Union Pacific Railroad Company's Yakima Branch line between Kennewick and Yakima, WA.

[5] In that proceeding, BN explained that the Stampede Pass line would provide an important link to international markets in the Pacific Rim and that rail freight traffic to be transported on this line would be important to the future economic growth of the Pacific Northwest. Its proposal to put the Stampede Pass route back in service was supported by the Ports of Seattle and Tacoma, the State Department of Transportation, and communities in the eastern part of the state. None of the commenters to BN's proposal raised any competitive concerns. Indeed, many of the commenters recognized the benefits to be derived from BN's ability to offer a shorter route for certain traffic and, at the same time, reduce congestion on other BN routes for time sensitive traffic. The Cities participated in our proceeding. They did not oppose the project, although they expressed concern about the potential environmental impacts that could result from increased traffic and requested environmental conditions during the course of our environmental review process to mitigate those impacts.

STB Finance Docket No. 33200

expedited action so that, if the railroad obtained a favorable decision, the repairs and improvements to the Stampede Pass line could begin by July 1, 1996.[6] BN recognized that the states retain their police powers with respect to railroad safety. However, it stated that the County's powers over its repairs and upgrades are extremely limited due to broad federal preemption of railroad transportation. Citing ICCTA, judicial, and Interstate Commerce Commission (ICC) precedent, it asserted that allowing localities to regulate rail line maintenance and upgrading through an environmental review and permitting process would paralyze the national rail transportation system.

On June 20, 1996, the Secretary of the Board issued to the County and BN an informal, nonbinding opinion that the County's permitting process was preempted by ICCTA.[7] The Secretary noted that the County, if allowed to subject BN to the permitting process, could delay or deny BN authority to undertake the improvements to the Stampede Pass line and thus could in effect prevent BN from operating the line. As a result, he concluded that the state or local permitting process appeared to interfere with the federal licensing program and unreasonably burden interstate commerce. At the same time, the Secretary recognized that state and local governments were entitled to protect the health and safety of their citizens through means other than the permitting process.[8]

On August 21, 1996, the County petitioned for a formal declaratory order similar to the one currently sought by the Cities. The County argued, as the Cities maintain here, that BN was required to obtain local permits before undertaking improvements to the Stampede Pass rail line. In *King County, WA--Petition for Declaratory Order--Burlington Northern Railroad Company--Stampede Pass Line*, STB Finance Docket No. 33095 (STB served Sept. 25, 1996) (*King*

---

[6] BN explained that, if work did not begin by that date, it would seriously jeopardize the railroad's ability to complete the repairs and improvements before the onset of winter ended the work season in the area.

[7] While the Secretary limited the scope of his opinion to preemption under ICCTA, he noted (Informal Opinion at 2, n.2) that BN also must comply with the safety and environmental requirements imposed by other federal statutes, such as the Clean Water Act's National Pollution Discharge System program involving water quality issues relating to spills into lakes or streams. Train noise also is subject to federal jurisdiction, and local standards may not be imposed unless identical to federal standards. 42 U.S.C. 4916(c); 49 CFR Part 210.

[8] Based on the Secretary's opinion, BN withdrew its pending grading, building, and shoreline application permits that had been filed with the County.

*County*),[9] we determined (slip op. at 4) that ICCTA wholly preempts the County's permitting of construction relating to the reopening of the Stampede Pass:

> The County permitting process contemplated for this project would both interfere with the federal licensing program and unreasonably burden interstate commerce. Accordingly, it would be preempted by the ICCTA.

No stay of *King County* was sought from us or from the Ninth Circuit.

The Cities were not parties to the County's petition, and did not initially seek to formally intervene in our *King County* proceeding. On September 17, 1996, however, the City of Auburn sent a letter to the Board as an "interested party." In that letter, the City of Auburn requested that it be designated a party of record in *King County*, and asked that we defer action in *King County* until we had the opportunity to consider the City of Auburn's position on this matter. The City of Kent also requested a ruling from us on local government preemption.

In view of the County's and BN's requests for expedition in *King County*, we denied the Cities' requests to intervene in *King County*, and declined to delay the issuance of our declaratory

---

[9] The City of Auburn also filed a lawsuit in King County Superior Court seeking a declaratory judgment that BN's proposed improvements to the Stampede Pass line are subject to state and local permitting and a writ of mandamus directing the County and Kittitas County to order construction stopped until permits are obtained. At BN's request, that case was removed to the United States District Court for the Western District of Washington on September 30, 1996. *City of Auburn v. King County Et Al.*, No. C96-1565-Z. BN then moved to dismiss the district court case for lack of jurisdiction, explaining that the action constituted a collateral attack on *King County*, which could only be challenged in a United States Court of Appeals under the Hobbs Act, 28 U.S.C. 2321(a) and 2342. On January 7, 1997, the district court granted the motion to dismiss.

The City of Auburn, which had not been a party to the administrative proceeding in *King County*, filed a petition for judicial review of *King County* in *City of Auburn v. STB*, U.S.C.A. 9th Cir. No. 96-71051 (pet. for review filed November 22, 1996). BN then filed a motion to dismiss the lawsuit (which we supported), explaining that City of Auburn was not a "party aggrieved" within the meaning of 28 U.S.C. 2344 and therefore lacked standing to file a petition for judicial review. By order dated March 26, 1997, the court granted BN's motion to dismiss in part. The court agreed that because City of Auburn was not a party to the proceedings below, it lacked standing to obtain review on the merits of *King County*. However, noting that it may have jurisdiction to review our denial of City of Auburn's request to intervene in *King County*, the court directed the parties to brief that issue. That court proceeding remains pending in the Ninth Circuit.

order in that proceeding (which was decided on September 25, 1996, only 8 days after the date of the City of Auburn's letter). *See King County,* at 1 n. 2. However, we invited the Cities to submit their own petition for declaratory order in a separate docket (*id.*), and on October 11, 1996, the Cities accepted our invitation and filed the instant petition requesting a declaratory order similar to the one previously requested by the County. The Cities' petition, in effect, is a petition for reconsideration of our decision in *King County,* and we will treat it as such.[10]

Subsequently, in a decision served October 25, 1996, we approved BN's proposed control of WC and operation of WC's segment of the Stampede Pass rail line. In that proceeding, we conducted an environmental review under NEPA of BN's proposed operation of the entire Stampede Pass line. *See Burlington Northern Sante Fe Corporation, BNSF Acquisition Corp., and Burlington Northern Railroad Company--Control--Washington Central Railroad Company*, STB Finance Docket No. 32974 (STB served Oct. 25, 1996), *pending review in City of Auburn v. United States*, U.S.C.A. 9th Cir. 97-70022 (pet. for review filed December 20, 1996) (*BNSF Control*).[11]

---

[10] In their petition for declaratory order, the Cities alternatively ask the Board to vacate *King County* to permit the matter to be resolved judicially. That request will be denied. It is appropriate for us to issue a declaratory order addressing the jurisdictional questions presented here, subject, of course, to the right of a dissatisfied party to seek judicial review. *See, e.g.*, 5 U.S.C. 554(e); 49 U.S.C. 721(a); *Gray Lines Tour Co. v. ICC*, 824 F.2d 811, 815 (9th Cir. 1987); *Texas v. United States*, 866 F.2d 1546 (5th Cir. 1989) (agencies have jurisdiction to determine the scope of their jurisdiction).

[11] As required by our environmental rules for proceedings where (as in this case) the railroad has demonstrated that the particular proposal would involve operational changes that meet the agency's thresholds for environmental review but were not expected to result in a significant environmental impact (*see* 49 CFR 1105.6(b)(4), 1105.6(d)) an Environmental Assessment (EA) was prepared. The EA was based on the information provided by BN or the third-party consultant, consultation with appropriate environmental agencies, and independent investigation and verification by the Board's Section of Environmental Analysis (SEA). The EA also assessed and developed environmental mitigation to address potential environmental impacts based on an increase in traffic to the City of Auburn. (Our environmental documentation did not address the potential effects of upgrading, maintaining, or rehabilitating the line because those actions were within the railroad's management discretion and did not require our approval. *See BNSF Control* at 9.)

The EA was made available for public comment. SEA then issued a detailed Post Environmental Assessment (Post EA) based on its investigation of the comments received. The Post EA recommended final environmental mitigation measures and concluded that, if the mitigation recommended in the Post EA were imposed and implemented, the project would not have significant environmental impacts. The comments to the EA, the EA, and the Post EA were

   *2. The Parties' Claims.* In their petition for declaratory order, the Cities concede that local law is preempted by Federal law if: (1) Congress expressly preempts such activity; (2) Federal law so thoroughly occupies a legislative area that it is reasonable to conclude that Congress intended to prohibit local regulation of the activity; (3) Federal law or regulation actually conflicts with state or local law; or (4) State or local law discriminate against or unreasonably burden interstate commerce. Petitioners maintain, however, that none of these criteria apply to BN's proposed improvements to the Stampede Pass line. According to the Cities, there is nothing in ICCTA that directly preempts state or local law with respect to railroad transactions such as this one. Any incidental effect of local law on interstate commerce, the Cities argue, is legitimately within their police power and justified by the benefits accruing to the local populace and environment.

   Petitioners complain that our decisions in *King County* and *BNSF Control* have allowed BN's Stampede Pass improvements to be virtually unregulated. The mitigation measures imposed on the carrier in *BNSF Control*, the Cities maintain, lack substance and do not adequately address their environmental or safety concerns. The Cities assert that the Board's decision in *King County* is not binding on local agencies or the courts because the decision is merely advisory and the Board lacks expertise in state and local environmental matters.

   BN by contrast argues that all state and local permitting regulations for BN's improvements to the Stampede Pass are preempted by federal law.

DISCUSSION AND CONCLUSIONS

---

forwarded to us for consideration in making our decision in the case. We then issued our October 1996 decision granting the application with various environmental mitigating conditions to address environmental concerns raised by petitioners and others. We concluded that, as conditioned, the *BNSF Control* proceeding would not have significant environmental impacts. The Cities then filed their environmental court challenge of *BNSF Control*, which remains pending in the Ninth Circuit.

STB Finance Docket No. 33200

We will exercise our discretionary authority to issue a declaratory order in this proceeding to eliminate controversy and remove uncertainty on the preemption issue raised by petitioners.[12] 5 U.S.C. 554(e) and 49 U.S.C. 721. We will not attempt here to analyze any particular ordinances or local regulatory requirements; the review of individual ordinances or state or local regulations is beyond the scope of our limited inquiry in this case and is more appropriately an issue for the courts. However, we will set out in this decision our view of our role, and the appropriate role of state and local regulation, in regulating BN's reactivation of the Stampede Pass line.

At the outset, we reaffirm here our determination in *King County* (at pp. 3-5) that a state or local permitting process for prior approval of this project, or of any aspect of it related to interstate transportation by rail, would of necessity impinge upon the federal regulation of interstate commerce and therefore is preempted. The power to authorize the construction of railroad lines and the power to authorize railroads to operate over them has been vested exclusively in the Board by 49 U.S.C. 10901. The ICCTA abolished the ICC, established the Board as the successor to the ICC, and revised the law as it existed in the former Interstate Commerce Act, all effective January 1, 1996. The Board now has exclusive authority over the construction and operation of rail lines that are part of the interstate rail network, pursuant to 49 U.S.C. 10501(b) and 10901. The ICC and court precedents regarding the ICC's preemptive authority now apply to the Board's authority. *See* ICCTA section 205.

In the Transportation Act of 1920, Congress established a comprehensive scheme of federal regulation of track additions and deletions by interstate railroads like BN.[13] *Chicago & N.W. Tr. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 318 (1981) (*Kalo Brick*) (ICC abandonment authority is plenary and exclusive); *Transit Comm'n v. United States,* 289 U.S. 121 (1933) (same for constructions). Moreover, under the Commerce and Supremacy Clauses of the United States Constitution, "there can be no divided authority over interstate commerce * * * . [T]he acts of Congress on that subject are supreme and exclusive." *Missouri Pac. R.R. v. Stroud*, 267 U.S. 404, 408 (1925). *See also Edgar v. MITE Corp.*, 457 U.S. 624, 640 (1982); *Kalo* Brick, 450 U.S. at 318. Indeed, Congress in ICCTA confirmed that the Board's jurisdiction over transportation by rail carriers like BN is exclusive and preempts the remedies under Federal

---

[12] It should be noted, however, that at this point there may be little need for our guidance. As discussed above, no stay of *King County* was sought from us or from the Ninth Circuit, and it is our understanding that the improvements to the Stampede Pass line largely have been completed.

[13] The BN line through Stampede Pass was built before Congress gave the ICC the authority to approve the construction of rail lines, but authority to approve the construction of the line was "grandfathered" under the provisions of the 1920 Act.

or state law. 49 U.S.C. 10501(b)(2). *See also* 49 U.S.C. 11321(a) (a transaction approved under 49 U.S.C. 11323-25 is exempt from state or local law "as necessary to let that rail carrier . . . carry out the transaction . . . and operate property"). Thus, any state or local statute that requires an interstate railroad like BN to obtain state or local approval before construction or abandonment of a line, or a merger or acquisition of control, would appear, on its face, to conflict with ICCTA and is preempted.

In *King County*, we indicated that, in transactions such as *BNSF Control* requiring Federal approval and federal environmental review, there is no role for state and local agencies to play other than to participate in the Federal environmental review process under NEPA for the proposed action. Because there are significant roles for state and local agencies under various federal statutes, including environmental statutes, we want to clarify that statement here. For example, the Clean Air Act requires states to implement plans to protect and enhance air quality so as to promote the public health and welfare. *See* 42 U.S.C. 7401 *et seq*. Rather than relegating state and local agencies to the periphery in implementing Federal law, the statutory scheme gives individual states the responsibility of developing and enforcing air quality programs that meet or exceed the national standards within their borders.[14] *See Chevron v. U.S.A. Inc., Hammond,* 726 F.2d 483, 489 (9th Cir. 1984) (Hammond), *cert. denied,* 471 U.S. 1140 (1985). Nothing in *King County* or this decision is intended to interfere with the role of the states and local entities in implementing these federal laws.

Moreover, as explained in *King County* and the Secretary's informal opinion, not all state and local regulations that affect interstate commerce are preempted. A key element in the preemption doctrine is the notion that only "unreasonable" burdens, *i.e.*, those that "conflict with" Federal regulation, "interfere with" Federal authority, or "unreasonably burden" interstate commerce, are superseded. The courts generally presume that Congress does not lightly preempt state law. *Medtronic Inc. v. Lora Lohr*, 116 S. Ct. 2240, 2250 (1996). Also, preemption does not deprive the states of the "power to regulate where the activity regulated [is] a merely peripheral concern" of Federal law. *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 243 (1959). *See CSX Transportation v. Easterwood*, 507 U.S. 658 (1993) (federal regulations adopted by the Secretary of Transportation under the Federal Railroad Safety Act preempt negligence action only insofar as it was alleged that petitioner's train was traveling at an excessive speed).

---

[14] *See also* comparable state responsibilities under the Federal Water Pollution Control Act, 33 U.S.C. 1251 *et seq.*, and the Safe Drinking Water Act, Pub. L. No. 93-523.

In short, where the state or local law can be applied without interfering with the Federal law, the courts have done so. *See Hayfield Northern R.R. v. Chicago & N.W. Transp. Co.*, 467 U.S. 622 (1984) (state proceeding to condemn railroad property did not interfere with the Interstate Commerce Act because the state process followed the abandonment of the line pursuant to the ICC's process and the line was no longer part of the national transportation system). Local law, however, is preempted when the challenged state statute "stands as an obstacle to the accomplishment and execution to the full purposes and objectives of Congress." *Perez v. Campbell*, 402 U.S. 637, 649 (1971), quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). Local law also is preempted where there is a compelling need for uniformity. *Hammond*, 726 F.2d at 491. We believe that there is such a need in connection with the interstate rail system, which spans every state in the Continental United States.

As a result, we believe that state or local laws that would impose a local permitting or environmental process on BN's operations on, or maintenance or upgrading of, the Stampede Pass line are preempted to the maximum extent permitted by the Constitution. As explained in *King County* and the Secretary's informal opinion, an incident of the carrier's receipt of authority to construct a line is the right to maintain and improve it to keep it in operable condition.[15] This is necessary to remedy wear and tear and to meet the changing needs of the market for rail services by, for example, enlarging or raising tunnels to accommodate bigger cars, raising towers to employ new communication systems, or replacing sidings to accommodate more traffic. Moreover, a state or local permitting process implies the power to deny authorization, which could frustrate the activity that is subject to federal control. If BN were unable to undertake the projects, or if its ability to commence projects to maintain and upgrade its facilities were substantially delayed pending resolution of a state or local permitting or environmental process, its ability to carry rail traffic over the Stampede Pass line could be greatly inhibited, if not foreclosed. Given these circumstances, it appears that state or local permitting or environmental requirements would both interfere with the federal licensing program and unreasonably burden interstate commerce.

At the same time, we agree with the Secretary's informal opinion that there are areas with respect to railroad activity that are reasonably within the local authorities' jurisdiction under the Constitution. For example, even in cases where we approve a construction or abandonment project, a local law prohibiting the railroad from dumping excavated earth into local waterways would appear to be a reasonable exercise of local police power. Similarly, as noted by the Secretary, a state or local government could issue citations or seek damages if harmful substances were discharged during a railroad construction or upgrading project. A railroad that

---

[15] *See, e..g., Detroit/Wayne Port Authority v. ICC*, 59 F.3d 1314, 1317 (D.C. Cir. 1995) (while initial construction of a rail line requires authority from the Board, improvements to existing lines do not require an additional license or environmental review).

STB Finance Docket No. 33200

violated a local ordinance involving the dumping of waste could be fined or penalized for dumping by the state or local entity. The railroad also could be required to bear the cost of disposing of the waste from the construction in a way that did not harm the health or well being of the local community. We know of no court or agency ruling that such a requirement would constitute an unreasonable burden on, or interfere with, interstate commerce. Therefore, such requirements are not preempted.

We also agree with the Cities that state or local laws providing for permitting and environmental review, in other areas, need not be found to discriminate against interstate commerce. This process, initiated in the state legislature or local governing body, is ordinarily within the localities' legitimate policing powers. However, where the local permitting process could be used to frustrate or defeat an activity that is regulated at the Federal level, the state or local process is preempted. Here, the Cities' admitted goal is to constrain BN's train operations that we have already approved in *BNSF Control* in order to force BN to fund infrastructure improvements related to the line. For example, Charles A. Booth, mayor of the City of Auburn, has indicated that:

We do not appreciate having to devote substantial effort to thwarting the Railroad's plans but their actions leave little other choice.

We are told the benefit of separated grade crossings accrue mostly to the citizens, therefore, the expense of constructing such should be a local responsibility. All the City has ever asked is that those who benefit or profit from the "improvements" be responsible for cleaning up the mess and mitigating the negative impacts upon the City.[16]

*See also*, the County's petition for declaratory order in *King County*, filed August 27, 1996, where, in view of the City of Auburn's threatened court action against the County, the County requested our formal decision on whether BN can be required, through the local permitting process, to construct overpasses, underpasses, and natural or artificial noise barriers to mitigate the effects of increased train traffic through the City.

Petitioners' claim that we ignored or overlooked their local concerns is unfounded. As noted (*see supra* note 11), in *BNSF Control* the Board engaged in an appropriate environmental review under NEPA and our environmental rules and adopted environmental mitigation conditions to address the environmental concerns that had been raised during the environmental review process by petitioners and others, including mitigation in the City of Auburn.[17]

---

[16] City of Auburn letters to the Board, dated May 15 and October 21, 1996.

[17] The environmental impacts on the City of Kent were not considered because SEA found that Kent was not on the Stampede Pass line and would incur no direct environmental

- 10 -

STB Finance Docket No. 33200

Petitioners cannot use this declaratory order proceeding to mount a collateral attack on, or seek to substitute a state or local environmental review process for, the agency's environmental review under NEPA in *BNSF Control*.[18] See *Toye Bros. Yellow Cab Co. v. Irby*, 437 F.2d 806, 810 (5th Cir. 1971). Rather, what we said on the environmental issues that were addressed there is conclusive, subject to the right of the Cities (or any other interested parties) to seek judicial review, under the appropriate standards, if they are dissatisfied with the scope or outcome of the agency's NEPA process.[19]

We did not review the construction aspects of BN's improvements because *BNSF Control* was an inter-carrier consolidation under 49 U.S.C. 11323-25, rather than a construction project under 49 U.S.C. 10901. We therefore appropriately limited our environmental review to the operational changes that we were approving. Had this been a construction case, any reasonable concerns relative to BN's compliance with local land use and building codes would have been considered in detail in our environmental review and our decision.

---

impacts. Moreover, evidence of record in that case showed that rail traffic in Kent will decrease by an average of one train a day as a result of the reopening of the Stampede Pass line to transcontinental traffic.

[18] It is noteworthy here that the State is <u>not</u> attempting to apply its own environmental review.

[19] As noted, the Cities' environmental court challenge of *BNSF Control* is currently pending in the Ninth Circuit.

Petitioners complain that our decision in *King County* creates a regulatory void that Congress could not have intended. In such instances, according to the Cities, the states may impose their own oversight authority. As an example, petitioners maintain that states have residual regulatory authority over spur or switching tracks that are excepted from our jurisdiction pursuant to 49 U.S.C. 10906. Under section 10501(b)(2) of ICCTA, however, we have "exclusive" jurisdiction over spur or switching tracks located entirely in one state. When sections 10906 and 10501(b)(2) are read together, it is clear that Congress intended to remove our authority over the entry and exit of these auxiliary tracks, while still preempting state jurisdiction over them, leaving the construction and disposition of auxiliary tracks entirely to railroad management. *See* Conference Report on ICCTA, explaining that section 10501(b)(2) was added "[i]n light of the exclusive Federal authority over auxiliary tracks and facilities * * *." H.R. Rep. No. 104-422, 104th Cong., 1st. Sess. 167 (1995).[20] Thus, although we may not regulate the construction and disposition of spur and switching tracks, it is equally clear that state and local authorities may not regulate those activities either.[21] *See, e.g., Morales v. Trans World*

---

[20] The Cities' reliance on *Illinois Commerce Comm'n v. ICC*, 879 F.2d 917 (D.C. Cir. 1989), is misplaced. In that case, the court concluded that the states had jurisdiction over abandonments of spur track under section 10907(b)(1) of the former Interstate Commerce Act. *Illinois Commerce Comm'n*, however, was expressly overruled by Congress in ICCTA through the enactment of section 10501(b)(2).

The Cities incorrectly suggest that the local permitting they seek to impose is only peripheral to and not in conflict with the Board's jurisdiction. As we stated in *King County*, at p. 4:

> the permitting process implies the power to deny authorization and thereby to frustrate the activity that must be sanctioned. If BN[] were unable to undertake the projects, or if its ability to commence projects to maintain and upgrade its facilities were substantially delayed pending resolution of environmental issues, its ability to carry rail traffic over the Stampede Pass line could be greatly inhibited, if not foreclosed. Given these circumstances, it appears that the county permitting process contemplated for this project would both interfere with the federal licensing program and unreasonably burden interstate commerce. Accordingly, it would be preempted by the ICCTA.

[21] The Cities concede that section 10501 contains express preemption language, but argue that the section does not govern the local environmental, land use, or building permit regulatory authority they seek to have enforced. However, section 10501(b)(2) grants the Board *exclusive* jurisdiction over rail transportation and the "practices, routes, services, and facilities" of rail carriers. Section 10102(9) in turn broadly defines "transportation" as including " a locomotive, car, vehicle, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, and services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling,

*Airlines*, 504 U.S. 374 (1992); *Schneidewind v. ANR Pipeline Co*, 485 U.S. 293 (1988); *Transcontinental Gas Pipe Line Corp. v. State Oil & Gas Bd.*, 474 U.S. 409 (1986); *G&T Terminal Packaging Co. v. Consolidated Rail Corp.*, 830 F.2d 1230 (3d Cir. 1987), *cert. denied*, 485 U.S. 988 (1988).

     As BN states, Congress would not have totally preempted the states from regulating the construction, operation, and abandonment of spur and switching tracks in ICCTA if it had intended to permit continued state regulation -- through a permitting process or otherwise -- of main line interstate trackage, such as the Stampede Pass line, which has a significant impact on interstate commerce. *See* H.R. Rep. No. 104-311, 104th Cong., 1st Sess. 95 (1995) ("Although States retain the police powers reserved by the Constitution, the Federal scheme of economic regulation and deregulation is intended to address and encompass all such regulation and be completely exclusive. Any other construction would undermine the uniformity of Federal standards and risk the balkanization and subversion of the Federal scheme of minimal regulation for this intrinsically interstate form of transportation.")

     Finally, we note that none of BN's Stampede Pass construction projects criticized by petitioners is located within their municipal boundaries or jurisdiction.[22] As noted, it is apparent that petitioners' primary concern is the increased level of train traffic through their respective cities. After reviewing the Cities' concerns in this regard, we specifically addressed the operational impacts of BN's acquisition in *BNSF Control* and imposed appropriate environmental mitigation measures. The Cities are clearly dissatisfied with the environmental mitigation we imposed, but that does not justify their application of local land use and building codes to force BN to make additional concessions. We think that their effort to do so results in an unreasonable burden on interstate commerce. In addition, the Cities' attempt to use local law in such a manner constitutes an improper collateral attack on our decision in *BNSF Control*. Therefore, while we have clarified *King County* to make it clear that state and local entities have important roles in implementing various federal statutes, we agree with that decision's ultimate

---

and interchange of passengers and property...." The Stampede Pass line plainly is "property," a "facility," or a "route" used in "transportation by [a] rail carrier." Moreover, BN's operations over, and repair and upgrading, that line are "services related to the movement . . . of . . . property." In short, the Stampede Pass line constitutes property and facilities subject to the exclusive jurisdiction of the Board. That jurisdiction encompasses the original licensing and construction of the line, subsequent maintenance and upgrade projects on the line, and BN's operations over the line.

[22] The proposed snow sheds, communications towers, service facilities buildings, and parking lots are located outside petitioners' city limits.

STB Finance Docket No. 33200

ruling that state or local permitting or environmental review of BN's upgrading of the Stampede Pass line goes too far, and that Congress intended to preempt all regulation of this project under state law or local ordinances to the maximum extent permitted by the Constitution.

This action will not significantly affect either the quality of the human environment or the conservation of energy resources.

*It is ordered*:

1. The request to intervene by King County, WA, is granted.

2. The Cities' petition for declaratory order will be treated as a petition for reconsideration of *King County*.

3. *King County* is modified to the extent discussed above. In all other respects, the petition for reconsideration of *King County*, and the Cities' petition for declaratory order, are denied.

4. This proceeding is terminated.

5. This decision is effective 30 days from the date of service.

By the Board, Chairman Morgan and Vice Chairman Owen.

Vernon A. Williams
Secretary

- 14 -