# EXHIBIT "4"

Case 4:03-cv-40291-NMG   Document 3-4   Filed 12/29/2003   Page 1 of 19

**Case** (Released after 10:30 AM)
**Docket No.**                **Title**
FD 33971 0                    JOINT PETITION FOR DECLARATORY ORDER - BOSTON AND MAINE CORPORATION AND TOWN OF AYER, MA

## Decision Summary
FOUND THAT AYER'S PLANNING BOARD PERMIT PROCESS, THE ORDINANCE DETERMINING THAT AUTOMOBILE UNLOADING FACILITIES ARE A "NOISOME TRADE" OR NUISANCE, AND THE CONSERVATION COMMISSION'S PRE-APPROVAL PROCESS ARE ALL PREEMPTED UNDER 49 U.S.C. 10501(B) AND THE COURT AND AGENCY DECISIONS INTERPRETING IT; AND (2) PROVIDED GUIDANCE FOR THE COURT AS TO THE REASONABLENESS OF THE TYPES OF CONDITIONS AYER WOULD HAVE IMPOSED ON GUILFORD IN THIS CASE.

## Download Files
The WordPerfect (WPD) version of this decision is provided as a courtesy and should not be used for citation purposes. The PDF file represents the official Board decision.

**WordPerfect**           **Graphics/Maps/Figures:**
- 31506.wpd               - 31506.pdf

Size of PDF File: **0.09** MB

Approximate download time at 28.8 : **0.5** Minute(s)

**Note:**
Some installations of Adobe Acrobat 3 browser plug-ins cannot open large PDF files. If you experience problems viewing our files, we recommend upgrading to an Acrobat 4 reader available free at **www.adobe.com**.

## Full Text of Decision

31506

SERVICE DATE - LATE RELEASE MAY 1, 2001

EB

SURFACE TRANSPORTATION BOARD

DECISION

STB Finance Docket No. 33971

JOINT PETITION FOR DECLARATORY ORDER - BOSTON AND

MAINE CORPORATION AND TOWN OF AYER, MA

Decided: April 30, 2001

In a decision served December 22, 2000 (the December 2000 decision), we instituted this declaratory order proceeding in response to a joint petition filed by Boston and Maine Corporation, Springfield Terminal Railway Co., and Guilford Transportation Industries, Inc. (collectively, Guilford) and the town of Ayer, Massachusetts. We instituted the proceeding to address the extent to which regulation by Ayer of Guilford's proposed construction and operation of an automobile unloading facility is preempted by 49 U.S.C. 10501(b),[1] as broadened by the ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803 (1995) (ICCTA).

Statements were filed by Guilford, Ayer, the Littleton Electric Light and Water Department (a division of the municipal government of Littleton, Massachusetts) (together with Ayer, the towns), the Association of American Railroads (AAR), and the Norfolk Southern Corporation and Norfolk Southern Railway Company.

As discussed below, it is our view, based on the evidence presented by the parties, that Ayer's Planning Board permit process, the ordinance determining that automobile unloading facilities are a "noisome trade" or nuisance, and the Conservation Commission's pre-approval process are all preempted under 49 U.S.C. 10501(b) and the court and agency decisions interpreting it. In addition, we provide general guidance for the court as to the reasonableness of the types of conditions Ayer would have imposed on Guilford in this case.

BACKGROUND

This matter was referred to us by order dated October 19, 2000, by the United States District Court for the District of Massachusetts in Boston and Maine Corp. et al. v. Town of Ayer et al., Case No. 99-CV-12606 JLT (Boston & Maine). The court asked that we "evaluat[e] the right of the defendants, if any, to regulate the plaintiffs' proposed development off Willow Road in the Town of Ayer . . . [to] assist this Court in determining the rights, duties, and obligations of the parties."

As described by the parties, since 1974, Guilford has operated an automobile unloading facility (existing facility) on 40 acres of land in Ayer's "Heavy Industry District."[2] In 1997, Guilford purchased a 126-acre parcel of land (the San Vel site) located across the road from the existing facility. This site is bordered by two rail lines, and since 1997 has been used by Guilford for off-loading rail cars and storage.[3]

Guilford plans to construct and operate a second car unloading facility (new facility) on 57.7 acres of the San Vel site, which will include an access road, 6 unloading and 2 support tracks to be used for car switching and storage, a parking area for about 3,000 cars, and a 55-foot by 75-foot maintenance building. About 40 acres of this site will be surfaced. The new facility, which like the existing facility will be located entirely within a "Heavy Industry District," will be used for unloading, temporarily storing, and transferring cars to motor carriers for distribution in New England.

The new facility is located in an aquifer area categorized as a Zone II wellhead protection area, which "is an area where precipitation will enter the ground and migrate towards a drinking water well."[4] It is also in the Zone III protection area (which is an "upgradient watershed to a drinking water source") for Littleton's well at Spectacle Pond.[5] Ayer receives drinking water from 2 wells at Spectacle Pond. Littleton gets water from a third well situated at the opposite end of the Pond. The three wells have a collective capacity of about 3.5 million gallons a day, and provide about 50% of the combined drinking water capacity of Ayer and Littleton.

Guilford states that it will take appropriate action to address the risk of pollutant leaks at the new facility.[6] It explains that new automobiles will arrive at the new facility with less than one gallon of gas in their fuel tanks and the normal quantity of motor oil. There is to be no maintenance or fueling of the autos at the new facility, and, if an automobile arrives damaged, the vehicle will be removed from the site and repaired elsewhere.[7] In the event that an auto were to leak fuel or oil onto the pavement of the new facility, the leak would drain into one of the approximately 40 catch basins that will be installed to contain any spills of fuel or motor oil.[8]

Guilford will place an impermeable membrane and an isolated drainage system under the entire portion of the site over which the locomotives will travel. Guilford states that, should a fuel or oil leak from a locomotive occur, the spill would be retained in a structure that drains the impermeable membrane so that it would not reach the aquifer. The spill contents then would be removed from the structure and disposed of in accordance with applicable regulations.[9] Accordingly, Guilford maintains that there will be no threat of pollution to the San Vel site or the aquifer.[10]

Guilford began seeking local approval for construction in November 1997. In May 1998, it filed an application with the Ayer Planning Board requesting site plan approval. Ayer hired Camp, Dresser & McKee (CDM) as environmental consultants to review Guilford's plans. CDM's report to the town concluded that Guilford's initial proposal to pave the San Vel site could retard percolation and reduce the water flow to the aquifer, and accordingly recommended certain changes to Guilford's plans. Guilford then incorporated into the design of the new facility "almost all the features and adjustments requested by . . . CDM, that relate to aquifer protection."[11] The Planning Board issued a certificate of approval for the new facility on August 26, 1999, but made the permit subject to 36 separate conditions, which are listed in the Appendix to this decision.

In accordance with a state conservation law,[12] Guilford filed a "notice of intention" for the new facility with the Conservation Commission in April 1998, but that agency has not yet issued any ruling addressing the plans. Moreover, on November 17, 1999, the Ayer Board of Health determined that auto unloading facilities are a "noisome trade" and could thus be prohibited within town limits.[13] Guilford claims that this action could threaten both the new facility and continued operations at the existing facility.

On December 20, 1999, Guilford filed its court action in Boston & Maine seeking a declaratory judgment, injunctive relief, and damages based on the ICCTA preemption provision and the Supremacy and Commerce Clauses of the Constitution. On October 19, 2000, the court stayed its proceedings and referred the matter to us. In our December 2000 decision instituting a proceeding, we asked the parties to address whether the project comes under 49 U.S.C. 10901 or 10906;[14] whether the conditions set by Ayer interfere with interstate railroad operations; and whether we should address both the existing and new facilities or only the new facility.

## POSITION OF PARTIES

The towns argue that Ayer can regulate the new facility because most of the regulation it seeks to impose is rooted in the Safe Drinking Water Act, 42 U.S.C. 300f et seq. (SDWA), and the Clean Water Act, 33 U.S.C. 1311 et seq. (CWA).[15] The towns point to Board precedent[16] indicating that, where state and local entities have been given enforcement authority under Federal environmental statutes such as the SDWA and the CWA, the actions of the local entities are not preempted by section 10501(b). They state that, where there are two overlapping Federal statutes capable of coexistence, courts will give effect to both, by reading them together, assuming that Congress did not intend to create an inconsistency. The towns contend that Congress did not intend, when it enacted ICCTA, to allow railroads to act without regard to the environment. Absent town regulation, they claim, there would be a regulatory void that Congress did not intend. The towns note that we undertake an environmental review under the National Environmental Policy Act, 42 U.S.C. 4321 et seq. (NEPA), only when Board authorization is needed. When authorization from us is not required, as in actions that fall within section 10906, they claim that state and local entities can step in and perform their role under Federal environmental statutes such as the CWA to fill the regulatory void.

Guilford does not object to the towns' imposing appropriate after-the-fact remedial measures should Guilford cause environmental injury.[17] But it argues that Ayer's efforts to inhibit the facility or to block it entirely by imposing prior restraints -- the Ayer Planning Board's site plan permit (with its 36 conditions), the Board of Health's determination that automobile unloading facilities are a "noisome trade" or nuisance, and the preconstruction review of the Conservation Commission -- are preempted under section 10501(b).[18] Guilford contends that the SDWA and CWA are not applicable here; that, if those statutes apply, ICCTA preempts them; and that, in any event, the towns in fact are applying local law, and only using the CWA and SDWA as a pretext. Additionally, Guilford argues that Ayer's actions should be voided as (1) discriminatory (because other local businesses have not faced similar

restrictions)[19] and (2) an undue burden on interstate commerce.

Guilford states that it is unlikely that substantial volumes of pollutants will be leaked by the new cars at the new facility.[20] Guilford indicates that it will comply with "the substance" of the town ordinances concerning aquifer protection and that its operations will meet the requirements of Massachusetts regulations for aquifers.[21] The railroad notes that the Massachusetts Department of Environmental Protection concluded in a recent study that the new facility poses no risk to the Littleton water supply and, if the system proposed by Guilford is implemented, no risk to the Ayer water supply either.[22] Moreover, Guilford states that it provided the Environmental Protection Agency (EPA) with detailed information about the project, but EPA has never expressed any concerns about it.[23]

## DISCUSSION AND CONCLUSIONS

Section 10901 vs. Section 10906.

We agree with the parties that this project does not come within section 10901. Railroads are not required to obtain Board approval under section 10901 to build or expand facilities that are ancillary to a railroad's operations unless the activity is part of a larger project subject to our jurisdiction (such as construction of a new rail line). See Nicholson, 711 F.2d at 368-70. Railroads also do not require authority from us to upgrade an existing line, to increase the level of traffic on a line, or to construct "spur," "industrial," or "switching" track." 49 U.S.C. 10906; Detroit/Wayne County Port Auth. v. ICC, 59 F.3d 1314 (D.C. Cir. 1995). Indeed, "[t]rackage . . . used in the loading, reloading, storage and switching of [rail] cars incidental to the receipt of shipments by the carrier or their delivery to the consignee . . . is 'spur, industrial, team, switching or side tracks'" under section 10906. Railway Labor Executives Ass'n v. City of Galveston, 849 F.2d 145, 148 (5th Cir. 1988) (quoting New Orleans Terminal Co. v. Spencer, 366 F.2d 160, 165-66 (5th Cir. 1966)).

New Facility/Existing Facility.

In light of the court's referral order, which, as noted above, is limited to the new facility, we will focus on that facility. However, the legal principles set out in this decision can provide general guidance as to how section 10501(b) applies to state and local regulation of the existing facility.

The General Parameters of Preemption Under Section 10501(b).

State and local railroad regulation has long been preempted to a significant extent. See Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 318 (1981) (historically, the Interstate Commerce Act was recognized as "among the most pervasive and comprehensive of federal regulatory schemes."). In 1980, Congress adopted "an exclusive Federal standard, in order to assure uniform administration of the regulatory standards of the Staggers [Rail] Act of [1980]." H.R. Rep. No. 104-311, reprinted in 1995 U.S.C.C.A.N. 807-808 (ICCTA Conference Report). In 1995, in ICCTA, Congress broadened the express preemption, so that both "the jurisdiction of the Board over transportation by rail carriers" and "the remedies provided under [49 U.S.C. 10101-11908] are exclusive and preempt the remedies provided under Federal or State law." 49 U.S.C. 10501(b). See City of Auburn, 154 F.3d at 1029-31; Riverdale I at 5. Several courts have held that this statutory preemption applies even in cases,-- such as the construction of ancillary facilities under section 10906, as involved here -- where we lack licensing and conditioning authority and therefore do not conduct our own environmental review. See cases cited in Riverdale I at 5-9 and in Borough of Riverdale -- Petition for Declaratory Order -- The New York Susquehanna and Western Railway Corporation, STB Finance Docket No. 33466 (STB served Feb. 27, 2001) (Riverdale II). [24] As the court stated in CSX Transp., Inc. v. Georgia Pub. Serv. Comm'n, 944 F. Supp. 1573, 1581 (N.D. Ga. 1996), "[i]t is difficult to imagine a broader statement of Congress' intent to preempt state regulatory authority over railroad operations" than that contained in section 10501(b).

Court and agency precedent interpreting the statutory preemption provision have made it clear that, under this broad preemption regime, state and local regulation cannot be used to veto or unreasonably interfere with railroad operations. Thus, state and local permitting or preclearance requirements (including environmental requirements) are preempted because by their nature they unduly interfere with interstate commerce by giving the local body the ability to deny the carrier the right to construct facilities or conduct operations. See Stampede Pass; City of Auburn, 154 F.3d at 1029-31.

As the courts also have found in addressing the scope of section 10501(b), zoning ordinances and local land use permit requirements are preempted where the facilities are an integral part of the railroad's interstate operations. Austell; Ridgefield Park. Moreover, in Ridgefield Park, the court found that section 10501(b) precluded the state court from adjudicating common law nuisance claims involving noise and air pollution from a railroad maintenance facility because to do so would infringe on the Board's exclusive jurisdiction over the location and operation of railroad facilities.

This does not mean that all state and local regulations that affect railroads are preempted. As we stated in Stampede Pass, 2 S.T.B. at 337-38, and Riverdale I, state and local regulation is permissible where it does not interfere with interstate rail operations, and localities retain certain police powers to protect public health and safety.[25] For example, non-discriminatory enforcement of state and local requirements such as building and electrical codes generally are not preempted. Id. at 8-9; Flynn. While a locality can not require permits prior to construction, the courts have found that a railroad can be required to notify the local government "when it is undertaking an activity for which another entity would require a permit" and to furnish its site plan to the local government. Ridgefield Park.

Furthermore, a town may seek court enforcement of voluntary agreements that the town had entered into with a railroad, notwithstanding section 10501(b), because the preemption provisions should not be used to shield the carrier from its own commitments, and "voluntary agreements must be seen as reflecting the carrier's own determination and admission that the agreements would not unreasonably interfere with interstate commerce." Township of Woodbridge, NJ et al. v. Consolidated Rail Corporation, Inc., STB Docket No. 42053 (STB served Dec. 1, 2000), at 5 (Woodbridge).

Finally, nothing in section 10501(b) is intended to interfere with the role of state and local agencies in implementing Federal environmental statutes, such as the Clean Air Act, the CWA, and the SDWA. See Stampede Pass, 2 I.C.C.2d at 337 & n.14; Riverdale I at 7.[26] Thus, the lack of a specific environmental remedy at the Board or under state and local laws (as to construction projects such as this, over which the Board lacks licensing power) does not mean that there are no environmental remedies under other Federal laws.

Of course, whether a particular Federal environmental statute, local land use restriction, or other local regulation is being applied so as to not unduly restrict the railroad from conducting its operations, or unreasonably burden interstate commerce, is a fact-bound question. Accordingly, individual situations need to be reviewed individually to determine the impact of the contemplated action on interstate commerce and whether the statute or regulation is being applied in a discriminatory manner, or being used as a pretext for frustrating or preventing a particular activity, in which case the application of the statute or regulation would be preempted.

This Case.

Both Ayer and Littleton acknowledge that a prior restraint interferes with interstate commerce and is preempted under section 10501(b).[27] Nevertheless, the towns argue that Ayer can regulate the new facility because most of the regulation it seeks to impose is rooted in the SDWA and the CWA, which are not preempted.[28] However, those statutes may not be used simply to permit local communities to hold up or defeat the railroad's right to construct facilities used in railroad operations through the guise of saying they are enforcing the CWA or the SDWA, as Ayer appears to be doing here.

Guilford has presented arguments why the CWA and the SDWA may not even apply to the new facility.[29] But even if those statutes were found to be applicable, it appears that Ayer is simply using them as a pretext to do what Congress expressly precluded: interfere with interstate commerce by imposing a local permitting or environmental process as a prerequisite to the railroad's ability to conduct its operations. The towns insist that there is a potentially significant water quality problem that needs to be addressed here. But as Guilford notes, an expert agency, the Massachusetts Department of Environmental Protection, recently concluded that, with the mitigation system proposed by Guilford, the new facility poses no threat to the local water supply. Moreover, EPA, which was given detailed information about

the project, has expressed no concerns about it.

The record supports Guilford's argument that it is unlikely that substantial volumes of pollutants will be leaked by the new cars at the new facility. Guilford agrees to comply with the substance of the Ayer ordinances addressing aquifer protection, and has incorporated the recommendations of Ayer's contractor in making its final plans to protect against pollutant leaks and degradation of water quality. Guilford indicates that it will comply with best management practices and that the new facility will include a system for artificial recharge of precipitation that meets the requirements of the applicable Massachusetts Department of Environmental Protection regulations for Zone II aquifers. The impermeable membrane and catch basins that Guilford will install should provide protection if a fuel or oil leak occurs. And Guilford will also conduct appropriate monitoring of water quality and the rate at which the aquifer is being recharged.

In these circumstances, the towns cannot reasonably argue that Ayer is basing its various permitting requirements, prohibitions, and conditions on the SDWA and the CWA. Rather, the record here supports the conclusion that the SDWA or the CWA are being used merely as a pretext. As Ayer's actions do not appear needed to carry out the SDWA or the CWA, we agree with Guilford and AAR that the noisome trade ordinance, [30] the Ayer Planning Board permit process, and the Conservation Commission's pre-construction approval process are preempted under the statutory preemption provision and the case law interpreting it. See City of Auburn; Riverdale I; Stampede Pass; Ridgefield Park.

The 36 Conditions.

Finally, as not all state and local regulation that affects railroads is preempted -- and some of the 36 conditions (see Appendix) that the Ayer Planning Board would have imposed on Guilford in August 1999 might be reasonable measures in and of themselves -- we will offer some general observations regarding the kinds of restrictions that might be reasonable in individual circumstances.[31]

Both the courts and the Board have found that railroads, while exempt from traditional permitting and zoning processes, are not necessarily exempt from other generally applicable laws.[32] Like any citizen or business, railroads have some responsibility to work with communities to seek ways to address local concerns in a way that makes sense and protects the public health and safety, and to assume responsibility if they act negligently. But at the same time, literal compliance with state or local laws often may be impractical in cases involving railroad facilities. Thus, as the court indicated in Ridgefield Park, a certain degree of pragmatism on the part of communities and cooperation on the part of railroads is necessary to reach reasonable solutions to state and local concerns that do not unreasonably interfere with interstate commerce.[33]

Examples of solutions that appear to us to be reasonable include conditions requiring railroads to (1) share their plans with the community, when they are undertaking an activity for which another entity would require a permit; [34] (2) use state or local best management practices when they construct railroad facilities; (3) implement appropriate precautionary measures at the railroad facility, so long as the measures are fairly applied; [35] (4) provide representatives to meet periodically with citizen groups or local government entities to seek mutually acceptable ways to address local concerns; and (5) submit environmental monitoring or testing information to local government entities for an appropriate period of time after operations begin. [36]

Communities also can enforce their local codes for electrical, building, fire, and plumbing, [37] unless the codes are applied in a discriminatory manner, unreasonably restrict the railroad from conducting its operations, or unnecessarily burden interstate commerce. Moreover, railroads may not deny towns access in emergencies and for reasonable inspection of the railroad facilities. And to the extent a railroad is willing to undertake an activity or restriction, the activity or restriction generally should be seen as reflecting the carrier's own determination that the condition is reasonable and will not unduly burden interstate commerce. [38] See Woodbridge.

This action will not significantly affect either the quality of the human environment or the conservation of energy resources.

It is ordered:

1. This proceeding is discontinued.

2. This decision is effective 30 days from the date of service.

3. A copy of this decision will be served on:

United State District Court, District of Massachusetts

(Attn: District Judge Joseph L. Tauro)

(RE: Case No. 99-CV-12606 JLT)

United States Courthouse

1 Courthouse Way - Suite 2300

Boston, MA 02210

By the Board, Chairman Morgan, Vice Chairman Clyburn, and Commissioner Burkes.

Vernon A. Williams

Secretary

## APPENDIX

TERMS AND CONDITIONS

1. Guilford shall install a sewer line to their lot line, as part of the original project and shall connect to the Town's sewer, at Guilford's sole expense, within 6 months of receiving notice from the Town that the Town's Wastewater System, is accessible to Guilford's property.

2. Prior to construction, Guilford shall provide a detailed monitoring plan for water quality as discussed in Camp Dresser & McKee, Inc.'s (CDM) memorandum from Andrew Miller regarding "Review of Environmental Monitoring Plan - Ayer, MA" dated May 18, 1999 and summarized in CDM's memorandum "Final Report on Proposed Guilford Automobile Transfer Facility" dated June 30, 1999 (Groundwater Quality Section). Guilford shall bear all expenses associated with water quality monitoring.

3. Guilford shall provide the Planning Board with final copies of the Spill Prevention Control and Countermeasures Plan and the Stormwater Pollution Prevention Plan prior to construction.

4. Guilford shall provide detailed design plans for the retention basin showing all grade contours and spot grades, inverts of control structures and slope treatments prior to construction. The plans shall be stamped by a Registered Professional Engineer.

5. Guilford shall provide a plan showing the drainage areas on the site and demonstrating the 50/50 split in flows to each basin system prior to construction.

6. The Stormwater Calculations indicate that, except under the most extreme events, the infiltration basins will not see any significant flows. Guilford shall provide the Planning Board with similar as[-]built percolation rates for the detention and infiltration ponds upon construction. If the as-built percolation rates are not within acceptable bounds, then the pond system must be reconstructed to provide [ ] acceptable percolation rates.

7. Guilford shall submit, for review and approval, detailed design drawings for the catch basins including the oil/gas separator hoods from the vendor who will supply them prior to construction.

8. Guilford has proposed a monitoring well network around the site for both groundwater quality and quantity. There is also an existing network of Monitoring Wells. Guilford shall measure groundwater elevations for the existing and new wells monthly during the first year after construction of the paved areas and new wells monthly during the first year after construction of the paved areas is completed to determine any trends in groundwater elevation. Guilford shall provide the Town's DPW Water Department with a monthly report on the groundwater elevations which shall include discussion of any changes with respect to historic conditions. After the first year of monitoring, the Town will require Guilford to continue with monthly monitoring until it is determined by the Town of Ayer's Water Department that there is no significant impact on Groundwater elevations in the vicinity of the site.

9. Guilford shall write up a temporary improvement plan for the intersection of Willow Road and Route 2A for the grading of the intersection, widening of the intersection and lines for designation of the intersection, with the cost of repair or improvements provided by Guilford with a cap of $5,000. The temporary improvements shall be accomplished prior to the beginning of construction of the new facility.

10. The Planning Board shall appoint a local citizens group. Guilford shall meet with this citizens group at least on a monthly basis to address their concerns regarding the facility. This group will be organized prior to construction beginning and last until residents no longer wish to meet. This local citizen group map [sic] report back to the Planning Board whenever they deem necessary.

11. Guilford shall plow the entire emergency access road provided to Wagon Road residents that is on Guilford's property to ensure safe passage for Wagon Road residents during winter storms.

12. Guilford agrees to convey to the Town of Ayer in fee, or convey to the Town of Ayer a Conservation Restriction on the Property described as Lot B on the plan entitled "Plan of Land in Ayer, Massachusetts for Guilford Transportation Industries, Inc. prepared by Chase International, Inc. dated July 7, 1999" subject to any existing easements or rights of way, for use as Conservation and/or Open Space Land. Guilford shall provide access to the public to Lot B by providing an easement over its other land if necessary. This conveyance shall be subject to acceptance by Town Meeting. This condition shall be null and void if Town Meeting does not accept this conveyance. The conveyance shall be null and void if Town Meeting does not accept this conveyance. The conveyance will occur prior to the commencement of operation of Guilford's Facility. An authorized representative of Guilford shall confirm in writing Guilford's agreement to this 30 days of the date of this decision.

13. Guilford shall utilize only organic non-slip material or plan sand on site for slip prevention.

14. Guilford shall provide the Town of Ayer with an adequate water supply if the Town's existing water supply is contaminated as a result of the contaminants entering the Town's water supply from Guilford's facility. Guilford shall submit to the Planning Board prior to the beginning of construction of the facility a detailed plan describing how Guilford will provide an adequate water supply to the Town if such contamination occurs. Said plan shall be subject to review by the Ayer Board of Health and shall be modified to meet the requirements, if any, of the Board of Health.

15. Guilford shall provide to the Planning Board, on a quarterly basis during construction and during the first two years of operation of the facility, test sections to demonstrate whether the protective membrane under the railroad tracks is performing adequately.

16. Guilford agrees to monitor the loading of asphalt at the asphalt plant as part of the contract with the asphalt company to assure that there are no possible carcinogens to the asphalt transporter. Guilford shall include in its contract with the asphalt provider for the project a provision stating that the asphalt not contain possible carcinogens.

17. Guilford shall include in the contract with any asphalt provider for the project a condition that the asphalt not contain ground up or other tire material.

18. Guilford shall develop a procedure to ensure that the asphalt and any other paved surfaces on the property are at all times sealed.

19. Guilford shall comply with all Federal, State, and Local Statutes, Regulations, By-laws, and other requirements concerning the length of time the Willow Road and Wagon Road Crossing may be blocked during operation of its facilities.

20. Guilford shall monitor the length of time that the Wagon Road Crossing and Willow Road Crossing is blocked and shall provide to the Planning Board, at six months intervals for two years after the facility is in operation, reports of the results of the monitoring.

21. A Storm Water Maintenance Control Plan shall be submitted to the Planning Board for review by the Town of Ayer Department of Public Works and/or the Planning Board's Engineering Consultant prior to the beginning of construction of the facility.

22. Guilford will ensure that adequate landscaping to serve as a noise buffer is provided around the property. A specific Landscaping Plan will be submitted for Planning Board approval prior to the beginning of construction of the project.

23. Guilford will meet all requirement of the Town of Ayer's Aquifer Protection District Zoning By-law approved at the May 1999 Town of Ayer Annual Town Meeting prior to the beginning of construction.

24. Guilford shall comply with the requirements of the Town of Ayer Noise By-law and may not operate its facility at any time at which the noise from the facility exceeds the requirements of the Noise By-law.

25. The infiltration basins are designed for a minimum infiltration rate of 0.5 inches per hour. Prior to the operation of the facility, Guilford will provide documentation to the Planning Board that this infiltration rate is being met and, if it is not, they will provide additional measures such as drainage blankets to insure the appropriate amount of the recharge.

26. Guilford has conducted some test pits in the vicinity of the retention basins as a demonstration of the types of soils in this area. During construction, Guilford will conduct soil samples in this area to confirm that the soils in this area are consistent. Town Engineer, or his/her representative, will be invited to

witness the taking of the soil samples.

27. Two full sets of final plans stamped by a Registered Professional Engineer will be provided to the Planning Board prior to the beginning of construction.

28. A set of As-Built Plans for the site stamped by a Registered Professional Engineer will be provided to the Planning Board prior to starting operations.

29. All lights on the property will be boxed and angled down to avoid light pollution into the neighborhood.

30. There will be no snow removal from the site. All snow removed from the paved areas of the site shall be piled and allowed to melt on another portion of the site.

31. All upgrades to the crossing signal and gate systems on Willow Road shall be completed and operational prior to the commencement of the operation of the facility as described in the Guilford Rail System memorandum dated 5/17/99 subject; 'Crossing circuit design upon construction of New Auto Facility at Willow Park' from Mr. Tom Cary, Jr.

32. Guilford shall notify the Town of Ayer Board of Health concurrently with any required notification to the Massachusetts Department of Environmental Protection ("DEP") pursuant to G.L. C.21E and/or the Massachusetts Contingency Plan, 310CMR 40.00. Guilford shall provide to the Board of Health copies of all required filings with DEP pursuant to G.L. C.21E and/or the Massachusetts Contingency Plan. This condition is in addition to any and all other notices Guilford is required to provide to the Town of Ayer pursuant to any other Federal, State, or Local Statute, Regulation, By-law or other requirement concerning a release or threat of release of oil or hazardous materials at Guilford's property.

33. A geo-textile material as described in the approved Site Plan will be placed under the entire Storm Water Retention Basins Area of the facility prior to the operation of the facility.

34. All references to "Guilford" shall mean Guilford Rail System, it[]s successor, and assigns.

35. For the purposes of these conditions any reference to "construction" or "construction of this facility" shall mean any site work or any application for a building permit.

36. A determination that any of the above conditions is invalid or unenforceable shall not affect the validity of the remaining conditions.

1. That section reads in relevant part:

The jurisdiction of the Board over . . . transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and . . . the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one state, is exclusive. Except as otherwise provided under this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

2. This facility is bordered by a rail line and can be reached by vehicles via an access road. The existing facility has several unloading tracks with space for about 35 rail cars. It also has 2,000 automobile parking spaces, and an 8,800-square foot building. The existing facility receives rail serve twice daily and truck service about 75 times a day.

3. Prior to Guilford's acquisition, the site evidently was used to make railroad ties and for other industrial activities.

4. Littleton opening statement, Affidavit (Aff.) of Davos, ¶3.

5. Id.

6. According to Guilford, its proposed system for protecting against pollution or contamination is similar to what it has used for many years at its nearby Deerfield yard refueling facility.

7. Guilford opening statement at 9; Verified Statement (VS) of Michael C. Emerson.

8. Guilford opening statement at 10; VS Emerson; VS Reply Emerson; VS John Drobinski; Guilford reply at 3-6.

9. Id.

10. Id.

11. Guilford opening statement at 11. See also Guilford reply at 22-23.

12. Mass. Gen. Laws ch. 131, section 40.

13. The Board of Health stated that the new facility was a noisome trade because it "may be harmful to

the inhabitants of the Town of Ayer, injurious to their estates, dangerous to the public health, pose a threat to the aquifer and may be attended by injurious odors and noise resulting from the increased truck and vehicular traffic and attendant emissions and potential releases of harmful pollutants . . . ." Guilford opening statement, exhibit 4.

14. Under 49 U.S.C. 10901, a license from the Board (and an appropriate environmental review) is required for a railroad's construction of "an extension to any of its railroad lines [or] an additional railroad line." In a licensing proceeding, after conducting an environmental review, we typically impose appropriate environmental conditions to address environmental concerns raised by the parties, including local authorities. See City of Auburn v. STB, 154 F.3d 1025, 1031-33 (9th Cir. 1998), cert. denied, 527 U.S. 1022 (1999) (City of Auburn). However, there is no statutory requirement for a railroad to obtain Board approval to build or expand facilities that assist the railroad in providing its existing operations but do not give the carrier the ability to penetrate new markets. See Nicholson v. ICC, 711 F.2d 364, 368-70 (1983), cert. denied, 464 U.S. 1056 (1984) (Nicholson). Nor do railroads require authority from us to upgrade an existing line. Finally, 49 U.S.C. 10906 explicitly provides that no regulatory permission is required for "construction . . . of spur, industrial, team, switching, or side tracks." Where no license is required, there is no environmental review by the Board.

15. The towns claim that Ayer is not seeking to obstruct the construction of the new facility or to dismantle the existing facility, and that it is not operating in bad faith or in a discriminatory manner. Rather, the towns state, Ayer simply disagrees with Guilford's view that the railroad's proposed mitigation will be sufficient to protect against contamination.

16. Borough of Riverdale - Petition for Declaratory Order - The New York Susquehanna and Western Railway Corporation, STB Finance Docket No. 33466 (STB served Sept. 10, 1999) (Riverdale I) at 7; Auburn and Kent, WA- Petition for Declaratory Order - Burlington N.R.R. - Stampede Pass Line, 2 S.T.B. 330, 337 (1997) (Stampede Pass), aff'd, City of Auburn.

17. Guilford reply at 1.

18. AAR agrees that section 10501(b) preempts any attempt to use local environmental requirements to preclude construction of the new facility. AAR is particularly concerned about the Board of Health's attempt to prohibit the new facility on noisome trade/nuisance grounds. AAR notes that labeling the proposed facility as a nuisance prohibits Guilford from proceeding with its rail transportation proposal, which is precisely the kind of interference with interstate commerce that section 10501(b) is designed to prevent.

19. Ayer responds that a proposed development of the San Vel site by Patriot Energy was withdrawn when the threat to drinking water became apparent. Moreover, the town argues, other businesses within Zone II did not run afoul of the SDWA and the CWA because they were preexisting or located farther away from the aquifer.

20. As previously noted, a new car contains only about 1 gallon of gasoline and 8 quarts of motor oil, and Guilford is planning to install catch basins to contain spills. An impermeable membrane and a drainage system will be placed under the part of the site over which locomotives travel.

21. Guilford reply at 22. Specifically, Guilford contends that the new facility will have a system that complies with Ayer Aquifer Protection By-Law, ¶6.C.vi: "A system of groundwater recharge . . . which does not degrade groundwater quality," that uses "storm water infiltration basins or similar systems," and that precedes such systems with "traps to facilitate removal of contamination." Guilford also

submits that the new facility will comply with Ayer Site Protection By-Law ¶6.A.(e) by having "adequate measures to prevent pollution of surface or groundwater, to minimize erosion and sedimentation, and to prevent changes in groundwater levels, increased runoff, and potential for flooding." Moreover, Guilford states that it intends to comply with best management practices and to do appropriate monitoring of (1) the rate at which the aquifer is being recharged and (2) water quality.

22. Guilford reply at 3, 6-12; reply exhibit 1 at 5-6.

23. Ayer contends that EPA's failure to object is due to budget problems and limited resources and does not constitute tacit approval of the project.

24. The towns' theory that there is an exception to the broad preemption of section 10501 in instances where we lack licensing and conditioning authority and the state or local authority is enforcing environmental laws has been rejected by various courts. See Flynn v. Burlington Northern Santa Fe Corp., 98 F. Supp. 2d 1186 (E.D. Wash. 2000) (Flynn); Norfolk Southern Ry. v. City of Austell, No. 1:97-cv-1018-RLV, 1997 U.S. Dist. LEXIS 17236, at 17 n.6 (N.D. Ga. 1997) (Austell); Village of Ridgefield Park v. New York, Susquehanna & Western Ry., 750 A.2d 57 (N.J. 2000) (Ridgefield Park). Notwithstanding the usual presumption to the contrary, see Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516 (1992), even local environmental regulation is preempted where Congress intended to preempt all state and local law. As explained in City of Auburn, 154 F.3d at 1030-31, congressional intent to preempt a state or local permitting process for prior approval of rail activities and facilities related to interstate transportation by rail is explicit in the plain language of section 10501(b) and the statutory framework surrounding it.

25. In Stampede Pass, 2 S.T.B. at 339, we offered the following examples of state and local regulation that would not be preempted:

[E]ven in cases where we approve a construction or abandonment project, a local law prohibiting the railroad from dumping excavated earth into local waterways would appear to be a reasonable exercise of local police power. Similarly, . . . a state or local government could issue citations or seek damages if harmful substances were discharged during a railroad construction or upgrading project. A railroad that violated a local ordinance involving the dumping of waste could be fined or penalized for dumping by the state or local entity. The railroad also could be required to bear the cost of disposing of the waste from the construction in a way that did not harm the health or well being of the local community.

26. Section 10501(b) also does not preempt valid safety regulation under the Federal Rail Safety Act, 49 U.S.C. 20101 et seq. See Tyrrell v. Norfolk Southern Railway Company, No. 99-4505 (6th Cir. April 25, 2001); Riverdale II at 2 n.4.

27. Aff. of James Kreidler at ¶ 3, 4; Littleton reply at 20.

28. As the towns note, if two Federal statutes are "capable of coexistence," the statutes should be harmonized and each should be regarded as effective unless there is a "positive repugnancy" or an "irreconcilable conflict" between the laws. Matsushita Elec. Indus. Co. v. Epstein, 516 U.S. 367, 381 (1998); Blanchette v. Connecticut General Ins. Corp., 419 U.S. 102, 133-34 (1974); Unocal Corp. v. Kaabipour, 177 F.3d 755, 769 (9th Cir. 1999). Section 10501(b) need not be read to preempt valid regulation under the CWA and the SDWA where regulation under these statutes, fairly enforced, does not unreasonably interfere with railroad operations.

29. According to Guilford, the SDWA is not directed at private parties like Guilford. Moreover, the two

parts of SDWA upon which Ayer bases its regulation of the new facility -- the Source Water Assessment Program and the Wellhead Protection Program -- are inapplicable, as the former is limited to assessments and the latter is a voluntary program. The CWA, Guilford asserts, is not applicable because it applies to discharges of stormwater only if they are associated with industrial activity and travel into waters of the United States, which is not the case here.

30. As AAR notes, the noisome trade ordinance here is similar to the nuisance ordinance involving air and noise pollution that the court found to be preempted in Ridgefield Park.

31. The fact that the 36 conditions were initially imposed as part of an impermissible permit does not mean that every one of them is preempted.

32. See Ridgefield Park; Riverdale I; Stampede Pass.

33. Some cooperative efforts appear to have been made here. For example, the record shows that, at least initially, Guilford worked closely with the Ayer Planning Board and Ayer's contractor, CDM. Guilford incorporated almost all the features and recommendations of CDM that relate to aquifer protection in its final plans to protect against pollution. Guilford also states that it will comply with the substance of local ordinances concerning aquifer protection and that its operations will meet state requirements for aquifers. In addition, Guilford provided information about the project to EPA, and the Massachusetts Department of Environmental Protection studied the new facility.

34. Conditions such as 2-4 and 27-28 listed in the Appendix appear to be that type of restriction. But see condition 7 (unduly burdening interstate commerce by requiring Guilford to submit drawings for the catch basins "for review and approval" by the Planning Board, prior to construction).

35. See, e.g., conditions 16-18. On the other hand, certain conditions (including condition 14, which requires Guilford to provide Ayer with "an adequate water supply" if the town's existing water supply becomes contaminated) appear to be attempts to apply state and local regulation in a discriminatory manner. Ayer can seek redress for contamination from Guilford, but the normal processes for redress (i.e., fines, citations, or damages) should apply.

36. See conditions 8 and 15.

37. See, e.g., condition 1, which requires Guilford to install a sewer line and connect to Ayer's sewer system.

38. Railroads may agree voluntarily to take actions that go beyond that which a state or local government could require. See, e.g., condition 9 (requiring Guilford to pay for certain road improvements) and condition 12 (pertaining to the railroad's giving up land). We encourage railroads and communities to work together to reach mutually acceptable solutions to localized environmental concerns.