UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

FILED
IN CLERK'S OFFICE

2004 JAN -9  A 11: 10

U.S. DISTRICT COURT
DISTRICT OF MASS.

---

GRAFTON AND UPTON RAILROAD )
COMPANY,                    )
        Plaintiff        )
                         )
v.                          )    C.A. No.:  03-40291-NMG
                         )
TOWN OF MILFORD,            )
                         )
        Defendant        )
                         )

---

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

### STATEMENT OF THE CASE

The Plaintiff Grafton & Upton Railroad Company (hereafter "GU") filed this action seeking relief declaring that the Defendant Town of Milford (hereafter "Milford" or "Town") is preempted by the provisions of 49 USC § 10501(b) from enforcing its zoning by-laws and the Massachusetts Wetlands Protection Act (M.G.L. c. 131, § 40) in relation to a proposed use of GU property in Milford by a company known as Boston Railway Terminal Company (hereafter "BRT"). The Plaintiff's also seek injunctive relief prohibiting enforcement of the Milford Zoning By-Law and The Wetlands Protection Act, and ordering Milford to withdraw a Petition it had recently filed with the Federal Surface Transportation Board (hereafter "STB") pursuant to 5 USC, § 554(e) and 49 USC, § 721. In the STB proceedings the Town has sought an agency declaration of the applicability of Federal preemption in relation to the same underlying dispute. The matter is now before this Court on the Plaintiff's application for a Preliminary Injunction.

## FACTUAL BACKGROUND

In the introductory paragraph above, Milford emphasizes that the activity at issue, which the Town deems not to be exempt from enforcement of local and state law, is the activity of BRT, a trucking company, currently based in South Boston. By contrast, the Plaintiffs, in their pleadings and memorandum, emphasize a claimed level of involvement of GU in the activities BRT proposes to undertake in Milford. Resolution of the issue of what entity is truly undertaking the activity at the Milford GU property, and for what purpose, are ultimately keys to the question of whether or not preemption under 49 USC, 10501(b) attaches in this case. The following discussion of the facts will, therefore, key upon how the proposed activity was originally presented to the Town and how that presentation has seemingly now changed in an effort to bootstrap an argument for preemption under the law.

The Court has before it the Complaint, the Affidavit of Bridget Lucey, an operating officer of GU, and the Affidavit of Larry L. Dunkin, Milford Town Planner, with detailed exhibits accompanying. Certain matters are not in dispute.

GU is a small, regional railroad which has been dormant in recent years. (Complaint paras. 7 and 13). GU has some 15.5 miles of rail right-of-way which extends into Milford where it terminates next to the still active CSX "Milford Secondary Branch". (Comp. para. 20). Where the GU right-of-way approaches the CSX line there is a spur off of what used to be the main GU line and the right-of-way widens into what the Plaintiffs refer to euphemistically as a "Yard." (See Exhibits "B" and "K-2" to the Dunkin Affidavit).

No locomotive has traveled over the Milford portion of the GU Line in at least 25 years. (Dunkin Aff. para. 9). In fact, where the GU right-of-way crosses streets approaching the CSX Line the rails have been removed. The photographs attached to the Dunkin Affidavit as Exhibits "C-1" through "C-4" show the deteriorated condition of the

trackage which is still in place. These photographs also show that other than the deteriorated track, there is nothing else in the way of structures in the so-called "Yard".

The Milford GU property is in the Residential A (RA) Zoning District allowing single family and two-family use. Commercial and Industrial Uses are not allowed. (Dunkin Aff. para. 6). In addition, the overall locus is heavily impacted by wetlands and has a perennial stream known as the Godfrey Brook running along it. (Dunkin Aff. paras. 7 and 8). Very close by are well fields operated by the Milford Water Company in supplying water to the Milford community. (Dunkin Aff. para. 23 and Exhibits "J" and "K-1").

In mid-May of 2003 Mr. Robert Krafty, a railroad consultant representing GU contacted Milford Planner Larry Dunkin and asked to meet. A meeting was scheduled for June 6, 2003. Mr. Krafty followed up his call with a letter which expressed plans for the GU property as follows:

> We have requested the MBTA, per their letter agreement, to replace the switch in the CSX Milford Branch in order for us to gain access to our yard via rail. It is our intention to place a rail served customer on the property. Our customer will receive rail shipments of structural steel and pilings.
> (Dunkin Aff. Exhibit "A")

At the June 6, 2003 meeting Mr. Krafty indicated that although GU had been inactive for many years it was desirous of producing income from its property. Mr. Krafty indicated that they had found a company, the Boston Railway Terminal Company (BRT) which was located in South Boston and which had to find a new location for its operations. Mr. Krafty stated that GU was going to lease the locus to BRT which would operate from the GU property. Mr. Krafty indicated that rail cars would come to the BRT site by way of the CSX Line and then switch back to the GU locus. BRT would receive rail cars of steel which they would unload from those rail cars. Steel would then be loaded by BRT onto trucks which would exit down the old GU right-of-way onto Depot Street for delivery to BRT customers. As Mr. Krafty discussed the operations, all activity

3

on the site would be undertaken by BRT which was to lease the locus from GU. There was no indication that GU would be other than the landlord. (Dunkin Aff. para. 15).

In the course of the June 6th meeting Mr. Krafty indicated his belief that the GU property was exempt from local zoning. Mr. Krafty was asked to provide back-up for that position and as a result a letter was sent to Milford Town Counsel Gerald Moody from counsel for GU, dated September 8, 2003. That letter is Exhibit "D" to the Affidavit of Larry Dunkin. Significant to consideration of this matter is the statement contained in the first paragraph thereof as to what was going to be undertaken on the GU site. As stated therein:

> The GU is in negotiations to relocate the operations of the Boston Railway Terminal Company ("BRT") from South Boston to the Milford Yard which will require improvements to the property such as, but not limited to, ingress and egress for truck traffic to Depot Street, construction of a building on the property, improvements of the tracks, and the clearing of some land. The BRT *will conduct its operations* at the Milford Yard using its own locomotives and accepting industry cars containing shipments of steel from GU's interchange with CSX, unloading of the steel, then shipping the steel to customers. (emphasis added)

The letter from counsel for GU then went on in some detail to state the basis for an opinion that Milford is not permitted to enforce its zoning by-laws against the proposed activity which GU was going to permit BRT to undertake on the site.

After the letter from counsel for GU was sent, Milford also received another letter from Robert Krafty further describing the activity to take place on the locus. Mr. Krafty described the activity as follows in his September 16, 2003 letter (Exhibit "E" to Dunkin Aff.):

> Mr. Marsh will load and unload in the yard. The truck ingress and egress will be over the railroad right-of-way. The trucks will cross Vernon Street and then take a left onto Depot Street to gain access to Route 140.

> Mr. Marsh will receive rail cars of steel. They will be transported via truck to various locations in New England. He will also erect a building on the site.

4

Milford Town Counsel responded to counsel for GU by letter dated October 10, 2003. (Dunkin Aff. Exhibit "F"). Milford counsel explained his disagreement with the applicability of federal preemption. Significantly, he referred to the case of <u>Florida East Coast Railway Company vs. City of West Palm Beach</u>, 110 F. Supp. 2nd 1367, aff'd ,266 F. 3rd 1324(2001) and a line of reasoning from other cases which would hold that federal preemption does not apply to entities and activities not integrally related to the provision of interstate rail services.

After Town Counsel's response, the description of the activity at the locus, and what entity was to undertake it, began to shift. In a November 12, 2003 letter from counsel for GU the activity is referred to as "operations GU and BRT are planning to conduct". (Exhibit "G" to Dunkin Aff.)

In December of 2003 Milford filed its Petition For Declaratory Order with the STB providing much greater detail as to the basis for its position that federal preemption does not apply to the BRT trucking operations or the Milford locus. (Exhibit "E" to Comp.) Now that the Milford's position is fully understood by virtue of the STB filing, the subsequent Complaint in this matter attempts to paint a different picture as to the activity which will take place at the Milford locus.

The Plaintiff cannot escape the reality that the BRT operations, now completely independent of GU assistance or the assistance of any railroad company, will simply be moving from the South Boston site to the Milford site. The Plaintiff acknowledges that BRT has its own locomotive (shown in the photographs on Exhibit "I-1") which it currently uses to move rail cars as necessary at its South Boston site and to perform its own switching activity. (Comp. Para. 31) Although BRT clearly does not need any assistance, GU is claiming that it will be "leasing" the BRT locomotive and that GU employees will operate that BRT locomotive to move rail cars. (Comp. para. 42) Except to help with the bootstrap argument in favor of preemption this would not seem to make any sense. In addition, GU now tries to call what is clearly a $60,000, more or less, per

year yard lease something else. (Comp. para. 40). The footnote 4 at page 5 of the Complaint is particularly revealing:

> The original agreement called for BRT to lease the Yard from GU.
> However, the terms of the agreement have consistently evolved and
> changed over the last few months.

In fact, they seem to have changed as is deemed necessary to help justify a claim for Federal preemption.

**BRT is not a rail carrier** (Dunkin Aff. para. 26) and the Plaintiffs do not allege that it is. BRT is a trucking company with customers throughout New England. (Comp. para. 43) Not only is the proposed Milford locus of the BRT operations in a residential district, the locus is in an environmentally sensitive area. The Godfrey Brook, entitled to special protection under the Rivers Act provisions of the Massachusetts Wetlands Protection Act, runs along the property. The site is interspersed with wetlands. (Exhibit "K-2" to Dunkin Aff.) and is in the Zone II are of protection for the Milford Godfrey Brook Wells. (Dunkin Aff. para. 24, Exhibits "J" and "K-1") The potential for damage to the environment if there is to be no environmental review under either the local by-law or the state Wetlands Protection Act is very very real.

## ARGUMENT

The question before the Court being whether or not to grant or deny a Preliminary Injunction, the Plaintiff correctly points out the four-part framework to be utilized by the Court as outlined in <u>Ross-Simons of Warwick, Inc. vs. Baccarat Inc</u>., 102 F. 3rd 12, 15 wherein the Court held:

> Over time, we have crafted a four-part framework for use in determining
> whether the grant or denial of Preliminary Injunction relief is appropriate.
> Under this formulation, Trial Courts must consider (1) the likelihood of
> success on the merits; (2) the potential for irreparable harm if the
> Injunction is denied; (3) the balance of relevant impositions, i.e., the
> hardship to the non-movant if enjoined is contrasted with the hardship of
> the movant if no Injunction issues; and (4) the effect (if any) of the Court's

ruling on the public interest.  See <u>Weaver vs. Henderson</u>, 984 F. 2nd 11, 12
& n. 3 (1st Cir. 1993); <u>Narragansett Indian Tribe vs. Guilbert</u> 934 F. 2nd 4,
5 (1st Cir. 1991).

A. The Merits

The Court in <u>Ross-Simons</u> pointed out that in considering a request for
Preliminary Injunction, the Court need not determine the outcome on the merits
"with absolute assurance".  <u>Ross-Simons of Warwick, Inc. vs. Baccarat Inc.</u>, <u>supra</u> at 16.
The Plaintiff relies upon broad propositions of preemption under 49 U.S.C., § 10501(b)
and judicial and STB decisions where railroad operations were clearly at issue to argue
that it has a strong likelihood of success on the merits.  However, when one views the
facts as described above in relation to the law, and more closely analogous decisions, the
better view is that there is a greater likelihood of Town success on the merits in this
matter.

There is no question but that under 49 USC §10501, as amended by the ICCTA,
the Surface Transportation Board has exclusive jurisdiction over rail transportation and
further that there can be a statutory preemption of the application of state and local law.
Further, the breadth of the possible preemption is also beyond dispute.  As was stated in
<u>CSX Transportation Inc. vs. Georgia Pub. Serv. Commission</u>, 994 F.Supp. 1573, 1581
(N.D.GA 1996), "[i]t is difficult to imagine a broader statement of Congress' intent to
preempt state regulatory authority over railroad operations" than is contained in
§10501(b).

Notwithstanding the breadth of preemption, the courts must take cognizance of
the spirit of caution and prudence taught by the United States Supreme Court.  In <u>CSX vs.
Easterwood</u>, 507 US 658, (1993) the Supreme Court stated that lower courts should be
"reluctant to find preemption" pointing out that preemption would not lie unless it is the
"clear and manifest purpose of Congress".  The Supreme Court went onto state that "We
are not prepared to find preemption solely on the strength of general mandates of federal
preemption." <u>Id.</u> at 664.

To find the manifest intent and purpose of Congress, one must first (as the STB has done carefully in recent decisions) look closely at the express provisions of the statute from which the preemption concept flows. Under §10501(b) the jurisdiction of the board is over "(1) transportation by *rail carriers,* …" (emphasis added) and that jurisdiction is exclusive. It is then pointed out that the remedies "….under this part with respect to *rail transportation* are exclusive and preempt the remedies provided under federal or state law." (emphasis added)

By the plain language used by Congress, it is the transportation, and related activities, undertaken by *rail carriers* that benefit from preemption, not activity which may be related to rail transportation but which is provided and undertaken by non-rail carriers like BRT. As was stated in <u>Fletcher Granite Company, LLC</u> STB Docket No. 34020, June 25, 2001, (attached hereto as Exhibit "A") under the preemption provisions of the ICCTA, "….zoning ordinances and local land use permit requirements are preempted as to facilities that are an *integral part of the railroad's interstate operations.*" <u>Id</u>. at page 3. Citing Norfolk <u>Southern RY. vs. City of Austell</u>, No. 1:97-cv-1018-RLV, 1997 US Dist. LEXIS 17236, at 17 n. 6 (N.D. GA. 1997) and <u>Village of Ridgefield Park vs. New York, Susquehanna &</u> <u>Western RY</u>., 750A 2nd 57(N.J. 2000).

BRT proposes to undertake in Milford the *same receiving and trucking operation as it currently undertakes in South Boston*. BRT's operations and activity are not now, nor will they be if the move to Milford is undertaken, in any way "integrally related" to any Interstate rail operations of GU. The recently declared involvement of GU is a rather transparent attempt to make the BRT trucking operation sound like a GU Railroad operation.

The very significant distinction between activities of a rail carrier and activities of a non-rail carrier entity have been noted and found dispositive by federal courts. In <u>Florida East Coast Railway Company vs. City of West Palm Beach</u>, 110 F.Supp. 2nd 1367, aff'd. 266 F. 3rd 1324(2001), a company known as Rinker Materials Corporation

8

was proposing to lease facilities of the Florida East Coast Railway (FEC) and to establish a facility to receive aggregate material by rail and then to distribute from that point by truck. Citing the STB final <u>Riverdale</u> decision (attached hereto as Exhibit "B")[1] the District Court held that "Activities and facilities not integrally related to the provisions of interstate rail are not subject to (STB) jurisdiction or to federal preemption." 110 F. Supp. 2nd at 1378. In upholding the lower court decision the 11th Circuit Court of Appeals held that "....Rinker's use of the property at the 15th Street Yard and the activities there performed by Rinker serve no public function and provide no valuable service to FEC; rather, the arrangement between FEC and Rinker merely facilitates Rinker's operation of a private distribution facility on FEC owned premises." 266 F. 3rd at 1336. This last holding nicely characterizes what will be the arrangement between BTR and GU in Milford if allowed to go forward.

A very recent decision by the Director of the Office of Proceedings of the STB is essentially dispositive of the issues here raised by Milford. That case was <u>Hi Tech Trans, LLC</u> STB Finance Docket No. 34192, decided August 14, 2003. A copy of this decision is attached to the Plaintiff's Memorandum of Law as Exhibit "5".

In <u>Hi Tech</u>, the petitioning company was involved in transportation of construction and demolition (C&D) debris. The company had an arrangement with the Canadian Pacific Railway to use their Oak Island Yard in Newark New Jersey. The company would bring customers C&D debris to the yard by truck, unload it, and then load it onto trains for transportation to disposal sites. <u>Hi Tech</u>, page 2. The company, Hi Tech Trans, LLC ***was not a rail carrier***. The foregoing scenario is the mirror image of what is proposed to take place at the Milford site under consideration. Here, BRT, also not a rail carrier, would receive steel at the Milford site, unload it, and then load it onto trucks for transportation to customers across New England. From any practical or legal perspective, the essential operations would be the same as in <u>Hi Tech</u> and the end result should be the same; i.e. a finding that state and local regulations are not preempted.

---

[1] In the Plaintiff's Memorandum, reference is made to a preliminary, 1999 decision in the same <u>Riverdale</u> proceedings. That 1999 decision is attached to the Plaintiff's Memorandum as Exhibit "2".

In <u>Hi Tech</u>, the issue was squarely presented and argued by the company advocating strongly that preemption applied whether or not the subject facilities were operated directly by a rail carrier.  They even argued, as BRT presumably would in the case under consideration, that "…..the transloading services performed by Hi Tech at Oak Island Yard are one of the most integral components of interstate rail movement -- it is elementary that C&D debris cannot be transported by rail if it cannot be loaded onto rail cars."  (<u>Hi Tech Trans, LLC</u>, Petition for Declaratory Order, June 16, 2003, page 13). The Director correctly rejected such seemingly compelling arguments, for the very sound reason that they failed to account for the expressed intent of Congress that preemption apply only to activities of "rail carriers" and not any activity which may be related to rail transportation which might be performed by non-carrier entities.

The precise reasoning and clear statutory analysis of the Director deserves particular consideration in this matter.  In <u>Hi Tech,</u> at page 5, the Director carefully reviewed the relevant statutory scheme.

> The Board has jurisdiction over "transportation by rail carrier." 49 U.S.C. §10501(a).  The term "transportation" is defined to include a "facility" related to the movement of property by rail and "services" related to that movement by rail, including receipt, delivery, transfer, and handling of property.  49 U.S.C. §10102 (9)(a), (b).  "Rail carrier" is defined as a person providing "common carrier railroad transportation for compensation." 49 U.S.C. §10102 (5).  Where the Board has jurisdiction over transportation by rail carrier, that jurisdiction is "exclusive," 49 U.S.C. §10501(b), and state and local laws and regulations are generally preempted.  To come within the preemptive scope of 49 U.S.C.§10501(b), these activities must be both:  (1) transportation; and (2) performed by, or under the auspices of, a rail carrier.

The Director then applied the statutory analysis to the activities proposed by the company and reasoned as follows:

> There is no dispute that Hi Tech's transloading activities are within the broad definition of transportation.  The Board has consistently found such

activities to be transportation under 49 U.S.C. 10102(9). <u>See Green
Mountain Railroad Corporation – Petition for Declaratory Order</u>. STB
Finance Docket No. 34052 (STB served May 28, 2002) <u>(Green Mountain)</u>
(cement transloading facility); <u>Joint Petition for Declaratory Order –
Boston and Maine Corporation and Town of Ayer, MA</u>, STB Finance
Docket No. 33971 (STB served May 1, 2001) <u>(Ayer)</u> (automobile
unloading facility). This is only part of the statutory equation, however.
To be preempted, the transportation activities must be performed by a rail
carrier.

.      .      .      .

By Hi Tech's reasoning, any third party or non-carrier that even remotely
supports or uses rail carriers would come within the statutory meaning of
transportation by rail carrier. The Board and its predecessor, the Interstate
Commerce Commission, have indicated that the jurisdiction of this agency
may extend to certain activities and facets of rail transloading facilities,
but that any such activities or facilities must be closely related to
providing direct rail service. In every case, jurisdiction was found and
local regulations relating to transportation facilities preempted only when
those facilities have been operated or controlled by a rail carrier. <u>See
Green Mountain; Ayer; Borough of Riverdale – Petition for Declaratory
Order – The New York Susquehanna and Western Railway Corporation</u>,
STB Finance Docket No. 334656 (STB served Sept. 10, 1999); <u>Growers
Marketing Co. v. Pere Marquette Ry.</u>, 248 I.C. C. 215, 227 (1941); <u>see
also Norfolk S. Ry. V. City of Austell</u>, No. 1:97-CV-1081-RLV, 1997
U.S. Dist. LEXIS 17236 (N.D. GA Aug. 18, 1997). Here Hi Tech's
activities are not performed by a rail carrier.

<u>Hi Tech</u> pages 5-6

In the Plaintiff's Memorandum, reference is made to another STB decision of
recent vintage being their November 10, 2003 decision in <u>H & M International
Transportation, Inc. STP Finance Docket No. 34277</u>. (Exhibit 6 to Plaintiff's
Memorandum). Plaintiff refers to this decision as having been cited by the Town in its
Petition to the STB. The Town, in fact, did not so cite this decision but would have had it
been aware of its existence. The decision is brief in its analysis. Although not directly
"on point", it is very much to the point.

The company at issue in the <u>H & M</u> decision operated intermodal facilities
involving all manner of transportation related activities, including the loading, unloading
and movement of rail cars within the facilities. The question was whether or not the

11

company was a "rail carrier" within the meaning of 49 U.S.C. § 10102(5). The analysis of the STB in this decision was essentially the same as in <u>Hi-Tech</u>, <u>supra</u>. The STB stated at page 3 of the <u>H & M</u> decision that:

> To fall within the Board's jurisdiction, the transportation activities must be performed by a rail carrier, and the mere fact that H & M moves rail cars inside the Marion facility does not make it a rail carrier. To be considered a rail carrier under the statute, there must be a holding out to the public to provide common carrier services.

In the matter under consideration there is no such holding out to the public of an ability to provide common carrier services. BRT is simply going to operate its trucking company on the Milford property. As discussed previously, GU now is claiming that it is going to provide some switching activity, utilizing a BRT owned locomotive. This assertion cannot serve to hide the very clear fact that all of the activity to be transferred from the South Boston site to the Milford site is the activity of BRT.

In sum, when one looks past the alleged GU involvement, it becomes much more likely that Milford will prevail on the merits as to the question of preemption under the Federal law.

B.  Potential For Irreparable Harm

In paragraph 16 of the Complaint GU clearly states its goal for the Milford locus. GU wants to generate "….cash flow through projects which can be carried out on …." portions of its infrastructure. Its goal is, very simply, to make money. Certainly, this is a commendable goal for any business.

The Milford locus has been dormant for many, many years and has produced no income. The irreparable harm GU is claiming to support its application is ***not*** that denial of the injunction will cause it to lose money that it is currently making. The claim is that GU will not make as much money in the near term as it would like. Lack of an immediate ability to increase cash flow cannot be viewed as such irreparable harm as

would outweigh the very real potential for environmental harm, i.e. harm to the public health and welfare, which is very real in this case.

The potential risks to Milford's environment and its water supply are self-evident. The GU locus is interspersed with wetlands and has running through and along it the Godfrey Brook which, a very short distance away, flows into the Milford Water Company Godfrey Brook Well Field. (Dunkin Aff. para. 23 and Exhibits "J", "K-1" and "K-2"). It is not just standard zoning use regulation, i.e. Residential vs. Industrial, which Milford seeks to enforce. The Residential regulations relate more to the peace and tranquility of the immediate neighborhood and less to the overall community public health and welfare. Milford also seeks to enforce its extremely crucial Water Resources Protection District Regulations and the provisions of the Massachusetts Wetlands Protection Act (M.G.L. c. 131, § 40). The potential for damage to Milford's water supply in this case is very real. The photographs at Exhibits "I-1" and "I-2" show the current BRT operations in an Industrial area of South Boston far removed from any wetlands areas or water supply. The risk of irreparable harm from allowing BRT to establish its operations in Milford's wetlands, right next to a Milford water supply, far outweighs concerns about GU cash flow in the immediate future.

C.  The Public Interest

This is a case where the consideration of the public interest is of particular significance. GU claims that the grant of the Preliminary Injunction will positively serve the public interest by enhancing the development of the local and regional economy and by providing tax dollars for Milford. However, the primary public interest here involved is the threat to the environment and to the public water supply. The Wetlands Protection Act, the DEP regulations and the Water Resources Protection provisions of the Milford Zoning By-Law were carefully designed and coordinated to protect the public interest. The Preliminary Injunction requested would allow GU to ignore all of those serious environmental regulations and to plow ahead with industrial development and activity in the middle of an environmentally sensitive area. If it should later be determined that

13

preemption does not apply, the environmental damage will have been done and the public interest will obviously have been adversely affected by a Preliminary Injunction enjoining the enforcement of valid environmental regulations.  Agency Rent-A-Car vs. Connolly, 686 F. 2nd 1029, 1035 (1982).

As a final note this Court should take cognizance of a very recent decision of a Federal Magistrate Judge in the case of CNFR Operating Company, Inc. vs. City of America Canyon, 282 F. Supp. 2nd 1114, 203 WL 22078058 (ND Cal.) This decision was an interlocutory one denying a preliminary Injunction request in circumstances remarkably similar to the ones now at issue.  The reasoning of the Judge was based in part upon  Florida East Coast Railway Company, supra. and the reasoning was very supportive of the STB's Hi-Tech decision.  CNFR involved a non-rail carrier company utilizing the property of a rail carrier.  Like the BTR proposal now at issue, the company in CNFR was to receive product over rail at the rail carrier's facility and then load that product onto trucks and deliver the material to local customers.  The company was seeking injunctive relief to stop the enforcement of local regulation.

In denying the injunctive relief sought, the Magistrate Judge held that the preemptive language of § 10501(b) "…, does not reach local regulation of activities not integrally related to rail service." Id. at 118 citing Florida East Coast Railway Company, supra.  Addressing an argument essentially the same as that put forth by BRT in asserting a right to preemption of Milford's regulatory activities, the Magistrate Judge stated at page 1118-1119:

> At the hearing, the Plaintiffs argued that because Apex hauls goods from its facility at the railroad terminal to the customer who ordered the goods, it completes the process of transporting goods by rail and so is subject only to ICCTA regulation.  Taken to its logical conclusion, Plaintiff's argument would mean that any trucking company who picks up goods from a railroad terminal for delivery to a customer would be free from local regulation.  Congress, however, could not have intended such an expansive interpretation of the ICCTA's reach.  See eg. Florida East Coast Railway Company, 266 F. 3rd at 1328-1331.

In considering the question of the public interest, the Judge pointed out that "....issuance of a Preliminary Injunction would certainly prevent the City from enforcing its Municipal Code and the Resolution, which appear to reflect the interest of public health and safety. <u>CNFR, supra.</u> at 1114. The Judge went on to point out that the speculative job and revenue losses cited by the Plaintiff did not weight the public interest in the Plaintiff's favor.

D.  Deference To Agency Determination

The Plaintiff cites a decision of the STB, <u>Joint Petition For Declaratory Order – Boston & Maine Corporation and Town of Ayer</u>, STB Finance Docket No. 33977 to support its position. The underlying dispute in that STB matter had its genesis in the Federal District Court. In fact, the matter was before the STB for Declaratory Order pursuant to a referral by the Court. See <u>Boston & Maine Corporation vs. Town of Ayer</u>, 191 F. Supp. 2nd 257, 261(2002). It was because of cases such as Ayer and others that were reviewed by the Town that the Town determined that it would be best to move directly to the agency determination and save the parties a lot of time involved in first proceeding into Court. The matter is now pending before the STB, the Plaintiff has filed its reply, and there would seem to be no reason this Court should not, under all of the circumstances, deny the Preliminary Injunction requested at this time to at least await the agency determination.

CONCLUSION

For all of the foregoing reasons the Town of Milford respectfully requests that this Honorable Court deny the Preliminary Injunctive Relief requested by the Plaintiff.

Respectfully Submitted
By its attorney,


Gerald M. Moody, Esq.
Town Hall – 52 Main Street
Milford, MA  01757
BBO# 352380
Tel. (508) 634-2302

31730
DO

SERVICE DATE - JUNE 29, 2001

SURFACE TRANSPORTATION BOARD

DECISION

STB Finance Docket No. 34020

FLETCHER GRANITE COMPANY, LLC - PETITION FOR DECLARATORY ORDER

Decided:  June 25, 2001

In a petition filed March 13, 2001, Fletcher Granite Company, LLC, successor in interest to H.E. Fletcher Company (Fletcher), seeks a declaratory order that the Board has exclusive jurisdiction over the resumption of rail service by Fletcher over certain sidetrack in Westford, MA.  Fletcher owns and operates a granite quarry and stone fabrication mill in Westford and the sidetrack runs from its quarry and fabrication mill to the mainline connection of the Stoney Brook Branch of the Boston & Maine Corporation (B&M).[1]  The Town of Westford filed a notice of appearance on March 26, 2001.

Fletcher indicates that rail operations connecting the granite quarry (located on the north side of Groton Road) and mill (on the south side of Groton Road) with the Stoney Brook Branch began in 1895.  Fletcher laid the rail track on its property and provided its own rail service to the B&M interchange.  This service continued until about 1965, when Fletcher decided to ship granite by truck instead of rail.  While Fletcher has discontinued rail service from the fabrication mill to the B&M, it has maintained rail service on the part of its track running from the quarry to the fabrication mill.  With the exception of the switch to the B&M that was removed in 1965, the original track remains in place.  Debris, however, has been dumped on the right-of-way by local land abutters, and residents have placed retaining walls and a landfill parallel to the track but within the right-of-way.  Fletcher contends that neither it nor any other entity has attempted to abandon the track, and that it was not aware of the encroachments to its property until it began repair work in preparation for the reuse of the line.

Fletcher submits that it has had extensive discussions with B&M concerning reestablishing rail service and that the parties have agreed as to what would be needed to repair or upgrade the track.  B&M has also agreed to replace the switch to the Stoney Brook line and to furnish rail service to and from the interchange.

---

[1] Fletcher states that rail operations are conducted by the Springfield Terminal Railway Company, which, like B&M, is part of the Guilford Rail System.

EXHIBIT "A"

Fletcher states that it has repaired the grade crossing at Groton Road and plans to improve another grade crossing at Brookside Road.[2] It has retained a railroad design and construction consultant to determine what is needed to resume safe rail service. Fletcher asserts that the consultant believes "the required improvements are viable." Petition at 3 (citation omitted).

Fletcher is concerned that the resumption of rail service could be delayed or defeated if state and local officials try to regulate the matter. Fletcher claims that its concerns are not speculative, citing negative press coverage and alleged hostility by the local community to development in Westford. It also asserts that part of its right-of-way abuts a brook and wetlands, and that it has been told by local officials that resuming service would entail an environmental permitting process under state law and review by the local Conservation Commission. Fletcher states that it will submit its workplan to the Conservation Commission and will work consistently with applicable environmental standards by, for example, not storing materials in protected wetlands. Nevertheless, Fletcher asserts that, if its proposal comes under Conservation Commission review, it will likely "become involved in extensive, time-consuming hearings that will result in either denial of any permit application or the imposition of such expensive and unwieldy conditions that the project will be unfeasible to complete." Petition at 4 (citation omitted). In any event, Fletcher claims that the permitting process will substantially delay and add cost to the project.

Accordingly, Fletcher seeks a declaratory order that, under 49 U.S.C. 10501(b)(2), the Board has exclusive jurisdiction over the resumption of rail service and that local or state regulation is preempted. Fletcher argues that, while the Board does not have licensing and conditioning authority over ancillary facilities, citing 49 U.S.C. 10906, Congress gave the Board exclusive jurisdiction over rail transportation under section 10501(b).

## DISCUSSION AND CONCLUSIONS

Under the Administrative Procedure Act, "the agency, . . . in its sound discretion, may issue a declaratory order to terminate a controversy or remove uncertainty." 5 U.S.C. 554(e). See also 49 U.S.C. 721. It would be premature for the Board to institute a declaratory order proceeding at this point, as there is not now, and may never be, a controversy that needs to be terminated. Westford, while filing a notice of appearance, has not submitted any substantive views on this matter. Nor does Westford appear to have taken any official action that would impede the resumption of rail service over Fletcher's track. Fletcher, moreover, has indicated that it will submit workplans and act consistently with applicable environmental standards. Thus, the Board will not attempt to intervene in this matter at this time.

---

[2] Fletcher states that the Federal Highway Administration (FHWA), pursuant to its Federal Railroad Grade Crossing Program, has funded 80% of the cost of the Groton Road grade crossing improvements. It has also approved funding for the Brookside Road grade crossing improvements, and funds will be released when work begins.

2

Nevertheless, to provide guidance to the parties, this decision will summarize relevant court and agency case law addressing similar situations. Under 49 U.S.C. 10501(b)(2), as broadened by the ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803 (1995) (ICCTA), the Board has exclusive jurisdiction over "the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks or facilities, even if the tracks are located, or intended to be located entirely in one State." Section 10501(b)(2) further provides that both "the jurisdiction of the Board over transportation by rail carriers" and "the remedies provided under [49 U.S.C. 10101-11908] are exclusive and preempt the remedies provided under Federal or State law." See City of Auburn v. STB, 154 F.3d 1025, 1029-31 (9th Cir. 1998), cert. denied, 527 U.S. 1022 (1999) (City of Auburn); Borough of Riverdale – Petition for Declaratory Order – The New York Susquehanna and Western Railway Corporation, STB Finance Docket No. 33466 (STB served Sept. 10, 1999) (Riverdale I) at 5. As several courts have held, this statutory preemption applies even in cases involving the construction of ancillary tracks and facilities under section 10906, even though the Board does not have licensing authority over such matters and therefore does not conduct its own environmental review.[3] See Flynn v. Burlington Northern Santa Fe Corp., 98 F. Supp.2d 1186 (E.D. Wash. 2000) (Flynn)[4] and cases cited in Joint Petition for Declaratory Order – Boston and Maine Corporation and Town of Ayer, MA, STB Finance Docket No. 33971 (STB served May 1, 2001) (Ayer) at 8, Riverdale I at 5-9, and Borough of Riverdale — Petition for Declaratory Order — The New York Susquehanna and Western Railway Corporation, STB Finance Docket No. 33466 (STB served Feb. 27, 2001) (Riverdale II) at 3.

In addressing the scope of 49 U.S.C. 10501(b), the courts have found that, under this broad preemption provision enacted in ICCTA, zoning ordinances and local land use permit requirements are preempted as to facilities that are an integral part of a railroad's interstate operations. Norfolk Southern Ry. v. City of Austell, No. 1:97-cv-1018-RLV, 1997 U.S. Dist. LEXIS 17236, at 17 n.6 (N.D. Ga. 1997); Village of Ridgefield Park v. New York, Susquehanna & Western Ry., 750 A.2d 57 (N.J. 2000) (Ridgefield Park). Moreover, state and local permitting or preclearance requirements (including environmental requirements) have been found to be preempted because, by their nature, they interfere with interstate commerce by giving the state or local body the ability to deny the carrier the right to construct facilities or conduct operations.

---

[3] Under 49 U.S.C. 10906, "The Board does not have authority . . . over the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks."

[4] The Flynn court noted that while the Board does not have regulatory authority over section 10906 projects, it does have jurisdiction over these rail activities. Id. at 1189-90.

STB Finance Docket No. 34020

Auburn and Kent, WA– Petition for Declaratory Order – Burlington N.R.R. – Stampede Pass Line, 2 S.T.B. 330 (1997) (Stampede Pass), aff'd, City of Auburn.[5]

      The Board has regulatory authority over rail line constructions under 49 U.S.C. 10901, and it conducts an environmental review of such activities under the National Environmental Policy Act (NEPA), and can adopt appropriate environmental mitigation conditions in response to concerns of the parties, including local authorities. See Ayer at 4, n.14.[6] However, there is no statutory requirement for a carrier to obtain Board approval to build or expand facilities that assist the railroad in providing its existing operations but that do not give the carrier the ability to penetrate new markets. See Nicholson v. ICC, 711 F.2d 364, 368-70 (1983), cert. denied, 464 U.S. 1056 (1984); Riverdale I. Railroads also do not require Board authority to upgrade an existing line, and, as noted, the law explicitly provides that a license is not required to construct "spur," "industrial," or "switching" tracks, see 49 U.S.C. 10906. Where no license is required, there is no environmental review conducted by the Board. Regardless of whether a project falls under section 10901 or 10906, however, the preemption provisions of section 10501(b) apply.

      It should be noted, moreover, that in Stampede Pass, Riverdale I, and Ayer, the Board expressed its view that not all state and local regulations that affect railroads are preempted.[7]

---

[5] The argument that the statutory preemption in section 10501(b) is limited to state and local "economic" regulations was rejected by the court as contrary to the statutory text and unworkable in practice. City of Auburn, 154 F.3d at 1029-31.

[6] Under 49 U.S.C. 10901(a), a license from the Board (and an appropriate environmental review) is required for a railroad's construction of "an extension to any of its railroad lines . . . [or] . . . an additional railroad line . . . ." The terms "extension" and "additional railroad line" are not defined in the statute. These terms have been interpreted, however, in Texas & Pacific v. Gulf, Colorado & Santa Fe Ry., 270 U.S. 266 (1926) (Texas & Pacific), as those tracks that enable a railroad to penetrate or invade a new market. See Union Pacific Railroad Company – Petition for Declaratory Order – Rehabilitation of Missouri-Kansas-Texas Railroad Between Jude and Ogden Junction, TX, STB Finance Docket No. 33611 (STB served Aug. 21, 1998).

[7] In Stampede Pass, 2 S.T.B. at 339, the Board offered the following examples of state and local regulation that would not be preempted:

    a local law prohibiting the railroad from dumping excavated earth into local waterways would appear to be a reasonable exercise of local police power. Similarly, . . . a state or local government could issue citations or seek damages if harmful substances were discharged during a railroad construction or upgrading project. A railroad that violated a local ordinance involving the dumping of waste could be fined or penalized for dumping by the state or local entity. The railroad

                                                        (continued...)

STB Finance Docket No. 34020

The Board has stated that state and local regulation is appropriate where it does not interfere with interstate rail operations, and localities retain certain police powers to protect the public health and safety. For example, non-discriminatory enforcement of state and local requirements such as building and electrical codes generally are not preempted. Riverdale I at 8-9; Flynn. While a locality cannot require permits prior to construction, the courts have found that a railroad can be required to notify the local government "when it is undertaking an activity for which another entity would require a permit" and to furnish its site plan to the local government. Ridgefield Park. Local authorities can take actions that are necessary and appropriate to address a genuine emergency on railroad property.

Finally, the Board has concluded that "nothing in section 10501(b) is intended to interfere with the role of state and local agencies in implementing Federal environmental statutes such as the Clean Air Act, the [Clean Water Act], and the [Safe Drinking Water Act]." Ayer at 9.[8] Thus, the lack of a specific environmental remedy at the Board or at the local level as to construction projects over which the Board lacks licensing power does not mean that there are no environmental remedies under other Federal laws. Whether a particular Federal environmental statute, local land use restriction, or other local regulation is being applied so as to not unduly restrict the railroad from conducting its operations, or unreasonably burden interstate commerce, is a fact-bound question. Id.[9]

This action will not significantly affect either the quality of the human environment or the conservation of energy resources.

---

[7](...continued)
also could be required to bear the cost of disposing of the waste from the construction in a way that did not harm the health or well being of the local community.

[8] Section 10501(b) also does not preempt valid safety regulation under the Federal Rail Safety Act, 49 U.S.C. 20101 et seq. See Tyrrell v. Norfolk Southern Railway Company, No. 99-4505 (6th Cir. Apr. 25, 2001); Riverdale II at 2 n.4.

[9] The Board indicated, Ayer at 10, that

individual situations need to reviewed individually to determine the impact of the contemplated action on interstate commerce and whether the statute or regulation is being applied in a discriminatory manner, or being used as a pretext for frustrating or preventing a particular activity, in which case the application of the statute or regulation would be preempted.

STB Finance Docket No. 34020

It is ordered:

1. Petitioner's request for a declaratory order proceeding is denied.

2. This decision is effective on July 29, 2001.

By the Board, David M. Konschnik, Director, Office of Proceedings.


Vernon A. Williams
Secretary

6

31189
EB
SERVICE DATE - FEBRUARY 27, 2001

SURFACE TRANSPORTATION BOARD

DECISION

STB Finance Docket No. 33466

BOROUGH OF RIVERDALE – PETITION FOR DECLARATORY ORDER –
THE NEW YORK SUSQUEHANNA AND WESTERN RAILWAY CORPORATION

Decided: February 23, 2001

The Borough of Riverdale (the Borough), a New Jersey municipality, filed a petition for declaratory order in this proceeding.[1]  The Borough sought a determination regarding the extent to which certain facilities constructed and operated in Riverdale by The New York, Susquehanna and Western Railway Company (NYSW) are covered by the Federal preemption provisions contained in 49 U.S.C. 10501(b), as broadened by the ICC Termination Act of 1995 (ICCTA).[2]

In our decision instituting this proceeding on September 10, 1999 (1999 Decision), we expressed our general views on the preemption issues raised, to the extent the record permitted,

---

[1]  The background of the controversy that led to the petition for a declaratory order is set out in our prior decision, and there is no need to repeat it here.

[2]  49 U.S.C. 10501(b) now provides:

The jurisdiction of the Board over—

(1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

(2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,

is exclusive.  Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

EXHIBIT "B"

based primarily on the interpretation by the courts of the statutory preemption provision.[3] We pointed out that, under this broad preemption regime, state and local regulation[4] cannot be used to interfere with interstate railroad operations. We expressed the view that state and local permitting or pre-clearance requirements are preempted because by their nature they interfere with interstate commerce, but that non-discriminatory enforcement of other types of state and local requirements, such as building and electrical codes, generally would not be preempted. Thus, individual situations need to be reviewed individually to determine the impact of the contemplated action on interstate commerce.

Accordingly, we permitted the Borough, NYSW, and other interested persons to submit further information and comments about the operation of NYSW's facility in the Borough and about any other unresolved general preemption issues as to which parties believed the Board should provide clarification. In addition to responses from the Borough and NYSW, we received seven other comments.[5] The material provided by the Borough and NYSW indicates that those parties have settled all of their differences about the dispute that prompted this proceeding, i.e., application of municipal regulations to NYSW's Riverdale facility. Consequently, there is no longer any basis for us to review that situation. None of the other comments expressed disagreement with our analysis of the general parameters of the statutory provision,[6] or with the need to resolve specific preemption issues on a fact-specific basis.

---

[3] Many of the preemption decisions have been issued by the courts, rather than the Board, because the controversies have tended to arise in the context of proceedings that are outside of the Board's regulatory jurisdiction.

[4] As we have explained, section 10501(b) does not preempt valid safety regulation under the Federal Rail Safety Act, 49 U.S.C. 20101 et seq. See Regulations on Safety Integration Plans Governing Railroad Consolidations, Mergers, Acquisitions of Control, and Start Up Operations; and Procedures for Surface Transportation Board Consideration of Safety Integration Plans in Cases Involving Railroad Consolidations, Mergers, and Acquisitions of Control, STB Ex Parte No. 574, FRA Docket No. SIP-1, Notice No. 1, 63 FR 72,225 (Dec. 31, 1998).

[5] Those comments were filed by: the Borough of Bogata, NJ; a group of seven other municipalities (Auburn, WA; Bay Village, Rocky River, and Sandusky, OH; Lee's Summit, MO; Olathe, KS; and Rochester, MN); the Association of American Railroads; the American Short Line & Regional Railroad Association; the Hackensack Meadowlands Development Commission; former Congressman Robert A. Roe; and Congressman Stephen R. Rothman.

[6] While some parties complain about the breadth of the statute, they do not offer specific examples of how we can interpret the statute differently, given the existing case law.

STB Finance Docket No. 33466

In these circumstances, we will now terminate this proceeding.  In so doing, we reaffirm the views we expressed in the 1999 Decision and summarize additional agency and court precedent that may provide guidance in resolving preemption issues in other contexts.

    1.  New Court Rulings.

In the 1999 Decision, we noted that courts have found that the broad statutory preemption applies even in instances — such as the construction of yards or ancillary facilities, or the upgrading of existing track — in which the Board lacks licensing and conditioning authority. We pointed out that railroads can nevertheless be required to observe generally applicable, nondiscriminatory local fire, health, safety, and construction regulations that do not restrict the railroad from conducting its operations or unreasonably burden interstate commerce.  In Flynn v. Burlington Northern Santa Fe Corp., 98 F. Supp. 2d 1186 (E.D. Wash. 2000), the court similarly recognized Congress' intent in the ICCTA to preempt local permitting requirements with respect to railroad operations, but it found that the railroad would have to comply with local codes for electrical, building, fire, and plumbing when building a refueling facility, unless the codes restrict the railroad from conducting its operations or unreasonably burden interstate commerce.

In Village of Ridgefield Park v. New York, Susquehanna & Western Ry., 750 A.2d 57 (N.J. 2000), the court found that section 10501(b) preempted local zoning regulations and precluded the state court from adjudicating common law nuisance claims involving noise and air pollution from a railroad maintenance facility.  The court further found that, while the locality could not require permits prior to construction, the railroad must notify the local government "when it is undertaking an activity for which another entity would require a permit."  The court determined that, generally, localities may enforce their local fire, health, plumbing, safety, and construction regulations and that the railroad may not deny the local government access for reasonable inspection of its maintenance facility.  Moreover, the court concluded that the railroad could be required to furnish its site plan to the local government.

Another court found that section 10501(b) precludes condemnation under state law of passing track that is integral to operating the railroad's single-track line.  Wisconsin Central Ltd. v. City of Marshfield, No. 99-C-0636-S (W.D. Wis. Feb. 10, 2000), 2000 U.S. Dist. LEXIS 10570.  On the other hand, the court in Florida East Coast Ry. v. City of West Palm Beach, 110 F. Supp. 2d 1367 (S.D. Fla. 2000), determined that a city could apply its zoning and licensing regulations to a facility that, although owned by a railroad, is not used in rail transportation but rather by the railroad's lessee, a building materials company.

    2.  New Board Ruling.

The Board has dealt with one major preemption case since issuance of the 1999 Decision. In Township of Woodbridge, NJ, et al. v. Consolidated Rail Corporation, Inc., STB Docket No. 42053 (STB served Dec. 1, 2000), we expressed our view that a town may seek court enforcement of two noise abatement agreements that the town had entered into with a railroad,

-3-

STB Finance Docket No. 33466

notwithstanding the broad sweep of the statutory preemption provisions. We explained that the railroad had voluntarily entered into the agreements, and thus the preemption provisions should not be used to shield the carrier from its own commitments. Rather, because "[t]hese voluntary agreements must be seen as reflecting the carrier's own determination and admission that the agreements would not unreasonably interfere with interstate commerce" (slip op. at 5), we declined to undercut them. The railroad involved in that proceeding subsequently filed a petition for clarification or reconsideration of our decision and has recently challenged the decision in court. <u>Consolidated Rail Corporation v. Surface Transportation Board</u>, No. 01-1042 (D.C. Cir. filed Jan. 25, 2001).

<u>It is ordered</u>:

1. This proceeding is terminated.

2. This decision is effective on its service date.

By the Board, Chairman Morgan, Vice Chairman Clyburn, and Commissioner Burkes.


Vernon A. Williams
Secretary

-4-

<u>CERTIFICATE OF SERVICE</u>

       I Gerald M. Moody attorney for the Defendant Town of Milford in the above matter hereby certify that I have this 9th day of January 2004 served the within Memorandum of Law In Opposition To Plaintiff's Motion For A Preliminary Injunction, Affidavit of Larry L. Dunkin and Exhibits To Affidavit of Larry L. Dunkin, upon counsel for the Plaintiff addressed as follows:

             Michael B. Flynn, Esq.
             Flynn & Associates, P.C.
             189 State Street, 6th Floor
             Boston, MA  02109

Gerald M. Moody, Esq.