United States District Court
District of Massachusetts

```
_____
                                )
GRAFTON AND UPTON RAILROAD       )
COMPANY,                         )
          Plaintiff,             )
                                 )     Civil Action No.
          v.                     )     03-40291-NMG
                                 )
TOWN OF MILFORD,                 )
          Defendant.             )
_____ )
```

**MEMORANDUM & ORDER**

In this motion for declaratory and injunctive relief, the Plaintiff Grafton and Upton Railroad Company ("GU") seeks a declaration that the Interstate Commerce Commission Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803 (1995)("ICCTA") preempts state and municipal law as applied to the railroad.  The GU also seeks to enjoin the Town of Milford from taking any action to assert or enforce its Zoning By-Law and/or to prohibit the Town from otherwise attempting to prevent, delay, obstruct or prohibit the railroad's proposed development in conjunction with a Boston-based terminal railroad company.

**I.   <u>Factual Background</u>**

The GU is a Massachusetts railroad corporation with its principal place of business in Worcester.  The Town of Milford ("the Town") is a municipality incorporated under the laws of the

-1-

Commonwealth of Massachusetts and is located in Worcester County.
The following facts are stated as alleged (or conceded) in the
GU's Verified Complaint for Declaratory Judgment (Docket No. 1),
in the Memorandum in Support of Preliminary Injunction (Docket
No. 3) and the opposition thereto (Docket No. 5).

The GU is a privately owned railroad with its roots in
central Massachusetts dating back to 1873.  The GU operates over
15.5 miles of main line track that runs from North Grafton to
Milford and also has rail yards in Hopedale, Grafton, Upton and
Milford, Massachusetts.  The GU also has a number of sidetracks
throughout its territory.  From the 1890's to the 1940's, the GU
was a significant carrier, initially of passengers but eventually
of freight such as cattle and motor vehicles.  The volume of the
GU's business has steadily declined since its peak in the 1930's
and 1940's.  Recently, the GU has been "relatively dormant".

As part of that decline, several of the GU's tracks have
become underutilized, a number of its grade crossings have been
paved over, individuals have encroached on its property and its
customers are few in number.  To stem the decline, the GU has
recently initiated an effort to reestablish itself as a going
concern by improving its infrastructure, re-utilizing its rail
yards and increasing the volume of freight conveyed over its
tracks.  Inadequate capitalization has, however, impeded those

-2-

efforts.  According to the GU, its future viability depends on
generating greater cash flow from its current infrastructure.
The GU intends to re-invest its income in infrastructure and
business development.  To help with those efforts, the GU hired
Robert Krafty, a railroad consultant and the former Manager of
Real Estate for the Consolidated Rail Corporation.

The GU has identified its Milford Yard as a "prime location"
for conducting income-generating railroad operations.  CSX
Transportation, Inc. ("CSX"), a Class I freight railroad
headquartered in Jacksonville, Florida, currently interchanges
with the GU at North Grafton, Massachusetts.  CSX operates over
tracks it owns in several states throughout the northeastern,
midwestern, mid-atlantic and southeastern United States and is
the primary carrier of freight between Massachusetts and the rest
of the country.  The Milford Yard is immediately west of the
intersection between the GU's main line and a busy CSX freight
line known as the "Milford Secondary Branch."  The GU's main line
runs directly through the Milford Yard and terminates at the CSX
intersection.

The GU seeks to develop the Milford Yard thereby increasing
its ability to interchange with CSX.  To that end, Mr. Krafty, on
behalf of the GU, contacted the principal of the Boston Railway
Terminal Corporation ("BRT") with a proposal to move BRT's

-3-

operations to the Milford Yard.  BRT is a terminal railroad company, meaning it operates a railroad over a short, fixed distance for a singular purpose such as the movement of freight within an industrial complex or for a single industrial entity.

BRT currently operates out of a facility in South Boston, which is owned by CSX.  At that facility, BRT engages in the transfer and distribution of steel via truck to customers throughout the region.  CSX has notified BRT to vacate the South Boston facility as soon as possible.  The Milford Yard is uniquely located and configured to accommodate BRT's operations because it is connected to CSX, it is geographically located in the center of BRT's sphere of operations and it has roadway access via Route 140 to Interstate 495 which is a desired route for the truck transport of steel to BRT's customers.

The relocation of BRT to the Milford Yard would also apparently provide a unique opportunity for the GU.  The GU contends that "few, if any" operating terminal railroads in Massachusetts are currently looking to relocate their operations and that the BRT represents the only viable option available for it to improve its financial condition through the improvement, development and use of the Milford Yard.

In the spring of 2003, the GU and BRT agreed that the BRT would move its operations to the GU's Milford Yard.  As part of

-4-

that agreement, the GU agreed to reinstall, and did in fact reinstall, an old switch at the point where the GU's tracks intersect with the CSX such that CSX is now able to deliver and transfer shipments of steel via railcars to the GU's account at the Milford Yard.

The GU anticipates revenue generation from the interchange of those railcars arriving from all over the country. Steel shippers will pay the GU $250 per car for its services. The agreement between BRT and GU provides that BRT will pay the GU $5,000 per month for the use of the Milford Yard and for the GU's services which will be offset by a $100 credit to BRT for every railcar brought into the Milford Yard. As part of that agreement, GU employees will operate a locomotive leased from BRT and will move the railcars from the point of interchange with CSX to locations within the Milford Yard. BRT employees will then transfer the steel to trucks and transport it to customers throughout New England. The GU will retain the right to use its main line for other traffic in addition to the BRT's steel operations. The GU claims that it has been ready, willing and able, since late Spring, 2003, to memorialize the agreement outlined above in a contract and to begin railroad operations at the Milford Yard.

The operations have not commenced, however, because the Town

of Milford has taken the position that the proposed railroad operations are unlawful.  During the Spring and Summer of 2003, Mr. Krafty and Bridget Lucey, the GU's General Manager, informed Town officials of the proposed railroad operations.  During the course of those meetings, Town officials indicated that the Milford Yard was, pursuant to the Town's Zoning By-Law, located in a district classified as "General Residential."  Milford thus objected to, and prohibited the GU and BRT from conducting, the proposed railroad operations at the Milford Yard.

Following repeated attempts to resolve the dispute informally, initially without but eventually with the assistance of counsel, the GU was informed on December 4, 2003 that the Town intended to file a petition with the Surface Transportation Board ("STB") seeking a declaratory order that the proposed use of the Milford Yard was prohibited by the Milford Zoning By-Law and was also subject to the Massachusetts Wetlands Protection Act, M.G.L.c. 139 § 40.  Now pending before the this Court is the GU's Motion for a Preliminary Injunction (Docket No. 2) to enjoin the Town from taking any action to assert or enforce its Zoning By-Law and/or to prohibit the Town from otherwise attempting to prevent, delay, obstruct or prohibit the railroad's proposed development and use of the Milford Yard.  In support of its motion, the GU asserts that the Town Zoning By-Law, and any other

-6-

supportive state or municipal statute, ordinance or regulation,
are preempted by federal law.

## II.  <u>**Legal Analysis**</u>

The plaintiff must satisfy the four prerequisites for a
preliminary injunction: 1) that plaintiff is likely to succeed on
the merits, 2) that plaintiff will suffer irreparable injury if
the injunction is not granted, 3) that plaintiff's injury
outweighs any harm that would flow to the defendant if injunctive
relief were granted, and 4) that the public interest will not be
adversely affected by the granting of the injunction.  <u>See
Narragansett Indian Tribe</u> v. <u>Guilbert</u>, 934 F.2d 4, 5 (1st Cir.
1991); <u>Planned Parenthood League of Massachusetts</u> v. <u>Bellotti</u>,
641 F.2d 1006, 1009 (1st Cir. 1981).  The likelihood of success
on the merits has been held to be the "main bearing wall" of the
four-factor framework.  <u>See, e.g.</u>, <u>Ross-Simons of Warwick, Inc.</u>
v. <u>Baccarat, Inc.</u>, 102 F.3d 12, 19 (1st Cir. 1996)(discussing the
importance of the likelihood of success on the merits).

### A.    **Likelihood of Success**

The GU contends that it has a strong likelihood of success
on the merits because of the federal preemption of state and
local zoning regulations at issue in this case.  Under the
Supremacy Clause of the United States Constitution, "the Laws of
the United States...shall be the supreme Law of the Land...any

-7-

Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. As the Supreme Court has held, "Where a state statute conflicts with, or frustrates, federal law, the former must give way." CSX Transportation, Inc. v. Easterwood, 507 U.S. 658, 663 (1993). The GU contends that the ICCTA preempts the Town's Zoning By-Law as well as any other state or municipal statute or ordinance that is contrary to that Act.

Congress originally enacted the Interstate Commerce Act ("ICA") in 1887 to establish a statutory scheme for regulating the nation's railroads. As part of its regulatory scheme, the ICA established the Interstate Commerce Commission ("ICC") as the federal agency charged with regulation of railroad transportation. In 1995, in an effort to deregulate, in substantial part, the railroads and other modes of surface transportation, Congress enacted the ICCTA and abolished the ICC. Congress replaced the ICC with the newly established Surface Transportation Board ("the STB") and granted the STB exclusive jurisdiction over rail function and proceedings. See 49 U.S.C. § 701. The GU contends, and the Town in fact does not deny, that Congress intended for the ICCTA, 49 U.S.C. § 10501, to preempt expressly all local regulations governing rail transportation. See CSX Transp., Inc. v. Georgia Pub. Serv. Comm'n., 944 F. Supp.

-8-

1573, 1581 (N.D. Ga. 1996), citing Medtronic v. Lohr, 518 U.S. 470, 494 (1996).

The Town responds that this case does not fall within the purview of the ICCTA because the BRT's function in the development of the Milford Yard is essentially that of a trucking company. As such, the ICCTA's preemption provisions do not apply because the activities of BRT are not integrally related to the provision of interstate rail services. See Florida East Coast Ry. Co. v. West Palm Beach, 266 F.3d 1324, 1328-31 (11th Cir. 2001). Thus, the Town asserts that it, rather than the GU, has a strong likelihood of success on the merits.

The plain language of the ICCTA compels a contrary conclusion. The statutory language indicates an express intent on the part of Congress to preempt the entire field of railroad regulation, including activities related to but not directly involving railroad transportation. See 49 U.S.C. § 10102(6)(A), (C). Indeed, the ICCTA defines "transportation" as including, in addition to the movement of locomotives and railcars, "services related to that movement, including...interchange of passengers and property." Id.

An examination of decisions of courts in this and other jurisdictions confirms the breadth of Congress' intent. For example, in Burlington Northern Santa Fe Corp. v. Anderson, 959

F. Supp. 1288 (D. Mont. 1997), the court considered whether the
ICCTA preempted Montana law authorizing that state's railroad
agency to regulate an interstate railroad's intrastate economic
activities.  See id. at 1291.  The court adopted the rationale of
the United States District Court for the Northern District of
Georgia in CSX Transportation, Inc. v. Georgia Public Services
Commission, 944 F. Supp. 1573, 1581-81 (1996) to support its
conclusion that the authority of state railroad agencies to
regulate even purely intrastate rail activities was expressly
preempted by the ICCTA.  Burlington Northern, 959 F. Supp. at
1293.

    In Dakota, Minnesota & Eastern Railroad Corp. v. South
Dakota, 236 F. Supp.2d 989, 1007 (D.S.D. 2002) the court held
that state regulation of the economic, environmental and public
safety effects of South Dakota's eminent domain statute were
preeempted to the extent the state regulated those areas in the
context of railroads.  See id. As the court held, a state
"cannot regulate indirectly through the use of its eminent domain
power what it cannot regulate directly."  Id.

    In Soo Line Railroad Company v. City of Minneapolis, 38 F.
Supp.2d 1096, 1101 (D. Minn. 1998), the court similarly held that
the City's demolition-permitting process was "related to the
movement of property by rail" and therefore expressly preempted

under the ICCTA.  Id.  Other courts have also held that the
regulation of non-railroad activities are expressly preempted
under the ICCTA so long as those activities are related to the
operation of railroads for use in interstate commerce.  See City
of Auburn v. United States Gov't, 154 F.3d 1025, 1031 (9th Cir.
1998)(environmental regulation); Wisconsin Central Ltd. v. City
of Marshfield, 160 F. Supp.2d 1009, 1014 (W.D. Wis. 2000)(public
safety).

     Finally, although cases interpreting the preemptive scope of
the ICCTA have been relatively rare in this jurisdiction, the
First Circuit Court of Appeals has held that in order to be
permissible under the ICCTA, state and local regulations applied
to the development of an automobile unloading facility must not
interfere with interstate rail operations.  Boston and Maine
Corp. v. Town of Ayer, 330 F.3d 12, 16 (1st Cir. 2003).  In
Boston and Maine Corp., the court endorsed the decision of the
STB to limit local environmental regulation to that which does
not unduly burden interstate commerce or unduly restrict the
railroad from conducting its operations.  Id. at 16.  Thus, a
review of the cited precedent clearly indicates that the proposed
development of the Milford Yard relates to interstate rail
transportation and that the enforcement of conflicting state and
municipal regulations would interfere with the proposed

interstate rail operations.

Although the Milford Yard will clearly have a trucking component, an examination of the analogous scenarios discussed in the cited caselaw demonstrates that such a non-rail component is still subject to the preemptive effect of the ICCTA.  Without the non-rail component of the proposed development, the amount of steel to be shipped to the Milford area via the CSX line almost certainly would be diminished.  That impact on interstate commerce leads to the conclusion that the proposed GU-BRT development is governed by the ICCTA, that Massachusetts environmental regulations and local zoning by-laws are preempted and that there is a likelihood that the GU will be successful in its dual objective in this action.

**B.    Additional Prerequisites for a Preliminary Injunction**

The additional factors to consider in connection with a motion for preliminary injunction as outlined by the First Circuit Court of Appeals also counsel in favor of allowing, at least in part, the GU's motion for a preliminary injunction. First, there is credible evidence that the GU will suffer irreparable injury if it is unable to proceed with the proposed development.  It is unlikely that the GU will be able to revive its dormant operations if the BRT chooses not to relocate to the Milford Yard.  Without other prospects for revitalization, that

-12-

option represents the best chance for the railroad to return to profitability.

Second, the injury to the GU if the injunction is not granted is likely to outweigh the harm that would be incurred by the Town if the injunction is granted.  The business operations of the GU are at risk if the proposed development is foreclosed but if that development is allowed to proceed, the Town will still be protected by federal environmental statutes and regulations.  Thus, a balancing of the harms seems to tip slightly in favor of the GU.

Finally, the Court concludes that the public interest will not be adversely affected by the granting of an injunction in favor of the GU.  As noted above, the public interest will be protected by the enforcement of federal environmental statutes and regulations promulgated thereunder.  Moreover, considering the potential for economic development for the region which may arise from the development of the Milford Yard, the risk of harm is outweighed by the potential benefit.

C.    **The Continued Role of the Surface Transportation Board**

Notwithstanding this Court's conclusion that it is likely that the ICCTA will preempt the Town from enforcing its Zoning By-Law under the circumstances of this case, this Court also concludes that it would be ill-advised to remove the case from

the jurisdiction of the STB.  As noted above, the plain language of the ICCTA controls the scope of the federal preemption of state and local railroad regulation.  The statutory language indicates that the STB has exclusive jurisdiction over construction projects such as the one at issue here.  Section 10501(b) provides that

> [t]he jurisdiction of the [STB] over the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one state, is exclusive.  49 U.S.C. § 10501(b).

When Congress makes explicit its intent to preempt an area of state law, "the Courts' task is an easy one." English v. General Electric, 496 U.S. 72, 78-79 (1990).  In the context of railroad regulation, in the CSX Transportation case, supra, the District Court for the Northern District of Georgia explicitly granted jurisdiction to the STB and noted that it is "uniquely qualified to determine whether state law should be preempted." CSX Transp., 944 F. Supp. at 1584.  This Court agrees.  Thus, even if state and local law are preempted by the ICCTA, the STB should, in the first instance, determine the precise scope of that preemption.

Nevertheless, this Court recognizes the unusual posture of this case.  Usually, a district court refers a case to the STB

-14-

for a determination of whether state and/or local law has been preempted.  See e.g., Boston and Maine Corp., 330 F.3d at 15 (noting that the district court's referral to the STB was to evaluate the right of the defendant town to regulate the plaintiff railroad's proposed development).  In this case, however, the Town filed its petition for declaratory relief with the STB before the GU filed its complaint in this Court.  The Court will, therefore, retain jurisdiction over this case but stay it temporarily in order to permit the STB to consider the matter in full.  By so doing, the Court upholds the intent of Congress to delegate authority to that agency to adjudicate disputes regarding railroad transportation.

    If the STB reaches the same conclusion that this Court has reached on its preliminary review of the ICCTA, that does not, however, mean that the GU and the BRT may proceed with their development unfettered by applicable federal environmental regulations.[1]  In fact, the proposed GU-BRT development will be required to comply with all federal environmental protection statutes (and, indeed, all state and municipal ordinances, to the extent they do not interfere with interstate commerce), and the

_____

    [1]Indeed, the STB has adopted regulations to ensure compliance with federal statutes governing public health, safety environmental quality and historic preservation.  See Soo Line R.R. Co. v. City of Minneapolis, 38 F. Supp.2d 1096, 1099-1100 (D. Mn. 1998).

Town will be expected to play a pivotal role in the implementation and enforcement of those regulations. <u>See</u> <u>Cities of Auburn and Kent, WA – Petition for Declaratory Order – Burlington N. R.R. Co. – Stampede Pass Line</u>, STB Finance Docket No. 33200, 1997 WL 362017 at **4-5 (Jul. 2, 1997).

**ORDER**

Based upon and in accordance with the foregoing memorandum, the plaintiff's Motion for Preliminary Injunction (Docket No. 2) is **ALLOWED**, in part and **DENIED**, in part, as follows:

1)   the Town of Milford is hereby preliminarily enjoined from taking any action to assert or enforce its Zoning By-Law and/or from otherwise attempting to prevent, delay or prohibit the Grafton & Upton Railroad Company from its proposed development of the Milford Yard in conjunction with the Boston Railway Terminal Corporation;

2)   the Petition for Declaratory Order pending before the Surface Transportation Board is not removed from, but rather is to be heard by, that agency;

3)   this action is stayed pending resolution of the petition currently pending before the Surface Transportation Board; and

4)   the parties are directed to file a joint status report upon such resolution and at 90-day intervals, if applicable, before such resolution, beginning on May 31, 2004.

**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated: February 27, 2004

-17-