UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GRAFTON AND UPTON RAILROAD COMPANY,<br>　　　　Plaintiff,<br><br>Vs.<br><br>TOWN OF MILFORD,<br>　　　　Defendant | C.A. No.: 03-40291-NMG |

## MEMORANDUM IN SUPPORT OF THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### STATEMENT OF THE CASE

The Plaintiff Grafton & Upton Railroad Company (hereafter "GU") filed this action seeking relief declaring that the Defendant Town of Milford (hereafter "Milford" or "Town") is preempted by the provisions of 49 USC § 10501(b) from enforcing its zoning by-laws and the Massachusetts Wetlands Protection Act (M.G.L. c. 131, § 40) in relation to a proposed use of GU property in Milford by a company known as Boston Railway Terminal Company (hereafter "BRT"). The Plaintiff also sought injunctive relief prohibiting enforcement of the Milford Zoning By-Law and The Wetlands Protection Act, and ordering Milford to withdraw a Petition it had recently filed with the Federal Surface Transportation Board (hereafter "STB") pursuant to 5 USC, §554(e) and 49 USC, § 721. In the STB proceedings the Town sought an agency declaration of the applicability of Federal preemption in relation to the same underlying dispute. By unanimous decision dated August 11, 2004 the STB held in the Town's favor, finding that the activities proposed to be undertaken by BRT on the Milford property of GU are not entitled to any protection from enforcement of local and state law under 49 USC, 10501(a). The matter is now before this Court upon, presumably, competing Motions for Summary Judgment.

## FACTUAL BACKGROUND

The Court has before it the decision of the unanimous STB in *Town of Milford, MA – Petition For Declaratory Order*, STB Finance Docket No. 34444; (hereafter "*Milford* STB decision"); a copy of which is attached hereto as Exhibit "A". In that decision the STB concurred in the position of the Town that the business and activities of BRT, proposed to be moved from its South Boston site to Milford, are not exempt from the enforcement of state and local law. This decision was primarily premised upon the fact that those activities were not to be undertaken by a "rail carrier" as required by 49 USC 10501(a) in order to have any entitlement to preemption.

The findings of the STB were succinct and not disputed by the parties. Those findings are contained in the second and third paragraph of the decision of the STB as follows:

> GU, a rail carrier, owns a rail Yard located in Milford (Milford Yard) near an interchange with a line of another rail carrier, CSX Transportation, Inc. (CSXT). The Milford Yard straddles GU's long-dormant 15.5 mile main line, which terminates at the CSXT line. BRT, which, despite its name, is not a rail carrier, must relocate a facility that it currently operates in the Boston area. BRT therefore proposes to build and operate a trans-loading and steel fabrication facility on unused property within the Milford Yard, where it would receive shipments of steel from the CSXT line. In anticipation of the agreement, GU has reinstalled switches on its line at the point of interchange with the CSXT line.
>
> Under the parties' plan, GU would transport rail cars carrying steel from its interchange with CSXT to the Milford Yard and BRT's facility. BRT employees would then offload the steel and haul it by truck to customers throughout New England sometimes first performing some fabrication work (e.g. cutting and welding) in a building to be constructed across at least one track at the Milford Yard. After the steel shipments are unloaded, GU would move the empty rail cars back to the CSXT interchange point. BRT's use of GU's rail line and Yard would be nonexclusive, as GU may use the rail line and Yard for other transportation purposes.

The parties have previously put before this Court evidence which establishes the facts as found by the STB, and which serve to flesh those facts out. This Court has before it the Affidavit of Bridget Lucey, an operating officer of GU and the Affidavit of

2

Larry L. Dunkin, Milford Town Planner, with accompanying exhibits. There are simply no material facts in dispute in this matter.

GU is a small, regional railroad which has been dormant in recent years. (Complaint paras. 7 and 13). GU has some 15.5 miles of rail right-of-way which extends into Milford where it terminates next to the still active CSX "Milford Secondary Branch". (Comp. para. 20). Where the GU right-of-way approaches the CSX line there is a spur off of what used to be the main GU line and the right-of-way widens into what the Plaintiffs refer to as a "Yard." (See Exhibits "B" and "K-2" to the Dunkin Affidavit).

No locomotive has traveled over the Milford portion of the GU Line in at least 25 years. (Dunkin Aff. para. 9). In fact, where the GU right-of-way crosses streets approaching the CSX Line the rails have been removed. The photographs attached to the Dunkin Affidavit as Exhibits "C-1" through "C-4" show the deteriorated condition of the trackage which is still in place. These photographs also show that other than the deteriorated track, there is nothing else in the way of structures in the so-called "Yard".

The Milford GU property is in the Residential A (RA) Zoning District allowing single family and two-family use. Commercial and Industrial Uses are not allowed. (Dunkin Aff. para. 6). In addition, the overall locus is heavily impacted by wetlands and has a perennial stream known as the Godfrey Brook running along it. (Dunkin Aff. paras. 7 and 8). Very close by are well fields operated by the Milford Water Company supplying water to the Milford community. (Dunkin Aff. para. 23 and Exhibits "J" and "K-1").

In mid-May of 2003 Mr. Robert Krafty, a railroad consultant representing GU contacted Milford Planner Larry Dunkin and asked to meet. A meeting was scheduled for June 6, 2003. Mr. Krafty followed up his call with a letter which expressed plans for the GU property as follows:

> We have requested the MBTA, per their letter agreement, to replace the switch in the CSX Milford Branch in order for us to gain access to our Yard via rail. It is out intention to *place a rail served customer on the property*. Our customer will receive rail shipments of structural steel and pilings. (emphasis added)
> (Dunkin Aff. Exhibit "A")

3

At the June 6, 2003 meeting Mr. Krafty indicated that although GU had been inactive for many years it was desirous of producing income from its property. Mr. Krafty indicated that they had found a company, the Boston Railway Terminal Company (BRT) which was located in South Boston and which had to find a new location for its operations. Mr. Krafty stated that GU was going to lease the locus to BRT which would operate from the GU property. Mr. Krafty indicated that rail cars would come to the BRT site by way of the CSX Line and then switch back to the GU locus. BRT would receive rail cars of steel which they would unload from those rail cars. Steel would then be loaded by BRT onto trucks which would exit down the old GU right-of-way onto Depot Street for delivery to BRT customers. As Mr. Krafty discussed the operations, all activity on the site would be undertaken by BRT which was to lease the locus from GU. There was no indication that GU would be other than the landlord. (Dunkin Aff. para. 15).

In the course of the June 6th meeting Mr. Krafty indicated his belief that the GU property was exempt from local zoning. Mr. Krafty was asked to provide back-up for that position and as a result a letter was sent to Milford Town Counsel from counsel for GU, dated September 8, 2003. That letter is Exhibit "D" to the Affidavit of Larry Dunkin. Significant to consideration of this matter is the statement contained in the first paragraph thereof as to what was going to be undertaken on the GU site. As stated therein:

> The GU is in negotiations to *relocate the operations of the Boston Railway Terminal Company ("BRT")* from South Boston to the Milford Yard which will require improvements to the property such as, but not limited to, ingress and egress for truck traffic to Depot Street, construction of a building on the property, improvements of the tracks, and the clearing of some land. The *BRT will conduct its operations* at the Milford Yard using its own locomotives and accepting industry cars containing shipments of steel from GU's interchange with CSX, unloading of the steel, then shipping the steel to customers. (emphasis added)

The letter from counsel for GU then went on in some detail to state the basis for an opinion that Milford is not permitted to enforce its zoning by-laws

4

against the proposed activity which GU was going to permit BRT to undertake on the site.

After the letter from counsel for GU was sent, Milford also received another letter from Robert Krafty further describing the activity to take place on the locus. Mr. Krafty described the activity as follows in his September 16, 2003 letter (Exhibit "E" to Dunkin Aff.):

> Mr. Marsh will load and unload in the Yard. The truck ingress and egress will be over the railroad right-of-way. The trucks will cross Vernon Street and then take a left onto Depot Street to gain access to Route 140.
>
> Mr. Marsh will receive rail cars of steel. They will be transported via truck to various locations in New England. He will also erect a building on the site.

Milford Town Counsel responded to counsel for GU by letter dated October 10, 2003. (Dunkin Aff. Exhibit "F"). Milford counsel explained his disagreement with the applicability of federal preemption. Significantly, he referred to the case of Florida East Coast Railway Company vs. City of West Palm Beach, 110 F. Supp. 2nd 1367, aff'd 266 F. 3rd 1324(2001) and a line of reasoning from other cases which would hold that federal preemption does not apply to entities and activities not integrally related to the provision of interstate rail services.

After Town Counsel's response, the description of the activity at the locus, and what entity was to undertake it, began to shift. In a November 12, 2003 letter from counsel for GU the activity is referred to as "operations GU and BRT are planning to conduct". (Exhibit "G" to Dunkin Aff.)

In a letter from counsel for GU dated November 25, 2003 to Milford Town Counsel (Exhibit "H" to Dunkin Aff.) the activity proposed for the site was still unequivocally the business of BRT. It was described therein as follows:

5

> BRT is a Massachusetts corporation having a regular place of business at 160 West First Street, South Boston, where it occupies approximately 5 acres of land and 7,000 feet of track. It owns two on site office trailers, one 100 ton diesel electric switching locomotive, one over the road truck tractor and a number of semi-trailers of varying types.
>
> BRT's business consists of receiving shipments of steel by rail and truck and shipping same to customers by truck. It also performs some fabrication work, involving cutting and welding.
>
> . . . .
>
> The *BRT desires to relocate its operation to the GU's Milford Yard* and would perform substantially the same operations at this location."
> (emphasis added)

It should be pointed out that all of the above is consistent with the basic allegations of the Complaint wherein GU specifically alleges that the proposal was "....to move BRT's operations to the Milford Yard." (Comp. para. 27) The Complaint goes on to allege that "BRT accepts shipments of steel via rail car at its facility, where the rail cars are moved about, the steel is offloaded and placed onto trucks and then shipped to **BRT's customers** throughout the region. (emphasis added) (Comp. para. 30).

In December of 2003 Milford filed its Petition For Declaratory Order with the STB providing much greater detail as to the basis for its position that federal preemption does not apply to the BRT trucking operations or the Milford locus. (Exhibit "E" to Comp.) Once Milford's position was fully understood by virtue of the STB filing, the subsequent Complaint in this matter attempted to paint a different picture as to the activity which would take place at the Milford locus.

The Plaintiff cannot escape the reality that the BRT operations, now completely independent of GU assistance or the assistance of any railroad company, would simply be moving from the South Boston site to the Milford site. The Plaintiff acknowledges that BRT has its own locomotive (shown in the photographs on Exhibit "I-1") which it currently uses to move rail cars as necessary at its South Boston site and to perform its own switching activity.

6

(Comp. Para. 31) Although BRT clearly does not need any assistance, GU claimed that it would be "leasing" the BRT locomotive and that GU employees will operate that BRT locomotive to move rail cars. (Comp. para. 42) Except to help with the bootstrap argument in favor of preemption this would not seem to make any sense. In addition, GU now attempts to call what is clearly a $60,000, more or less, per year Yard lease something else. (Comp. para. 40). The footnote 4 at page 5 of the Complaint is particularly revealing:

> The original agreement called for BRT to lease the Yard from GU. However, the terms of the agreement have consistently evolved and changed over the last few months.

In fact, they seem to have been changed as was deemed necessary to help justify a claim for Federal preemption. Nevertheless, even with these changes, the basic facts are undisputed.

**BRT is not a rail carrier** (Dunkin Aff. para. 26) and the Plaintiffs do not and cannot allege that it is. BRT is a trucking company with customers throughout New England. (Comp. para. 43) Not only is the proposed Milford locus of the BRT operations in a residential district, the locus is in an environmentally sensitive area. The Godfrey Brook, entitled to special protection under the Rivers Act provisions of the Massachusetts Wetlands Protection Act, runs along the property. The site is interspersed with wetlands. (Exhibit "K-2" to Dunkin Aff.) and is in the Zone II area of protection for the Milford Godfrey Brook Wells. (Dunkin Aff. para. 24, Exhibits "J" and "K-1") The potential for damage to the environment if there is to be no environmental review under either the local by-law or the state Wetlands Protection Act is very very real.

Finally, it is of significant note that at the Status Conference on February 11, 2005 Counsel for GU revealed in open Court that the proposal to bring the BRT operation to the Milford Yard of GU is no longer viable and will not go forward. The BRT operations will not be coming to Milford no matter what the decision of this Court.

## **ARGUMENT**

The Court has before it the Milford STB decision attached to this Memorandum as Exhibit "A". The essence of the argument supporting Milford's Motion For Summary Judgment is that this Court should find consistently with the STB Decision, afford that decision the substantial deference which it is due, and dismiss the Plaintiff's Complaint. Conversely, the essence of the Plaintiff's Motion For Summary Judgment will undoubtedly be their position that this Court should disregard the *Milford* STB Decision and declare and order the relief which they originally sought.

A. <u>The Surface Transportation Board was correct in its analysis of the applicable law and in the application of that law to the undisputed facts.</u>

In the *Milford* STB Decision the STB carefully found that "The Board has jurisdiction over 'transportation by rail carrier'. 49 USC 10501(a). To come within the Board's jurisdiction and the scope of Federal preemption, an activity must be **both** 'transportation' and 'by rail carrier' under Section 10501." (*Milford* STB decision page 2) (emphasis added).

The STB specifically found that BRT is not a rail carrier. BRT had not sought or obtained authorization from the Board pursuant to 49 USC 10901 in connection with its planned Milford activities. The Board ultimately found, correctly, that the BRT/GU proposal was specifically to relocate the activities of the non-rail carrier BRT from its South Boston site to Milford. The STB held that it did not have jurisdiction over the steel fabrication activities of BRT or the rail/truck trans-loading activities and, by necessary implication, the remaining trucking and shipping activities of BRT. The STB stated that "....the broad Federal preemption of Section 10501(b) does not apply to activities over which the Board's jurisdiction does not extend." The STB decision is fully supported by careful analysis of the governing statutes, judicial and agency decisions. The

8

Plaintiff's broad analysis and citation of applicable decisional law is generally accurate, but where that analysis goes wrong is in the efforts to confuse the activities of BRT, a non-rail carrier undertaking non-rail activities, with the limited involvement of GU.

There is no question but that under 49 USC § 10501, as amended by the ICCTA, the Surface Transportation Board has exclusive jurisdiction over rail transportation and further that there can be a statutory preemption of the application of state and local law. Further, the breadth of the possible preemption is also beyond dispute. As was stated in <u>CSX Transportation Inc. vs. Georgia Pub. Serv. Commission</u>, 994 F. Supp. 1573, 1581 (N.D. GA 1996), "[i]t is difficult to imagine a broader statement of Congress' intent to preempt state regulatory authority over railroad operations" than is contained in § 10501(b).

Notwithstanding the breadth of preemption, the STB and courts must take cognizance of the spirit of caution and prudence taught by the United States Supreme Court. In <u>CSX vs. Easterwood</u>, 507 US 658, (1993) the Supreme Court stated that lower courts should be "reluctant to find preemption" pointing out that preemption would not lie unless it is the "clear and manifest purpose of Congress". The Supreme Court went onto state that "We are not prepared to find preemption solely on the strength of general mandates of federal preemption." <u>Id.</u> at 664.

To find the manifest intent and purpose of Congress, one must first (as the STB has done carefully in recent decisions, including the *Milford* STB decision) look closely at the express provisions of the statute from which the preemption concept flows. Under § 10501(b) the jurisdiction of the board is over "(1) transportation by ***rail carriers***, ..." (emphasis added) and that jurisdiction is exclusive. It is then pointed out that the remedies "...under this part with respect to ***rail transportation*** are exclusive and preempt the remedies provided under federal or state law." (emphasis added)

By the plain language used by Congress, it is the transportation, and related activities, undertaken by *rail carriers* that benefit from preemption, not activity which may be related to rail transportation but which is provided and undertaken by non-rail carriers like BRT. This was recognized by the STB in the *Milford* decision. As was stated in <u>Fletcher Granite Company, LLC</u> STB Docket No. 34020, June 25, 2001, (attached hereto as Exhibit "D") under the preemption provisions of the ICCTA, "...zoning ordinances and local land use permit requirements are preempted as to facilities that are an ***integral part of the railroad's interstate operations.***" <u>Id.</u> at page 3. Citing <u>Norfolk Southern RY. Vs. City of Austell</u>, No. 1:97-cv-1018-RLV, 1997 US Dist. LEXIS 17236, at 17 N. 6 (N.D. GA. 1997) and <u>Village of Ridgefield Park vs. New York, Susquehanna & Western RY.</u>, 750A 2nd 57(N.J. 2000).

BRT had proposed to undertake in Milford the ***same receiving and trucking operation as it currently undertakes in South Boston***. BRT's operations and activity are not now, nor would they be if the move to Milford is undertaken, in any way "integrally related" to any Interstate rail operations of GU. The more recent involvement of GU is a rather transparent attempt to make the BRT trucking operation sound like a GU Railroad operation.

The very significant distinction between activities of a rail carrier and activities of a non-rail carrier entity have been noted and found dispositive by federal courts. The decision in <u>Florida East Coast Railway Company vs. City of West Palm Beach</u>. 110 F. Supp. 2nd 1367, aff'd. 266 F. 3rd 1324 (2001), was relied upon by the STB in the *Milford* decision. In the <u>Florida East Coast</u> decision a company known as Rinker Materials Corporation was proposing to lease facilities of the Florida East Coast Railway (FEC) and to establish a facility to receive aggregate material by rail and then to distribute from that point by truck. Citing the STB 1999 *Riverdale* decision (attached hereto as Exhibit "E") the District Court held that "Activities and facilities not integrally related to the provision of interstate rail are not subject to (STB) jurisdiction or to federal preemption." 110 F. Supp. 2nd at 1378. In upholding the lower court decision the

10

11th Circuit Court of Appeals held that "...Rinker's use of the property at the 15th Street yard and the activities there performed by Rinker serve no public function and provide no valuable service to FEC; rather, the arrangement between FEC and Rinker merely facilitates Rinker's operation of a private distribution facility on FEC owned premises." 266 F. 3rd at 1336. This last holding nicely characterizes what will be the arrangement between BTR and GU in Milford if allowed to go forward.

A recent decision by the Director of the Office of Proceedings of the STB presaged the *Milford* STB decision. That case was *Hi Tech Trans. LLC* STB Finance Docket No. 34192, decided August 14, 2003. A copy of this decision is attached to the Plaintiff's Memorandum of Law as Exhibit "C".

In *Hi Tech*, the petitioning company was involved in transportation of construction and demolition (C&D) debris. The company had an arrangement with the Canadian Pacific Railway to use their Oak Island Yard in Newark, New Jersey. The company would bring customers C&D debris to the yard by truck, unload it, and then load it onto trains for transportation to disposal sites. *Hi Tech*, page 2. The company, Hi Tech Trans, LLC **was not a rail carrier**. The foregoing scenario is the mirror image of what was proposed to take place at the Milford site under consideration. Here, BRT, also not a rail carrier, would receive steel at the Milford site, unload it, and then load it onto trucks for transportation to its customers across New England. From any practical or legal perspective, the essential operations would be the same as in *Hi Tech* and the end result should be the same; i.e. a finding that state and local regulations are not preempted.

In *Hi Tech*, the issue was squarely presented and argued by the company advocating strongly that preemption applied whether or not the subject facilities were operated directly by a rail carrier. They even argued, as BRT presumably would in the case under consideration, that "....the trans-loading services performed by Hi Tech at Oak Island Yard are one of the most integral components of interstate rail movement -- it is elementary that C&D debris cannot

11

be transported by rail if it cannot be loaded onto rail cars." (*Hi Tech Trans, LLC*, Petition for Declaratory Order, June 16, 2003, page 13). The Director correctly rejected such seemingly compelling arguments, for the very sound reason that they failed to account for the expressed intent of Congress that preemption apply only to activities of "rail carriers" and not any activity which may be related to rail transportation which might be performed by non-carrier entities.

The precise reasoning and clear statutory analysis of the Director deserves close consideration in this matter particularly for its consistency with the latter *Milford* decision. In *Hi Tech*, at page 5, the Director carefully reviewed the relevant statutory scheme.

> The Board has jurisdiction over "transportation by rail carrier." 49 U.S.C. § 10501(a). The term "transportation" is defined to include a "facility" related to the movement of property by rail and "services" related to that movement by rail, including receipt, delivery, transfer, and handling of property. 49 U.S.C. § 10102 (2)(a), (b). "Rail carrier" is defined as a person providing "common carrier railroad transportation for compensation." 49 U.S.C. §10102 (5). Where the Board has jurisdiction over transportation by rail carrier, that jurisdiction is "exclusive," 49 U.S.C. § 10501 (b), and state and local laws and regulations are generally preempted. To come within the preemptive scope of 49 U.S.C. § 10501 (b), these activities must be both: (1) transportation; and (2) performed by, or under the auspices of, a rail carrier.

The Director then applied the statutory analysis to the activities proposed by the company and reasoned as follows:

> There is no dispute that Hi Tech's trans-loading activities are within the broad definition of transportation. The Board has consistently found such activities to be transportation under 49 U.S.C. 10102(2). See Green Mountain Railroad Corporation – Petition for Declaratory Order, STB Finance Docket No. 34052 (STB served May 28, 2002) (Green Mountain) (cement trans-loading facility); Joint Petition for Declaratory Order – Boston and Maine Corporation and Town of Ayer, MA, STB Finance Docket No. 33971 (STB served May 1, 2001) (Ayer) (automobile unloading facility). This is only part of the statutory equation, however. To be preempted, the transportation activities must be performed by a rail carrier.

> By *Hi Tech's* reasoning, any third party or non-carrier that even remotely supports or uses rail carriers would come within the statutory meaning of transportation by rail carrier. The Board and its predecessor, the Interstate Commerce Commission, have indicated that the jurisdiction of this agency may extend to certain activities and facets of rail trans-loading facilities, but that any such activities or facilities must be closely related to providing direct rail service. In every case, jurisdiction was found and local regulations relating to transportation facilities preempted only when those facilities have been operated or controlled by a rail carrier. See Green Mountain; Ayer, Borough of Riverdale – Petition for Declaratory Order – The New York Susquehanna and Western Railway Corporation, STB Finance Docket No. 334656 (STB served Sept. 10, 1999); Growers Marketing Co. v. Pere Marquette Ry., 248 I.C.C. 215, 227 (1941); see also Norfolk S. Ry. V. City of Austell, No. 1:97-CV-1081-RLV, 1997 U.S. Dist. LEXIS 17236 (N.D. GA Aug 18, 1997). Here Hi-Tech's activities are not performed by a rail carrier.
>
> *Hi Tech* pages 5-6

Another STB decision which presaged the *Milford* decision was *H & M International Transportation, Inc.* STB Finance Docket No. 34277. (Exhibit "B" to Plaintiff's Memorandum). The company at issue in the *H & M* decision operated intermodal facilities involving all manner of transportation related activities, including the loading, unloading and movement of rail cars within the facilities. The question was whether nor not the company was a "rail carrier" within the meaning of 49 U.S.C. § 10102(5). The analysis of the STB in this decision was essentially the same as in *Hi-Tech, supra.* The STB stated at page 2-3 of the *H & M* decision that:

> To fall within the Board's jurisdiction, the transportation activities must be performed by a rail carrier, and the mere fact that H&M moves rail cars inside the Marion facility does not make it a rail carrier. To be considered a rail carrier under the statute, there must be a holding out to the public to provide common carrier services.

In the matter under consideration there was no such holding out to the public of an ability to provide common carrier services and the STB so

recognized. BRT was simply going to operate its trucking company on the Milford property. As discussed previously, GU later claimed that it was going to provide some switching activity, utilizing a BRT owned locomotive. This assertion cannot serve to hide the very clear fact that all of the activity to be transferred from the South Boston site to the Milford site was the activity of BRT.

B. <u>Substantial Deference is due the Milford STB decision.</u>

It is the position of Milford that this Court must afford substantial deference to the *Milford* decision of the STB.

The STB is established by federal law to consist of three (3) members, appointed by the President with the advice and consent of the Senate. At least two (2) members of the STB "....shall be individuals with professional standing and demonstrated knowledge in the fields of transportation or transportation regulation, ...." 49 USC § 701(b)(2). By virtue of 49 USC 702 the STB is tasked to perform all of the functions that had previously been the functions of the Interstate Commerce Commission (ICC). Federal Courts have always recognized and supported the special perspective, expertise and character of the ICC (now the STB) in determining railroad issues. <u>State of S.C. Ex. Rel. South Carolina Public Service Commission vs. U.S.</u>, 136 F. Supp. 897, 903 (D.C.S.C. 1956) affirmed 351 US 944; <u>US vs. Louisville & Nashville R. Co.</u>, 235 US 314, 320 (1914). "[A]s the agency with authority delegated from Congress to implement the provisions of the ICCTA, the STB is uniquely qualified to determine whether state law or local law should be pre-empted....." <u>Florida East Coast Railway Company vs. City of West Palm Beach</u>, 110 F. Supp. 2nd 1367, 1378 FN. 5, citing <u>Norfolk Southern Rail Way Company vs. City of Austell, Georgia</u>, 1997, W.L. 1113647 (N.D. Ga. August 18, 1997). In the context of the experience, character and unique qualifications of the STB it is worthy of note at this juncture that the *Milford* STB decision here at issue was a unanimous one.

In the *Milford* decision the STB held that "To come within the Board's jurisdiction and the scope of Federal pre-emption, an activity must be both 'transportation' and 'by rail carrier' under Section 10501." (*Milford* decision, Exhibit "A", at page 2). The Board found that the proposed steel fabrication activity of BRT fell outside the definition of railroad transportation. The Board further found, and it was undisputed, that BRT was not a rail carrier. The Board then ultimately held that the 'rail/truck trans-loading and truck delivery activity were not to be conducted by or for a rail carrier." Consequently, the Board found that those activities were not entitled to pre-emption. (*Milford* decision, Exhibit "A", at page 4.)

The United States Supreme Court has repeatedly directed that substantial deference be afforded to interpretations of statutes by agencies which are charged with enforcing those statutes. "We have often noted that the interpretation of an agency charged with the administration of a statute is entitled to substantial deference." Blum vs. Bacon, 457 US 132, 141 (1992). "We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." Chevron USA vs. Natural Resources Defense Council, 467 US 837, 844 (1984). "Because the FDA is the federal agency to which the Congress has delegated its authority to implement the provisions of the Act, the agency is uniquely qualified to determine whether a particular form of state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' Hynes vs. Davitowitz, 312 US 52, 67 (1941), and, therefore, whether it should be pre-empted." Medtronic Inc. vs. Lohr, 518 US 470, (1996). Finally, in a railroad pre-emption question context, the Supreme Court has held that "judicial deference to a reasonable interpretation by an agency of a statute that it administers is a dominant, well settled principle of federal law. NRPC vs. Boston and Maine Corporation, 503 US, 407, 417 (1992).

Since the STB is the agency charged with determining whether or not a particular activity is entitled to pre-emption under 49 USC, Section 10501(b) this Court should be primarily guided by the Supreme Court decision in <u>Chevron USA vs. Natural Resources Defense Council</u>, supra., in reviewing the STB determinations at issue. To the extent that there was any 'interpretation' by the STB involved it would be in the meaning and application of the requirement within Section 10501(b) that to be entitled to pre-emption an activity must be "by rail carrier."

In a rail context the Seventh Circuit Court of Appeals utilized a succinct <u>Chevron</u> style analysis in reviewing a determination of the STB. The Circuit Court of Appeals in <u>United Transportation Union – Illinois Legislative Board vs. Surface Transportation Board,</u> 169 F. 3rd 474 (1999) first held that a determination of the STB was entitled to a "....high level of deference accorded to an agency's reasonable interpretation of the statutes which the agency administers." <u>Id</u>. at 476. The Court went on to explain that "Under <u>Chevron</u> deference we apply a two step analysis: (1) if the plain meaning of the [statutory] text either supports or opposes the [agency's interpretation], then we stop our analysis....But if .....the statute is either ambiguous or silent on the issue, we continue to the second step. (2)....if the [construction] is a reasonable reading of the statute we give deference to the agency's interpretation." (citations omitted). Later in its analysis the Court pointed out that ".... To overcome the great deference given under <u>Chevron</u> to agency interpretations or statutes they administer, the union must show that the Board's interpretation set forth above is unreasonable." <u>Id.</u> at 478. The Court found the interpretation at issue in the <u>United Transportation</u> case to be reasonable.

It cannot be said that the STB's interpretation of 49 USC 10501(b) and application thereof to the facts of the BRT/GU Proposal was in any way unreasonable. The agency interpretation and application is not only reasonable, it is completely consistent with the STB's own interpretative precedent over the years since the enactment of the ICCTA.

16

## **CONCLUSION**

For all of the foregoing reasons the Town of Milford respectfully requests that this Honorable Court enter a Summary Judgment dismissing the plaintiff's Complaint and declaring that the Town of Milford was not prohibited from enforcing its zoning by-laws and the Massachusetts Wetlands Protection Act in relation to the proposed activities of the Boston Railway Terminal Corporation at the Milford Yard of the Grafton and Upton Railroad.

                                                    Respecfully ubmitted
                                                    Town of Milford
                                                    By its attorney:

                                                  Gerald M. Moody, Town Counsel
                                                  Town Hall – 52 Main Street
                                                  Milford, MA  01757
                                                  BBO No. 352380
                                                  Tel. (508) 634-2302

Dated: March 7, 2005