# EXHIBIT "D"

31730
DO

SERVICE DATE - JUNE 29, 2001

SURFACE TRANSPORTATION BOARD

DECISION

STB Finance Docket No. 34020

FLETCHER GRANITE COMPANY, LLC - PETITION FOR DECLARATORY ORDER

Decided:  June 25, 2001

In a petition filed March 13, 2001, Fletcher Granite Company, LLC, successor in interest to H.E. Fletcher Company (Fletcher), seeks a declaratory order that the Board has exclusive jurisdiction over the resumption of rail service by Fletcher over certain sidetrack in Westford, MA. Fletcher owns and operates a granite quarry and stone fabrication mill in Westford and the sidetrack runs from its quarry and fabrication mill to the mainline connection of the Stoney Brook Branch of the Boston & Maine Corporation (B&M).[1]  The Town of Westford filed a notice of appearance on March 26, 2001.

Fletcher indicates that rail operations connecting the granite quarry (located on the north side of Groton Road) and mill (on the south side of Groton Road) with the Stoney Brook Branch began in 1895. Fletcher laid the rail track on its property and provided its own rail service to the B&M interchange. This service continued until about 1965, when Fletcher decided to ship granite by truck instead of rail. While Fletcher has discontinued rail service from the fabrication mill to the B&M, it has maintained rail service on the part of its track running from the quarry to the fabrication mill. With the exception of the switch to the B&M that was removed in 1965, the original track remains in place. Debris, however, has been dumped on the right-of-way by local land abutters, and residents have placed retaining walls and a landfill parallel to the track but within the right-of-way. Fletcher contends that neither it nor any other entity has attempted to abandon the track, and that it was not aware of the encroachments to its property until it began repair work in preparation for the reuse of the line.

Fletcher submits that it has had extensive discussions with B&M concerning reestablishing rail service and that the parties have agreed as to what would be needed to repair or upgrade the track. B&M has also agreed to replace the switch to the Stoney Brook line and to furnish rail service to and from the interchange.

---

[1] Fletcher states that rail operations are conducted by the Springfield Terminal Railway Company, which, like B&M, is part of the Guilford Rail System.

EXHIBIT

STB Finance Docket No. 34020

Fletcher states that it has repaired the grade crossing at Groton Road and plans to improve another grade crossing at Brookside Road.[2] It has retained a railroad design and construction consultant to determine what is needed to resume safe rail service. Fletcher asserts that the consultant believes "the required improvements are viable." Petition at 3 (citation omitted).

Fletcher is concerned that the resumption of rail service could be delayed or defeated if state and local officials try to regulate the matter. Fletcher claims that its concerns are not speculative, citing negative press coverage and alleged hostility by the local community to development in Westford. It also asserts that part of its right-of-way abuts a brook and wetlands, and that it has been told by local officials that resuming service would entail an environmental permitting process under state law and review by the local Conservation Commission. Fletcher states that it will submit its workplan to the Conservation Commission and will work consistently with applicable environmental standards by, for example, not storing materials in protected wetlands. Nevertheless, Fletcher asserts that, if its proposal comes under Conservation Commission review, it will likely "become involved in extensive, time-consuming hearings that will result in either denial of any permit application or the imposition of such expensive and unwieldy conditions that the project will be unfeasible to complete." Petition at 4 (citation omitted). In any event, Fletcher claims that the permitting process will substantially delay and add cost to the project.

Accordingly, Fletcher seeks a declaratory order that, under 49 U.S.C. 10501(b)(2), the Board has exclusive jurisdiction over the resumption of rail service and that local or state regulation is preempted. Fletcher argues that, while the Board does not have licensing and conditioning authority over ancillary facilities, citing 49 U.S.C. 10906, Congress gave the Board exclusive jurisdiction over rail transportation under section 10501(b).

## DISCUSSION AND CONCLUSIONS

Under the Administrative Procedure Act, "the agency, . . . in its sound discretion, may issue a declaratory order to terminate a controversy or remove uncertainty." 5 U.S.C. 554(e). See also 49 U.S.C. 721. It would be premature for the Board to institute a declaratory order proceeding at this point, as there is not now, and may never be, a controversy that needs to be terminated. Westford, while filing a notice of appearance, has not submitted any substantive views on this matter. Nor does Westford appear to have taken any official action that would impede the resumption of rail service over Fletcher's track. Fletcher, moreover, has indicated that it will submit workplans and act consistently with applicable environmental standards. Thus, the Board will not attempt to intervene in this matter at this time.

---

[2] Fletcher states that the Federal Highway Administration (FHWA), pursuant to its Federal Railroad Grade Crossing Program, has funded 80% of the cost of the Groton Road grade crossing improvements. It has also approved funding for the Brookside Road grade crossing improvements, and funds will be released when work begins.

2

Nevertheless, to provide guidance to the parties, this decision will summarize relevant court and agency case law addressing similar situations. Under 49 U.S.C. 10501(b)(2), as broadened by the ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803 (1995) (ICCTA), the Board has exclusive jurisdiction over "the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks or facilities, even if the tracks are located, or intended to be located entirely in one State." Section 10501(b)(2) further provides that both "the jurisdiction of the Board over transportation by rail carriers" and "the remedies provided under [49 U.S.C. 10101-11908] are exclusive and preempt the remedies provided under Federal or State law." See City of Auburn v. STB, 154 F.3d 1025, 1029-31 (9th Cir. 1998), cert. denied, 527 U.S. 1022 (1999) (City of Auburn); Borough of Riverdale – Petition for Declaratory Order – The New York Susquehanna and Western Railway Corporation, STB Finance Docket No. 33466 (STB served Sept. 10, 1999) (Riverdale I) at 5. As several courts have held, this statutory preemption applies even in cases involving the construction of ancillary tracks and facilities under section 10906, even though the Board does not have licensing authority over such matters and therefore does not conduct its own environmental review.[3] See Flynn v. Burlington Northern Santa Fe Corp., 98 F. Supp.2d 1186 (E.D. Wash. 2000) (Flynn)[4] and cases cited in Joint Petition for Declaratory Order – Boston and Maine Corporation and Town of Ayer, MA, STB Finance Docket No. 33971 (STB served May 1, 2001) (Ayer) at 8, Riverdale I at 5-9, and Borough of Riverdale — Petition for Declaratory Order — The New York Susquehanna and Western Railway Corporation, STB Finance Docket No. 33466 (STB served Feb. 27, 2001) (Riverdale II) at 3.

In addressing the scope of 49 U.S.C. 10501(b), the courts have found that, under this broad preemption provision enacted in ICCTA, zoning ordinances and local land use permit requirements are preempted as to facilities that are an integral part of a railroad's interstate operations. Norfolk Southern Ry. v. City of Austell, No. 1:97-cv-1018-RLV, 1997 U.S. Dist. LEXIS 17236, at 17 n.6 (N.D. Ga. 1997); Village of Ridgefield Park v. New York, Susquehanna & Western Ry., 750 A.2d 57 (N.J. 2000) (Ridgefield Park). Moreover, state and local permitting or preclearance requirements (including environmental requirements) have been found to be preempted because, by their nature, they interfere with interstate commerce by giving the state or local body the ability to deny the carrier the right to construct facilities or conduct operations.

---

[3] Under 49 U.S.C. 10906, "The Board does not have authority . . . over the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks."

[4] The Flynn court noted that while the Board does not have regulatory authority over section 10906 projects, it does have jurisdiction over these rail activities. Id. at 1189-90.

STB Finance Docket No. 34020

Auburn and Kent, WA– Petition for Declaratory Order – Burlington N.R.R. – Stampede Pass Line, 2 S.T.B. 330 (1997) (Stampede Pass), aff'd, City of Auburn.[5]

The Board has regulatory authority over rail line constructions under 49 U.S.C. 10901, and it conducts an environmental review of such activities under the National Environmental Policy Act (NEPA), and can adopt appropriate environmental mitigation conditions in response to concerns of the parties, including local authorities. See Ayer at 4, n.14.[6] However, there is no statutory requirement for a carrier to obtain Board approval to build or expand facilities that assist the railroad in providing its existing operations but that do not give the carrier the ability to penetrate new markets. See Nicholson v. ICC, 711 F.2d 364, 368-70 (1983), cert. denied, 464 U.S. 1056 (1984); Riverdale I. Railroads also do not require Board authority to upgrade an existing line, and, as noted, the law explicitly provides that a license is not required to construct "spur," "industrial," or "switching" tracks, see 49 U.S.C. 10906. Where no license is required, there is no environmental review conducted by the Board. Regardless of whether a project falls under section 10901 or 10906, however, the preemption provisions of section 10501(b) apply.

It should be noted, moreover, that in Stampede Pass, Riverdale I, and Ayer, the Board expressed its view that not all state and local regulations that affect railroads are preempted.[7]

---

[5] The argument that the statutory preemption in section 10501(b) is limited to state and local "economic" regulations was rejected by the court as contrary to the statutory text and unworkable in practice. City of Auburn, 154 F.3d at 1029-31.

[6] Under 49 U.S.C. 10901(a), a license from the Board (and an appropriate environmental review) is required for a railroad's construction of "an extension to any of its railroad lines . . . [or] . . . an additional railroad line . . . ." The terms "extension" and "additional railroad line" are not defined in the statute. These terms have been interpreted, however, in Texas & Pacific v. Gulf, Colorado & Santa Fe Ry., 270 U.S. 266 (1926) (Texas & Pacific), as those tracks that enable a railroad to penetrate or invade a new market. See Union Pacific Railroad Company – Petition for Declaratory Order – Rehabilitation of Missouri-Kansas-Texas Railroad Between Jude and Ogden Junction, TX, STB Finance Docket No. 33611 (STB served Aug. 21, 1998).

[7] In Stampede Pass, 2 S.T.B. at 339, the Board offered the following examples of state and local regulation that would not be preempted:

> a local law prohibiting the railroad from dumping excavated earth into local waterways would appear to be a reasonable exercise of local police power. Similarly, . . . a state or local government could issue citations or seek damages if harmful substances were discharged during a railroad construction or upgrading project. A railroad that violated a local ordinance involving the dumping of waste could be fined or penalized for dumping by the state or local entity. The railroad

(continued...)

STB Finance Docket No. 34020

The Board has stated that state and local regulation is appropriate where it does not interfere with interstate rail operations, and localities retain certain police powers to protect the public health and safety. For example, non-discriminatory enforcement of state and local requirements such as building and electrical codes generally are not preempted. Riverdale I at 8-9; Flynn. While a locality cannot require permits prior to construction, the courts have found that a railroad can be required to notify the local government "when it is undertaking an activity for which another entity would require a permit" and to furnish its site plan to the local government. Ridgefield Park. Local authorities can take actions that are necessary and appropriate to address a genuine emergency on railroad property.

Finally, the Board has concluded that "nothing in section 10501(b) is intended to interfere with the role of state and local agencies in implementing Federal environmental statutes such as the Clean Air Act, the [Clean Water Act], and the [Safe Drinking Water Act]." Ayer at 9.[8] Thus, the lack of a specific environmental remedy at the Board or at the local level as to construction projects over which the Board lacks licensing power does not mean that there are no environmental remedies under other Federal laws. Whether a particular Federal environmental statute, local land use restriction, or other local regulation is being applied so as to not unduly restrict the railroad from conducting its operations, or unreasonably burden interstate commerce, is a fact-bound question. Id.[9]

This action will not significantly affect either the quality of the human environment or the conservation of energy resources.

---

[7](...continued)
    also could be required to bear the cost of disposing of the waste from the construction in a way that did not harm the health or well being of the local community.

[8] Section 10501(b) also does not preempt valid safety regulation under the Federal Rail Safety Act, 49 U.S.C. 20101 et seq. See Tyrrell v. Norfolk Southern Railway Company, No. 99-4505 (6th Cir. Apr. 25, 2001); Riverdale II at 2 n.4.

[9] The Board indicated, Ayer at 10, that

    individual situations need to reviewed individually to determine the impact of the contemplated action on interstate commerce and whether the statute or regulation is being applied in a discriminatory manner, or being used as a pretext for frustrating or preventing a particular activity, in which case the application of the statute or regulation would be preempted.

STB Finance Docket No. 34020

It is ordered:

1. Petitioner's request for a declaratory order proceeding is denied.

2. This decision is effective on July 29, 2001.

By the Board, David M. Konschnik, Director, Office of Proceedings.


Vernon A. Williams
Secretary

6

# EXHIBIT "E"

29023
EB
SERVICE DATE - LATE RELEASE SEPTEMBER 10, 1999

SURFACE TRANSPORTATION BOARD

DECISION

STB Finance Docket No. 33466

BOROUGH OF RIVERDALE! PETITION FOR DECLARATORY ORDER!
THE NEW YORK SUSQUEHANNA AND WESTERN RAILWAY CORPORATION

Decided: September 9, 1999

On September 8, 1997, the Borough of Riverdale (the Borough), a New Jersey municipal corporation, filed a petition for a declaratory order in this case. The Borough seeks a determination regarding the extent to which certain facilities constructed and operated in Riverdale by The New York, Susquehanna and Western Railway Corporation (NYSW) are covered by the federal preemption provisions contained in 49 U.S.C. 10501(b), as broadened by the ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803, 807 (1995) (ICCTA).

The Borough contends, among other things, that the railroad's construction of a truck terminal and corn processing plant in a residential zone in Riverdale without first obtaining approval from the municipal Planning Board raises health and safety concerns. It asks for a ruling regarding whether the facilities are subject to federal jurisdiction, and, if so, the extent to which local laws and regulations (specifically zoning ordinances) apply. NYSW did not file a reply.[1] As discussed below, we will (1) grant the Borough's request that we institute a declaratory order proceeding, (2) summarize relevant recent agency and court cases construing the ICCTA and its effect on state and local regulation, to assist the parties and the court in resolving some of the preemption questions raised in this case, and (3) establish a schedule for the submission of further pleadings by the Borough, NYSW and other interested persons.[2]

---

[1] The Borough did not include in its petition a certificate showing service on NYSW. See 49 CFR 1104.12. We will serve a copy of the Borough's petition (including attachments) and a copy of this decision on NYSW.

[2] The material we have before us at this point does not permit a resolution of every one of the many preemption issues raised. We have only the Borough's initial filing, which consists principally of copies of New Jersey State court records and related documents. Nevertheless, the filing is sufficient to permit us to explain how certain preemption issues would be resolved under the statute; to support a determination that a question exists for which declaratory relief is appropriate; and to warrant institution of a declaratory order proceeding.

STB Finance Docket No. 33466

BACKGROUND

This controversy arises from the Borough's opposition to NYSW's construction and use of certain facilities within or between two residential zones of Riverdale. The facts, as represented by the Borough in the material furnished to us (its complaint and other material from the Borough's civil action seeking injunctive relief in New Jersey State court),[3] are as follows.

The facilities in question, a truck terminal, weigh station, and corn processing plant, evidently were constructed either within NYSW's right-of-way or on property that it owns adjacent to the right-of-way. The right-of-way, which is 100 feet wide, is situated on 3.59 acres within Riverdale. In addition to the right-of-way, NYSW owns a small parcel of land immediately adjacent to and west of the northernmost portion of the right-of-way, with 28 feet of frontage on the Paterson-Hamburg Turnpike. An asphalt parking area provides access to a former railroad passenger depot located within the right-of-way. The 1,080-foot portion of the right-of-way to the north is within the Riverdale central business area, while the 485-foot portion of the right-of-way to the south is between two residential zones.[4]

A water pipe installed within the right-of-way apparently has 20 or more outlets to transfer hot water to standing railroad tank cars for the purpose of heating the materials inside the tank cars to facilitate transfer of the materials to trucks. The outlets are located on the west side of the track, and there is a 20-foot wide paved area to accommodate the trucks that separates the track from the adjacent residences. The Borough is concerned about the potential for spills and malfunctions in the heat transfer process that could result in adverse environmental impacts. The Borough further states that NYSW has also established a corn processing facility that would bring 10 to 20 tanker trucks to the site per day to off-load its rail cars. These activities allegedly violate Riverdale's land use and permissive zoning ordinances as prohibited uses within this residential district.

In addition to these activities, the truck weigh station, which is located adjacent to the eastern edge of NYSW's property approximately 158 feet from where the property intersects with the Paterson-Hamburg Turnpike, allegedly poses a risk of injury to the public because of the proximity of large tractor trailers to high tension power lines. Concern was also expressed that NYSW's construction activities may cause flooding, disrupt traffic, and produce unacceptable noise levels for the town's firehouse and library located next door.

---

[3] Borough of Riverdale v. NYSW, No. MRS-L-2297-96 (Superior Court of New Jersey, Law Division - Morris County) (Riverdale). The Board was not a party in that court case.

[4] These residential zones evidently were established in September 1991 by Riverdale's Planning Board under its Master Plan. The boundary line between the two zones was set at the center of NYSW's right-of-way.

- 2 -

STB Finance Docket No. 33466

According to the material filed by the Borough, NYSW's construction activities took place without appropriate municipal approvals and permits and have resulted in noncompliance with local ordinances.[5] The Borough states that NYSW's agents, asserting that their activities were permitted under Federal law, opened local hydrants, filled its paver machines, and paved from Hamburg Turnpike to Post Lane, thereby connecting NYSW's property to local streets and county roads. The Borough also alleges that the improvements violate the landscaping buffer regulations that require 10-foot width buffer adjacent to and parallel with any street and provide for a buffer not less than 25 feet in width for lots contiguous to any residentially zoned lot.

In the Borough's civil suit, the court, by decision entered September 7, 1996, ordered: (1) NYSW to file a Site Plan Application with the Borough's Planning Board; (2) the Borough to review the application, subject to its standard procedures, but in a way that would not inappropriately obstruct the operation of NYSW's facility; and (3) the Borough to approve the application by January 31, 1997, or report back to the court for further proceedings. The court also directed NYSW to: (1) stop further construction except for emergency measures that were to be reported to Riverdale; and (2) comply with "applicable safety, health and welfare regulations." At the same time, the court determined that NYSW is not "bound by Local Zoning regulations as to Land Use and Utilization," which the court found to be preempted by the ICCTA. The court added that the Borough "shall not use regulatory measures regarding safety, environmental or health matters as a device for getting rid of NYSW's [Riverdale facilities]." Nor, in the court's words, can the Borough "preclude or interfere with [NYSW's] operation of the facilities."[6]

---

[5] The Borough states that NYSW applied to the Morris County Soil Conservation Board for approval and that, after Morris County notified the Borough, the railroad informed the Borough that it wished to bring trailers to the site. Subsequently, a Borough engineer conducted a site inspection. The Borough then advised that the planned activities required a site plan and variances. The railroad evidently took the position that it could proceed with work construction pursuant to federal law.

[6] The court also severed the Borough's complaint challenging NYSW's right to cross public roads, and transferred it to the Chancery Division of the Superior Court of New Jersey. This part of the complaint was predicated upon the theory that NYSW does not have an easement over these streets, which were termed "public rights-of-way." The complaint seeks an order directing NYSW to remove all rail and related fixtures "placed in the public domain without appropriate rights-of-way."

STB Finance Docket No. 33466

## DISCUSSION AND CONCLUSIONS

We will exercise our discretionary authority to institute a declaratory order proceeding pursuant to 5 U.S.C. 554(e) and 49 U.S.C. 721 to eliminate the controversy and remove uncertainty on the preemption questions raised in this case. We will express our understanding of the nature and effect of the preemption in 49 U.S.C. 10501(b) as it relates to the appropriate role of state and local regulation (including the application of local land use or zoning laws or regulations and other state and local regulation such as building codes, electrical codes, and environmental laws or regulations) regarding the construction and operation of NYSW's facilities in Riverdale.

We did not attempt to move this proceeding forward sooner because of the pendency of the "Stampede Pass" litigation.[7] Now that that litigation has concluded, we will establish in this decision a schedule for the submission of opening statements and replies by the Borough and the railroad.[8] We are providing the opportunity for further filings to ensure that we have the specific information we need to address the issues to which interested parties may seek an answer. As noted, the record consists mainly of material from a state court proceeding decided in 1996, before many of the recent Board and court decisions addressing the reach of the ICCTA preemption provisions were issued. Moreover, the record before us at this point does not reflect what has taken place in Riverdale following the issuance of the New Jersey state court's September 1996 decision.

In any event, to provide guidance, we will summarize here recent relevant agency and court decisions concerning the reach of the express statutory preemption in section 10501(b). This precedent gives us a basis, with the material provided by the Borough, to now address certain issues raised by the Riverdale case where the law has become well settled as to how preemption applies. Other issues presented in this case involving what types of state and local regulation of railroad facilities and activities may be appropriate under the ICCTA have not yet been directly addressed by the agency or the courts. As to these types of issues, we are providing our preliminary conclusions, in light of the existing court precedent, as to how a court would likely apply the preemption provisions. Our preliminary conclusions, of course, could change depending on our understanding of the facts after we have reviewed the parties' comments, evidence and arguments. Finally, there may be additional unresolved preemption issues as to which parties believe the Board should provide clarification that involve the extent to which state and local governments may regulate a railroad's construction plans or the operation of its facilities.

---

[7]    King County, WA--Petition for Declaratory Order--Burlington Northern Railroad Company--Stampede Pass Line, STB Finance Docket No. 33095 (STB served Sept. 25, 1996), clarified, Cities of Auburn and Kent, WA--Petition for Declaratory Order--Burlington Northern Railroad Company--Stampede Pass Line, STB Finance Docket No. 33200 (STB served July 2, 1997) (Stampede Pass), aff'd, City of Auburn v. STB, 154 F.3d 1025 (9th Cir. 1998), cert. denied, 119 S. Ct. 2367 (1999) (City of Auburn).

[8] A notice that we are instituting this proceeding also will be published in the Federal Register.

I. Existing Precedent.

When it finds it necessary to do so, Congress has the authority to preempt, that is, to provide for the application of federal rather than state or local law. State and local railroad regulation has long been preempted to a significant extent. See Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 318 (1981) (historically, the Interstate Commerce Act was recognized as "among the most pervasive and comprehensive of federal regulatory schemes.").

In 1980, Congress adopted "an exclusive Federal standard, in order to assure uniform administration of the regulatory standards of the Staggers [Rail] Act of [1980]." H.R. Rep. No. 104-311, reprinted in 1995 U.S.C.C.A.N. 807-08 (ICCTA Conference Report). In 1995, in the ICCTA, Congress broadened the express preemption, so that both "the jurisdiction of the Board over transportation by rail carriers" and "the remedies provided under [49 U.S.C. 10101-11908] are exclusive and preempt the remedies provided under Federal or State law." 49 U.S.C. 10501(b). See City of Auburn, 154 F.3d at 1029-31.

A. Court Rulings. Many rail construction projects are outside of the Board's regulatory jurisdiction. For example, railroads do not require authority from the Board to build or expand facilities such as truck transfer facilities, weigh stations, or similar facilities ancillary to their railroad operations, or to upgrade an existing line or to construct unregulated spur or industrial team track.[9] In such cases, we can provide advice about how preemption applies, but we have no direct involvement in the process. Thus, the interpretation of the preemption provisions has evolved largely through court decisions in cases outside of our direct jurisdiction and in which we were not a party.

One court that has addressed the issue concluded that zoning ordinances and local land use permit requirements are preempted by 49 U.S.C. 10501(b) where the facilities are an integral part of the railroad's interstate operations. In particular, in Norfolk Southern Ry. v. City of Austell, No. 1:97-cv-1018-RLV, 1997 U.S. Dist. LEXIS 17236, at 17 n.6 (N.D. Ga. 1997) (Austell), the court found that a local land use permit was not required before a railroad could construct and operate an intermodal facility. The court held that "a city may not . . . attempt to regulate land use and planning via local laws when Congress' intent to preempt such local laws is clear and manifest." Similarly, other courts have viewed the preemption provisions broadly. See CSX Transp., Inc. v. Georgia Public Service Com'n, 944 F. Supp. 1573, 1581 (N.D. Ga. 1996) (Georgia) ["It is difficult to imagine a broader statement of Congress' intent to preempt state regulatory authority over railroad operations" than Congress provided in 49 U.S.C. 10501(b)]; Burlington N. Santa Fe Corp.

_____

[9] See Nicholson v. ICC, 711 F.2d 364, 368-70 (D.C. Cir. 1983), cert. denied, 464 U.S. 1056 (1984).

- 5 -

STB Finance Docket No. 33466

v. Anderson, 959 F. Supp. 1288, 1294-95 (D. Mont. 1997) (the preemption provisions in ICCTA show an intent to occupy the entire field of regulation).[10]

B.  Board Rulings.  Where railroad activities have required Board approval, the Board has had occasion to address the scope of the Federal preemption law.  In the Stampede Pass cases, the Board found that state and local permitting or pre-clearance requirements (including environmental requirements) are preempted because, by their nature, they interfere with interstate commerce by giving the state or local body the ability to delay or deny the carrier the right to construct facilities or conduct operations.  The Ninth Circuit, in reviewing the matter, agreed and specifically rejected (as contrary to the statutory text and unworkable in practice) the argument that the statutory preemption in section 10501(b) is limited to state and local "economic" regulations.  City of Auburn, 154 F.3d at 1029-31.[11]

At the same time, in Stampede Pass we expressed our view that not all state and local regulations that affect railroads are preempted.[12]  In particular, we stated that state or local regulation is permissible where it does not interfere with interstate rail operations, and that localities retain certain police powers to protect public health and safety.[13]  We also explained that state and local agencies can play a significant role under many federal environmental statutes.  We offered the following examples of state and local regulation that in our view would not be preempted:[14]

---

[10]  See also Georgia Pub. Serv. Comm'n v. CSX Transp. Inc., 481 S.E.2d 799, 801 (Ga. Ct. App. 1997); In re Burlington N.R.R., 545 N.W.2d 749, 751 (Neb. 1996).

[11]  The court explained that ". . . if local authorities have the ability to impose 'environmental' permitting regulations on the railroad, such power will in fact amount to 'economic regulation' if the carrier is prevented from constructing, acquiring, operating, abandoning, or discontinuing a line." City of Auburn, 154 F.3d at 1031.  Although it recognized that some statutes limit preemption as to state and local environmental regulation, the court found preemption under provisions such as section 10501(b) to be broad.  Id.

[12]  We also determined in Stampede Pass that section 10501(b) does not nullify the Board's own obligation to follow the requirements of the National Environmental Policy Act, 42 U.S.C. 4321 et seq. (NEPA), and related federal environmental laws in contexts where they are applicable.  See 49 CFR 1105.1.  Because the Board itself controls the proceedings in which it applies those requirements, there is no risk of interference with our jurisdiction over rail transportation.

[13]  See H.R. Conf. Rep. No. 104-422 at 167, reprinted in 1995 U.S.C.A.A.N. 850, 852 (identifying criminal law prohibitions on bribery and extortion as examples of the police powers that the Act does not preempt); Robey et al. — Petition for Declaratory Order — Levin et al., STB Finance Docket No. 33420 (STB served June 17, 1998).

[14]  Stampede Pass, slip op. at 7.

-6-

[E]ven in cases where we approve a construction or abandonment project, a local law prohibiting the railroad from dumping excavated earth into local waterways would appear to be a reasonable exercise of local police power. Similarly, . . . a state or local government could issue citations or seek damages if harmful substances were discharged during a railroad construction or upgrading project. A railroad that violated a local ordinance involving the dumping of waste could be fined or penalized for dumping by the state or local entity. The railroad also could be required to bear the cost of disposing of the waste from the construction in a way that did not harm the health or well being of the local community.

Finally, in the Stampede Pass cases we noted that, where Board authorization is required, state and local governments can participate in the Board's environmental review process under NEPA and related laws. We further concluded that Congress did not intend to preempt federal environmental statutes such as the Clean Air Act and the Clean Water Act.

II. The Application of This Precedent To Riverdale's Petition.

The Riverdale petition involves construction activities that do not require our regulatory approval. Nevertheless, we can issue a declaratory order explaining how we believe those issues might be analyzed by a court with appropriate jurisdiction.

A. Local Zoning Ordinances. The Borough has specifically requested that we address whether local zoning ordinances apply to the facilities constructed by NYSW in Riverdale. Given the broad language of section 10501(b) and the recent court and agency decisions construing it, it is well settled that, as the New Jersey state court determined, the Borough can not apply its local zoning ordinances to property used for NYSW's railroad operations. The Borough suggests in its petition that NYSW should have located its transloading facilities not in Riverdale but in a nearby industrial zone and that one of NYSW's alleged zoning violations is "non-permitted use of land." But as the court found, the zoning regulations that the Borough would impose clearly could be used to defeat NYSW's maintenance and upgrading activities, thus interfering with the efficiency of railroad operations that are part of interstate commerce. As the courts have found, this is the type of interference that Congress sought to avoid in enacting section 10501(b). See Austell, at 22 (local zoning ordinance and land use permitting requirements "frustrate and conflict with Congress' policy of deregulating and rejuvenating the railroad industry"); Georgia, 944 F. Supp. at 1583.

B. Local Land Use Restrictions. Local land use restrictions, like zoning requirements, can be used to frustrate transportation-related activities and interfere with interstate commerce. To the extent that they are used in this way (e.g., that restrictions are placed on where a railroad facility can be located), courts have found that the local regulations are preempted by the ICCTA. Austell; City of Auburn. Of course, whether a particular land use restriction interferes with interstate commerce is a fact-bound question. In that regard, the material provided by the Borough indicates that the Borough would require a 25-foot landscaped buffer between residential zones and NYSW's transportation facilities. As the railroad has not been involved in our proceeding, and as we know

few specifics about the buffer issue, we cannot say at this time whether such a requirement, if applied in such a way as not to discriminate against railroads, would significantly interfere with NYSW's railroad operations and interstate commerce. Parties may file further information and comment on this issue.

C. Environmental and Other Public Health and Safety Issues. Similarly, recent precedent has made it clear that, to the extent that they set up legal processes that could frustrate or defeat railroad operations, state or local laws that would impose a local permitting or environmental process as a prerequisite to the railroad's maintenance, use, or upgrading of its facilities are preempted because they would, of necessity, impinge upon the federal regulation of interstate commerce.[15] City of Auburn, 154 F.3d at 1029-31; Stampede Pass, slip op. at 6-7. That means that, while state and local government entities such as the Borough retain certain police powers and may apply non-discriminatory regulation to protect public health and safety, their actions must not have the effect of foreclosing or restricting the railroad's ability to conduct its operations or otherwise unreasonably burdening interstate commerce.[16] We cannot go beyond these general principles here without more information as to the particular police power issues that may be involved in this case. Parties may file further information and comment on these issues.

D. Building Codes. Given the broad language of 49 U.S.C. 10501(b) and the case law interpreting it, our preliminary view is that local entities such as the Borough can not require that railroads seek building permits prior to constructing or using railroad facilities because of the inherent delay and interference with interstate commerce that such requirements would cause.[17] At the same time, we believe local authorities can take actions that are necessary and appropriate to address any genuine emergency on railroad property, and that interstate railroads such as NYSW are not exempt from certain local fire, health, safety and construction regulations and inspections.

---

[15] Railroads are required to provide adequate facilities for their traffic. Interchange of Freight at Boston Piers, 253 I.C.C. 703, 707 (1942). Moreover, an incident of the right to construct and operate a line is the right to maintain it and keep it in good operating condition. See Detroit/Wayne v. ICC, 59 F.3d 1314, 1317 (D.C. Cir. 1995). Accordingly, interfering with such activities could interfere with a railroad's right to operate its lines.

[16] Notwithstanding the usual presumption to the contrary [see Shanklin v. Norfolk Southern Ry., 173 F.3d 386, 394 (6th Cir. 1999), citing Hillsborough County v. Automated Med. Lab., Inc., 471 U.S. 707, 719 (1985); Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516 (1992)], even health and safety regulation is preempted where Congress intended to preempt all state and local law. As explained in City of Auburn, 154 F.3d at 1030-31, congressional intent to preempt a state or local permitting process for prior approval of rail activities and facilities related to interstate transportation by rail is explicit in the plain language of section 10501(b) and the statutory framework surrounding it.

[17] The Borough evidently seeks to require NYSW to obtain building permits for all construction activity, and a certificate of occupancy for NYSW's depot.

Specifically, under the law enacted by Congress, as interpreted by the courts, it appears to us that state and local entities can enforce in a non-discriminatory manner electrical and building codes, or fire and plumbing regulations, so long as they do not do so by requiring the obtaining of permits as a prerequisite to the construction or improvement of railroad facilities. With regard to the kinds of inspections that are permissible on property owned or used by interstate railroads, the potential for interference depends on the nature of the action by the state or local government and the effect on rail transportation and Board remedies; we see no simple, clear line of demarcation that has been or could be drawn, except that the inspection requirements or local regulations must be applied and enforced in a non-discriminatory manner and that preclearance permitting requirements plainly are preempted. E.g., City of Auburn; Stampede Pass. Again, we cannot go beyond these general principles here without more information about particular inspection and similar requirements that may be at issue in this case. Parties may file further information and comment on these issues.

E. Other Issues As to Which Comments May Be Filed. The Borough has also raised complaints about NYSW's facilities that concern surfacing, fence height, site distance for ingress and egress, roads, train utility stations, the truck weigh station, and the truck depot. We do not have enough information to determine whether the non-discriminatory application of state or local regulation regarding those matters would unduly restrict NYSW's ability to provide transportation-related facilities and service. Parties may file further information and comment as to these matters, and any other unresolved preemption issues as to which parties believe the Board should provide clarification.

F. Non-Transportation Facilities. Finally, it should be noted that manufacturing activities and facilities not integrally related to the provision of interstate rail service are not subject to our jurisdiction or subject to federal preemption. According to the Borough, NYSW has established a corn processing plant. If this facility is not integrally related to providing transportation services, but rather serves only a manufacturing or production purpose, then, like any non-railroad property, it would be subject to applicable state and local regulation. Our jurisdiction over railroad facilities, like that of the former ICC, is limited to those facilities that are part of a railroad's ability to provide transportation services, and even then the Board does not necessarily have direct involvement in the construction and maintenance of these facilities. See Growers Marketing Co. v. Pere Marquette Ry., 248 I.C.C. 215, 227 (1941). We cannot determine from the current record whether this facility is actually a corn processing plant or some sort of transloading operation (for the transfer of corn syrup, for example) that is related to transportation services. Accordingly, NYSW, in its opening statement, should describe the exact nature of this facility.

G. Summary. In this decision, we have (1) expressed our views on the local zoning ordinance issues raised; (2) expressed some general views and authorized the filing of additional information as to certain local land use issues; (3) expressed some general views and authorized the filing of additional information about environmental and similar issues, and about building codes; (4) authorized the filing of further information about the physical characteristics of the NYSW facilities; and (5) sought additional information about the corn processing plant. The views that the

STB Finance Docket No. 33466

Board has expressed are based primarily on the interpretation by the courts of the statutory provisions on preemption.

This action will not significantly affect either the quality of the human environment or the conservation of energy resources.

It is ordered:

1. A declaratory order proceeding is instituted. This proceeding will be handled under the modified procedure, on the basis of written statements submitted by interested persons. All persons submitting comments must comply with the Board's Rules of Practice.

2. NYSW must file an opening statement by November 9, 1999

3. The Borough must file an opening statement by November 9, 1999.

4. Other interested persons may file comments by December 9, 1999.

5. NYSW and the Borough may file replies by December 29, 1999.

6. This decision, which, along with the Borough's petition (including attachments), will be served on NYSW, is effective on its service date.

By the Board, Chairman Morgan, Vice Chairman Clyburn, and Commissioner Burkes.

Vernon A. Williams
Secretary

CERTIFICATE OF SERVICE

I Gerald M. Moody, Attorney for the Defendant Town of Milford in the above matter hereby certify that I have this 7th day of March 2005 served the within Memorandum In Support of The Defendant's Motion For Summary Judgment upon Counsel for the Plaintiff addressed as follows:

Michael B. Flynn, Esq.
Richard A. Davidson, Jr., Esq.
Flynn & Associates
189 State Street, 6th Floor
Boston, MA 02109

Gerald M. Moody, Town Counsel