UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GRAFTON AND UPTON RAILROAD COMPANY,<br>　　　　　Plaintiff,<br><br>　　　　　v.<br><br>TOWN OF MILFORD,<br>　　　　　Defendant. | C.A. No.: 03-40291-NMG |

**PLAINTIFF'S OPPOSITION TO THE DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

The plaintiff Grafton and Upton Railroad Company ("GU") hereby opposes the defendant Town of Milford's ("Town") *Motion for Summary Judgment* in that summary judgment is not appropriate in this case as there are, considering the verified pleadings and affidavits on file, genuine issues as to material facts such that the Town is not entitled to judgment as a matter of law.

As grounds therefore, the GU sets forth in opposition to the Town's motion the following:

**I.     FACTUAL BACKGROUND**

The GU hereby incorporates herein by this reference its allegations contained in its *Verified Complaint for Declaratory Judgment* ("Complaint"), the Factual Background section of its *Memorandum of Law in Support of the Plaintiff's Motion for a Preliminary Injunction* ("Memorandum") and *Affidavit of Bridget Lucey* ("Affidavit") which is attached as Exhibit "1" to the *Memorandum of Law in Support of the Plaintiff's Motion for a Preliminary Injunction*.

The GU also incorporates herein by this reference, the findings of this Court in its *Memorandum and Order*, dated February 27, 2004.

Further, the GU states (and has freely and openly acknowledged in its prior filings with this Court and the Surface Transportation Board ("STB")) that up and until the filing of the pleadings in this litigation, its proposed business relationship with the Boston Railway Terminal Company ("BRT") was constantly evolving. What initially was to have been a land lease agreement between the GU and BRT then developed into an operating agreement due to the parties' ongoing discussions which further revealed the realities and complexities of their proposed relationship and the need for a substantially different agreement. *See: Complaint* at fn. 4; Memorandum at fn. 2; and *Plaintiff's Motion in Limine Requesting that this Honorable Court not Grant Deference to the STB's Decision, dated August 12, 2004* ("Motion in Limine") at p. 6-7.

Last, GU's counsel stated in open court at the *Status Conference* on February 11, 2005, that the GU was unable to hold BRT into the agreement while the legal dispute over the GU's rights took its course through the STB and now the federal court. Therefore, the GU suffered and continues to suffer damages as alleged in its *Verified Complaint for Declaratory Relief* and *Motion for Preliminary Injunction*. GU seeks a determination of its rights and desires to pursue its damage claims against the Town.

**II.     DISCUSSION OF LAW**

    **A.     Summary Judgment Standard:**

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law.  Fed. R. Civ. P. 56; *see also* Magee v. United States, 121 F.3d 1, 3 (1st Cir. 1997). Summary judgment is mandated against a party failing to make a showing sufficient to establish an essential element of the case on which he or she bears the burden of proof.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986);  Taylor v. Hercules, Inc., 780 F.2d 171, 174 (1st Cir. 1986); Hahn v. Sargent, 523 F.2d 461, 464 (1st. Cir. 1975), cert. denied, 425 U.S. 904 (1976).

A genuine issue is one which a reasonable fact finder could resolve in favor of the nonmoving party.  Id.  "Not every genuine factual conflict, however, necessitates a trial." Riverdale Mills Corp. v. American Modern Home Insurance Co., 122 F.Supp.2d 114, 116 (D.Mass. 2000).  It is only when a disputed fact has the potential to change the outcome of the matter, under the governing law, if found favorably to the non-movant, that the materiality hurdle is cleared.  Parrilla-Burgos v. Hernandez-Rivera, 108 F.3d 445, 448 (1st Cir. 1997).

Once the moving party has demonstrated that there exists no genuine issue of material fact, the burden of proof then shifts to the non-moving party to contradict that which has been presented with specific provable facts that establishes that there is a triable issue.  Riverdale Mills Corp., 122 F.Supp.2d at 116-117, *citing* Matos v. Davila, 135 F.3d 182, 185 (1st Cir. 1998). If, on all of the evidence, it is just as reasonable to suppose the cause is one for which no liability would attach as for a cause for which there was liability, then the moving party fails to make its case and the motion for summary judgment must be denied.  Bigwood v. Boston & Northern Street Railway, 209 Mass. 345, 348 (1991).  The role of a summary judgment motion "is to pierce that boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required."  Coyne v. Taber Partners I, 53 F.3d 454, 457 (1st Cir. 1995).

**B.     The STB was incorrect in its legal and factual analysis of this case**

The GU hereby incorporates by this reference its *Motion in Limine* presently pending before the Court.  Additionally, and to more appropriately address the allegations of the Town as set forth in its *Motion for Summary Judgment*, the GU further states that the STB failed to: properly analyze the entire scope and breadth of the then proposed relationship between the GU and BRT; apply the applicable law to the unique relationship and proposed activities that the GU and BRT were set to undertake; and, properly construe the applicable statutes to give each its true and complete effect as intended by Congress.

Although the STB's rulings can be considered by the Court, they are not dispositive, nor are they necessarily entitled to deference.  See CSX Transportation, Inc. v. Georgia Pacific Serv. Comm'n, 944 F. Supp. 1573, 1584, n.8 (N.D. Ga. 1996).  The STB itself has also recognized such when it set forth that:

> railroads do not require authority from the Board to build or expand their facilities such as truck transfer facilities, weigh stations, or similar facilities, relating to their railroad operations, or to upgrade an existing line or to construct an unregulated spur or team track.  In such cases, we can provide advice about how preemption applies but we have no direct involvement in the process.  Thus, the interpretation of the preemption provisions has evolved largely through Court decisions in cases outside of our direct jurisdiction and in which we were not a party.

See: Borough of Riverdale Petition for Declaratory Order, the New York Susquehanna and Western Railway Corporation, STB Finance Docket No. 33466, 1999 WL 715272 at * 7 (Sept. 9, 1999).

4

In addition to the arguments contained in the *Motion in Limine* and the foregoing, the GU also sets forth the following:

### i.   Activities of BRT would have been different at the Milford yard

The defendant has failed to recognize that under the proposed operating agreement between the GU and BRT, the GU would have been responsible and liable for: the movement of the railcars about the Milford yard; the interchange of the railcars with CSX Transportation, Inc. ("CSX"); handling of the account billing for the railcars; and the additional expenses and liability concerning the transloading activities while on its premises.  At South Boston, BRT was totally responsible for all functions and aspects of the handling of railcars received from CSX.  At the Milford yard, BRT would have virtually no involvement with the railroad activities as it had been in South Boston as the GU had agreed to be responsible and handle same as the rail carrier.

### ii.   The proposed operating activities of the GU and BRT would have been integrally related to the GU's interstate freight operations.

This Court previously found that the GU was seeking to develop the Milford yard to increase its ability to interchange railcars with CSX in order to generate cash flow which the GU intended to re-invest into its infrastructure and business development. *Memorandum & Order*, at p. 3, 5.  The GU anticipated generating revenue of $250.00 per railcar from the interchange on its mainline with CSX of railcars carrying steel from all over the country.  Id, at p. 5.   The activities of the GU and BRT were wholly and solely related to the GU generating income in order to re-open its 15.5 mile mainline to freight rail traffic.[1]  The proposed activity by the GU and BRT could not be more integrally related to the GU's interstate freight rail operations.  The Town has

---

[1] The Town has attempted throughout this litigation to portray the GU as a non-viable railroad which fails to recognize that the GU presently, as well as at the time of the initial filing of the pleadings in this case, is operational on the northern end of its mainline.  The GU has acknowledged that it has a lot of investment, upgrade, rehabilitation, and track work which it needs to complete before the entire mainline once again becomes fully operational, and by the agreement with BRT the GU was attempting to generate income and revenue to commence the revitalization of its mainline.

5

inappropriately focused its entire argument on BRT as if the BRT was to operate alone at the Milford yard.  The Town's arguments fail to take into account that it was the GU which is and was the truly affected entity and that the operations proposed for the Milford yard were to have been conducted jointly.

### iii.     *Hi-Tech* and *H&M* are clearly distinguishable cases

The Town has cited and primarily relied upon two STB decisions in support of its position that the proposed activity at the Milford yard is not entitled to preemption, but these cases are clearly distinguishable from the GU's proposed activities at the Milford yard.  Those two cases are Hi Tech Trans, LLC – Petition for Declaratory Order, STB Finance Docket No. 34192 (Sub-No.1) (Aug. 14, 2003) and H&M International, Inc. – Petition for Declaratory Order, STB Finance Docket No. 34277 (Nov. 10, 2003).  Copies of these decisions were previously attached to the GU's *Memorandum* as Exhs. 5 and 6.  The proposed GU and BRT operational agreement suggested activities which were completely different from the operations which were the subject of *Hi Tech* and *H&M*.  In both cases, the STB refused to extend its jurisdiction to preempt local ordinances over trucking companies which planned to use railroad yards for nothing more than transloading and trucking purposes.  See *High Tech* at *2; *H&M* at 2.  Also, and in both cases, the STB's decisions were based on a narrow interpretation of the definition of "rail carrier" [*see* 49 U.S.C. §10102(5)] and a finding that the trucking companies were not "rail carriers" subject to the STB's jurisdiction.  *See, e.g.*, *H&M* at *2.

The STB noted that the determination of whether or not a particular operation falls under the jurisdiction of the ICCTA was to be a fact-specific determination.  *H&M* at *2.  Both decisions were based on facts which are not present here.  First, the GU, unlike the petitioners in the STB decisions, is a rail carrier.  Second, the petitions in *High Tech* and *H&M* pertained

6

simply to the trucking companies' operation of transloading facilities within a railroad's yard, and did not seek the STB's determination as to whether it would have had jurisdiction over the entire yard itself or the railroad operations which were being conducted within the yard.  Third, the most crucial factor in each of these decisions was that the railroads involved had little (if anything) to do with the operation of the transloading activity.  *See, e.g.*, *H&M* at *4.  Here, and to the contrary, the GU was to have been intimately involved with BRT which would have been evidenced by: the GU leasing the BRT's locomotive; the GU would have operated the locomotive and moved shipments of steel by railcar over its mainline and yard tracks and to a portion of the yard designated for transloading operations and once unloaded the GU would be responsible for setting off the railcars to be pulled by CSX; the GU agreed to absorb certain liability and insurance obligations which would have covered the potential liability of these operations; and the GU would have received significant compensation for the use of its yard.  Obviously, the GU's obligations and common carrier duties did not begin and end at the CSX interchange point but, instead, continued throughout the proposed operation.

Finally, the railroads involved in the two decisions were large Class I freight railroads with extensive holdings, large capital reserves and plenty of business opportunities.  It was important to the STB that the operations over which it refused to exercise jurisdiction were not "considered an integral part of (the railroad's) common carrier service."  Here, in stark contrast, the proposed operations are not only an integral part of the GU's service, but would have comprise the single most important part of the GU's business operations and the most crucial component of ensuring the GU's future financial viability.

     **iv.**  **The holding in the *Florida East Coast Railway Co.* case is inapplicable.**

  The Town has also relied on the <u>Florida East Coast Railway Company v. City of West Palm Beach</u>, 266 F. 3d 1324 (2001), case which is also distinct from the case at hand. In <u>Florida East Coast</u>, the arrangement between the railroad and its tenant (Rinker) was essentially a land swap deal whereby Rinker acquired a yard from FEC which FEC had little or no use for in its operations. Rinker leased the railroad's premises in order to conduct its own distinct distribution services. The services provided by Rinker had nothing to do with providing "railroad transportation" as that term is defined in the ICCTA. The Eleventh Circuit held that "Rinker's use of the property…and the activities there performed by Rinker serve no public function and provide no valuable services to FEC; rather, the arrangement between FEC and Rinker merely facilitates Rinker's operation of a private distribution facility on FEC-owned premises." <u>Id</u>, at 1336.

  Here, the GU was to have been intimately involved in the joint operations which were proposed for the Milford yard and the operations, in turn, provide valuable services (such as car movements, revenue and the cash needed for further improvements and expansion) to the GU. The proposed use of the Milford yard was much more than a "private distribution facility," the GU never proposed or agreed that its Milford yard would be exclusively used by BRT, the use of the Milford yard would continue with its public function, and there was no land swap or lease agreement involved in the last agreement between the GU and BRT; therefore, <u>Florida East Coast</u> simply does not apply.

**III.** **<u>CONCLUSION</u>**

  The GU's proposed use of its Milford yard was "railroad transportation" which would have been undertaken by a "rail carrier" and would have been an "integral part" of the GU's

8

railroad operations.  The questions of fact which present themselves through the pleadings and arguments of the parties dictates that the Town's *Motion for Summary Judgment* be denied as a matter of law.

                                                  Respectfully submitted,
                                                  GRAFTON AND UPTON R.R. CO.,
                                                  by its attorneys,

                                                  /s/   Richard A. Davidson, Jr.
                                                  Michael B. Flynn       BBO# 559023
                                                  Richard A. Davidson, Jr.   BBO# 552988
                                                  Flynn & Associates, P.C.
                                                  400 Crown Colony Drive, Suite 200
                                                  Quincy, MA  02169
                                                  (617) 773-5500

Dated:  April 5, 2005