UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GRAFTON AND UPTON RAILROAD COMPANY, )<br>Plaintiff, )<br>)<br>Vs. )<br>)<br>TOWN OF MILFORD, )<br>Defendant ) | C.A. No.: 03-40291-NMG |

## DEFENDANTS RESPONSE TO PLAINTIFF'S MOTION IN LIMINE

At the Status Conference held on February 11, 2005 the Court directed the parties to file dispositive Motions by March 11, 2005. The Town filed its Motion For Summary Judgment and Memorandum in Support thereof which Memorandum it incorporates herein by reference. The Plaintiff Grafton and Upton Railroad Company (hereafter "GU") chose to file a Motion in Limine asking this Court to rule on a preliminary basis that the decision of the Surface Transportation Board ("STB") in Town of Milford, MA – Petition For Declaratory Order, STB Finance Docket No. 3444 (hereafter the "*Milford* STB Decision") is entitled to no deference, seeking to have that decision not only disregarded, but also to have the Court rule to the opposite effect of the STB in the *Milford* Decision.

The Plaintiff begins its argument by denigrating the *Milford* STB Decision as one lacking "thoroughness in its consideration of the facts and circumstances" and as being "fraught with invalid reasoning." In other words, the Plaintiff disagrees with the result.

There is nothing in the various factual findings of the STB in the *Milford* Decision which is in any way in conflict with the facts as ***presented to the STB by***

*the Plaintiff* in their Reply to the Petition of the Town of Milford dated December 26, 2003. A copy of that reply, less the various exhibits, is attached hereto as Exhibit "A".

To summarize from the aforesaid document, some of the affirmative representations made by GU, which support the findings of the STB, are the following contained in pages 4 through 7 of Exhibit "A" hereto. GU represented to the STB that there was a "...proposal to move *BRT's operations to* the Milford Yard." (emphasis added). The principle business of BRT was the distribution of steel. BRT currently operates out of South Boston. Steel is "....shipped to *BRT's customers* throughout the region." (emphasis added). "BRT owns and operates its own locomotive and conducts its own switching operations" at South Boston. "The Milford Yard is uniquely located and configured to accommodate *BRT's operations*...." Milford is in the center of "....BRT's sphere of operations....". There are few companies "....currently looking to relocate *their operations*." During the Spring of 2003 "....the GU and BRT reached an agreement that would *move its operations* to GU's Milford Yard." etc. etc.

Again, *all* of the STB findings are fully supported by the record *as submitted* by GU through its Memorandum to the STB and the supporting Affidavit of Bridget Lucey.

At page 2 of the Plaintiff's Motion in Limine GU makes the broad statement that "The intent of Congress is exceptionally clear in the statutory scheme set forth at 49 U.S.C. § 10501, as it desires to protect rail carriers from the exact claims being advanced by the town in this case." The significance of that statement is that this is really the only time that GU seems to recognize that the federal statute and its protections concern activities of "rail carriers", not any activity of any entity which might be of some benefit to a rail carrier. The simple thrust of the *Milford* STB decision is that BRT is not a rail carrier; BRT's business activity was to be moved from South Boston to Milford and was to be conducted in the same manner as it always had been. The STB held that the

2

fabrication activity was neither "transportation" nor "by rail carrier" and further that the proposed trans-loading activities, although within the definition of "transportation" were not to be conducted "by or for a rail carrier." (*Milford* decision at 3-4). Despite the tortuous efforts of GU to make it appear that GU employees are to be involved and/or that BRT employees are going to be in some fashion "deputized" as GU employees, GU cannot escaped the simple fact that the trans-loading activity was going to be undertaken "by and for" BRT, not the GU.

A.    The GU's Latest Assertions Of How BRT Would Operate Are Not Supported By The Record.

As is laid out in Milford's earlier Memorandum it was through a letter dated October 10, 2003 (Dunkin Affidavit Exhibit "F") that Milford stated to GU representatives its position, based in part on Florida East Coast Railway, infra., that the proposed activity of BRT for the Milford Yard was not entitled to pre-emption. That is precisely when the twists and turns in the proposal of BRT/GU began to take place in order to try to fit the BRT activity within the scope of activity protected by 49 U.S.C. §10501(b). By the time GU submitted its position to the STB the concept had moved from a straight forward lease to an "operating agreement" with alleged involvement by GU in moving rail cars.[1]  Not only were these efforts transparent, they did not change the simple fact that the activities were to be conducted "by and for" BRT, perhaps with the assistance or cover of GU, but still "by and for" BRT. The STB recognized this.

Now facing the STB decision, the permutations continue. GU would now have it that BRT employees are to be the "....agents of the GU during the trans-loading activities." (GU Memorandum page 4). The STB is criticized for not recognizing this, whatever it may mean. The GU fails to point out that there is nothing in the record before the STB or this court to support this assertion. The statement is made in the GU Memorandum that "It was obviously GU's intent, as part of the agreement with BRT, that employees while performing trans-loading

---

[1]  In this aspect there is a remarkable similarity to the efforts by the parties in Florida East Coast Railway, infra.

duties would have become agents of GU given the fact that GU could not afford
to employ workers to conduct the work...."(GU Memorandum at page 5). This is
an incredible assertion. Not only is such not "obvious", whatever the assertion
may mean, it is nowhere supported by the record. Indeed, notwithstanding
numerous opportunities, GU has made no effort to introduce through affidavits
any draft "agreements" or other documentation which might support any of these
claims.

Without belaboring the point, GU's involvement in BRT activity at the
Milford Yard has been a continuously moving target, seeming to shift as has been
deemed necessary to try to counter any arguments against pre-emption. However,
all of these shifts do not obviate the simple fact that the BRT operations and
business activity were to be moved from South Boston to Milford. GU
involvement was not necessary, and was only proposed because it seemed to be
needed to bring the BRT trucking operations within the protection of 49 U.S.C. §
10501(b). The STB adhered to the mandate of the United States Supreme Court
and was "reluctant to find pre-emption" for reason that protection for the BRT
activity would not be consistent with the "....clear and manifest intention of
Congress." CSX vs. Easterwood, 507 U.S. 658, 664(1993).

Despite the clear record before this court and before the STB, GU now
tries to give the impression that something more than the BRT trucking operation
will take place at the Milford GU property. At page 7 of its Memorandum GU
states that "The STB discusses and at other times implies in its decision, that the
trans-loading services would not have been available to the public. There is
nothing in the record to which STB can cite which supports the STB's assumption
of fact." On the contrary, the record before the STB and this court, as pointed out
at the outset of this Reply, makes it abundantly clear that the trans-loading activity
that will go on would be solely for the benefit of BRT. In the submission of GU
to the STB there is one line in the Memorandum (Exhibit "A" hereto, page 6)
which states that "....GU will retain the right to continue to use its main line for
traffic in addition to BRT's shipments of steel." However, this bald assertion is

4

belied by the fact that the now defunct GU line is not only not proposed to be renewed, its bed was to be developed as the driveway for BRT's trucking activity. (See Dunkin Affidavit paragraph 15 and Exhibits "A", "B", "C1" and "D" thereto.)

B.    The STB Did Not Misinterpret "Transportation" And Did Not Unduly Focus On Fabrication.

Among the reasons the GU asserts for the proposition that the *Milford* STB decision is not entitled to deference is an assertion that "The regulatory scheme in this case is neither technical nor complex and the STB was not reconciling conflicting policies." (GU Memorandum page 3). Complexity of the statutory scheme is not the appropriate standard. The Congressional enactment here at issue and the industry which is regulated thereunder are complex in their many interrelationships. The First Circuit Court of Appeals has recognized this even if the GU does not. That court stated that "... The ICCTA creates an explicit and complex statutory scheme, ..." Boston and Maine Corporation vs. Town of Ayer, 330 F. 3rd 12, 18 (2003).

It is true that the *Milford* STB decision was not one attempting to reconcile conflicting policies. On the contrary, the *Milford* STB decision was a continuation of a series of STB decisions consistently interpreting the ICCTA and requiring that for an activity to be exempt under 49 USC Section 10501, that activity must be undertaken by or for a "rail carrier".[2] In short, it is this effort on the part of the STB to craft and enforce a consistent policy which entitles this decision to deference.

Contrary to the assertion of GU the STB did not focus its analysis on the fabrication portion of the proposed BRT activities. The STB simply addressed the fabrication activity directly, citing a relevant Interstate Commerce Commission decision, in holding that steel fabrication is not railroad

---

[2] A number of these STB decisions, leading up to the *Milford* STB decision are appended to the Town's Memorandum In Support of its Motion For Summary Judgment.

transportation. The STB then went on to other activities of the BRT. GU now additionally tries to evade the STB decision by declaring that "....fabrication would be a service related to the movement of steel..." (GU Memorandum page 4). Whatever that might mean, there is no support for such a claim anywhere in the record.

The STB did not misinterpret the term "transportation." The STB noted the breadth of the definition of that term. The STB then found that the BRT trans-loading activities would fall within the definition of transportation. What GU really objects to is not the interpretation or application of the term "transportation", but the STB recognition that "....for trans-loading activities to qualify for pre-emption, they must be offered by a rail carrier (either directly or through its agent)" (Milford STB decision at page 3).

As was pointed out previously, it is that holding, and its parentheticals in particular, which now causes GU to claim that BRT was going to be the agent for GU. Aside from the lack of support the reality is to the opposite effect; under the latest permutations, to the extent there would be any "agency" at all it would be that of GU as agent for BRT in performing BRT functions.

C.    The STB Correctly Construed and Applied The Florida East Coast Railway Decision.

GU continues to misunderstand and misapply the case of Florida East Coast RailWay vs. City of Palm Beach, 110 F. Supp. 2nd 1367, aff'd. 266 F. 3rd 1324 (2001). GU would argue to this court that the facts in the Florida East Coast case were completely different than the facts now under consideration. The memorandum of GU makes the statement that the arrangements in the Florida East Coast Railway case between the Railroad (FEC) and its tenant (Rinker) was essentially a land swap and that Rinker leased the railroad premises in order to conduct its own aggregate distribution services.

6

The reality, as has been pointed out previously by the Town and as affirmed by the STB, is that the factual background of the <u>Florida East Coast</u> case is very, very similar to the matter under consideration. One very striking similarity is that in order to try to justify the activity underlying the FEC case the railroad and its customer (Rinker) did attempt to change the arrangements at various times to bootstrap an argument for pre-emption. A land exchange was originally discussed between the railroad and Rinker but, "Upon further discussion the parties instead entered into a standard lease agreement and a standard trackage agreement on November 3, 1999." <u>Id</u>. at 1371. Just as in the case under consideration the railroad and the customer, Rinker, tried to adjust the "deal" to make it appear that the railroad had greater involvement. In this regard, at page 1372, the court pointed out that ".... FEC is prepared, if necessary, to run the operations through its employees and contractors. In fact, FEC and Rinker have entered into a contract for FEC to provide rail transport to and trans-loading of aggregate at the 15th Street Yard." Despite all of these efforts the court still found that the activity at issue was not entitled to pre-emption under the law. As the court summarized it "Rinker, a non-rail carrier, conducts a distribution operation on property owned by a rail carrier, solely for its own benefit and free of the rail carrier's involvement or control." <u>Id</u>. at 1377 "...As used by Rinker, the 15th Street Yard is not 'related to the movement of ....property,' for the Act as a whole is concerned with the 'rail transportation system,' not one company's distribution of its product....Rinker is not in the business of moving goods by rail; its operations are directed solely at moving its own product." <u>Id</u>. at 1378.

GU tries to go on to argue that somehow the BRT operations now in South Boston to be moved to Milford would not be "purely private function." Broad arguments are made about the GU and BRT activity serving the "important public function of facilitating the interstate shipment of steel." This is all simply verbage without substance. The reality is that BRT currently operates in South Boston and would be moving to Milford. BRT would be delivering steel to its customers the same as it does now. The operations would have nothing to do with broadly "facilitating the interstate shipment of steel." The Milford property would simply

7

be a different place for BRT to operate its private steel distribution company resulting in an opportunity for GU to produce income. There simply is no significant, factual or legal difference between the situation now under consideration or that at issue in the <u>Florida East Coast Railway</u> case.

D.    <u>Even If The Milford STB Decision Were Viewed As Wrongly Decided, This Matter is Moot and There is No Right To Damages Or Attorneys' Fees.</u>

Counsel for the plaintiff asserted in open court at the Status Conference on February 11, 2005 that BRT is no longer proposing to bring its operations to Milford. This case is therefore essentially moot. The plaintiff seeks to keep this matter alive asserting some manner of right to damages and attorneys' fees. The plaintiff's hope apparently is that this court will disregard the STB *Milford* decision and rule in favor of GU on a now theoretical basis. GU will then seek to go forward asserting a right to damages and attorneys' fees. The Plaintiff's Verified Complaint has no count other than that for Declaratory Relief although it does have a prayer for "costs, interest and attorney's fees." Presumably, plaintiffs would assert a right to damages and attorneys' fees under 42 USC, §§ 1983 and 1988.

In the context of a dispute involving an STB Decision under the ICCTA the First Circuit Court of Appeals has held that there is no right to attorneys' fees and damages under 42 USC, §§1983 and 1988. <u>Boston and Maine Corporation vs. Town of Ayer</u>, 330 F. 3rd 12 (2003). It is pursuant to 28 USC, § 1336 that Congress has given the Federal Courts the authority and jurisdiction to review decisions of the STB. The First Circuit Court in <u>Boston and Maine, supra.</u> held that

> ..., the ICCTA creates an explicit and complex statutory scheme, and § 1336 contains provisions authorizing judicial review. None of those provisions authorizes an award of attorney's fees. Had Congress wished to authorize such fees under §1336, it could easily have done so. The District Court did not have the benefit of the Supreme Court's later decision in <u>Gonzaga University vs. Doe</u>, 536 U.S. 273, 122 S.CT. 2268, 153 L.ED. 2nd 309 (2002). Acknowledging some ambiguity in its

8

precedent, the <u>Gonzaga</u> Court further clarified when an action is cognizable under 42 U.S.C., § 1983 and held that the same analysis applied to § 1983 questions as in implied cause of action cases. A Plaintiff must assert violation of a federal right which is "unambiguously conferred".

<u>Boston and Maine</u>, <u>supra</u>. at 118

A very recent (March 22, 2005) decision of The United States Supreme Court fully supports the reasoning of the First Circuit Court of Appeals in <u>Boston and Maine</u>, <u>supra</u>. In <u>City of Rancho Palos Verdes vs. Abrams</u>, _ _ S. Ct. _ _; 205 WL 645209 (U.S.) the Supreme Court reviewed the question of attorneys' fees and damages in the context of a decision under the Telecommunications Act of 1996 (TCA), 110 Stat. 56. This enactment was passed by Congress in 1996 to promote and secure rapid development and deployment of new telecommunications technologies. In essence, local tower and facility siting decisions are now subject to federal limitations and review in federal courts. The issue before the United States Supreme Court was whether or not, in the context of a lower court's decision overturning a telecommunications facility siting denial, damages, attorneys' fees and costs could be allowed by the court under 28 U.S.C. 1983. The Supreme Court ruled that such were not permitted under the federal statute.

The Supreme Court in <u>Rancho Palos Verdes</u> reviewed the analysis federal courts are to utilize in determining whether or not federally created rights may be enforced in the context of a § 1983 action. The Supreme Court held that where a federal statutory right is created there is only a "rebuttable presumption that the right is enforceable under § 1983." <u>Id</u>. at 5. The Court pointed out that a defendant may defeat the presumption by demonstration that Congress did not intend that remedy for a newly created right. "Our cases have explained that evidence of Congressional intent may be found directly in the statute creating the right, or inferred from the statute's creation of 'comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983.'" (citations omitted). <u>Id</u>. The Court concluded that in the context of the TCA

9

Congress did not intend the remedies thereunder to co-exist with an alternative remedy under § 1983.

The statutory scheme under the ICCTA is not unlike that under the TCA. There can be significant federal involvement in what otherwise are local land use issues and a federal agency, the STB, is given substantial jurisdiction in these matters. Indeed, the very provisions at issue hereunder 49 U.S.C. 10501(b) specifically provides that:

> (b) The jurisdiction of the Board over ----
>     (1) transportation by rail carrier, ....
>     is exclusive.

Moreover, there is a statutory system in place for review by the federal courts of STB decisions. 28 U.S.C. § 1336. The overall statutory scheme of the ICCTA is clearly a "comprehensive remedial scheme that is inconsistent with individual enforcement under § 1983." Id.

CONCLUSION

For all of the foregoing reasons the Plaintiff's Motion In Limine should be denied and the decision of the STB should be granted substantial deference. In addition, for the reason as is set forth in the Town's earlier memorandum the Town of Milford's Motion For Summary Judgment should be granted.

TOWN OF MILFORD
BY ITS ATTORNEY

Gerald M. Moody, Esq.
Town Hall – 52 Main Street
Milford, MA 01757
BBO # 352380
Tel. (508) 634-2302

10

BEFORE THE
SURFACE TRANSPORTATION BOARD

---

FINANCE DOCKET NO. 34444

---

THE GRAFTON & UPTON RAILROAD COMPANY'S
REPLY TO THE PETITION OF
THE TOWN OF MILFORD, MASSACHUSETTS
FOR DECLARATORY ORDER

---

Michael B. Flynn, Esq.
Richard A. Davidson, Esq.
FLYNN & ASSOCIATES, P.C.
189 State Street
Sixth Floor
Boston, MA   02109
tel:  (617)722-8253
fax:  (617)722-8254
e-mail:  *mbflynn@flynnassoc.com*

Counsel for the respondent, Grafton & Upton Railroad Company

DATED:  December 26, 2003

3

EXHIBIT "A"

**BEFORE THE
SURFACE TRANSPORTATION BOARD**

---

**FINANCE DOCKET NO. 34444**

---

**THE GRAFTON & UPTON RAILROAD COMPANY'S
REPLY TO THE PETITION OF
THE TOWN OF MILFORD, MASSACHUSETTS
FOR DECLARATORY ORDER**

---

This *Reply* is filed by and/or on behalf of the Grafton & Upton Railroad Company (the

"GU"). The GU requests that the Board either deny the Town's request to institute a Declaratory

Order proceeding or issue an Order determining that the railroad operations proposed to be

undertaken by the GU at its Milford Yard are exempt from application of the Town's *Zoning By-*

*laws*, the Massachusetts *Wetlands Protection Act* (M.G.L. c. 131 § 40) or any other state or local

laws, statutes, regulations and/or ordinances, and further issue an Order determining that any

such state or local laws, statutes, regulations and/or ordinances are preempted by the provisions

of the *Interstate Commerce Commission Termination Act*, 49 U.S.C. § 10501(b). The GU does

not, by submitting this *Reply*, admit that the Town's *Petition* is properly before the Board, and

files this *Reply* in order to preserve its rights under the applicable statutory provisions regarding

proceedings before the Board and without waiving any rights or arguments (which are hereby

expressly reserved) pertaining to the jurisdiction of this matter and the appropriateness of the

Town's *Petition*, and does so without waiving or otherwise affecting its right to seek relief in any

other appropriate forum (including, but not limited to, requesting a court of competent

jurisdiction to stay and/or otherwise terminate this proceeding) and without waiving or otherwise

affecting the arguments it raises in any other such forum.

4

## I.    STATEMENT OF FACTS:

**A.    Identity and Addresses of Parties:**

The GU is a Massachusetts railroad corporation, whose principal place of business is located at 40 Pullman Street, Worcester, Worcester County, MA. The GU does not dispute the accuracy of the identity and addresses of the other parties identified in the Town's *Petition*.

**B.    Factual Background:**

The GU is a privately owned railroad which was incorporated as the Grafton Center Railroad in 1873 and changed its name to its current moniker in 1887. *See Affidavit of Bridget Lucey* (the GU's General Manager), attached as Exhibit "A." The GU operates over 15.5 miles of main line track that runs from North Grafton to Milford and also has railroad yards in Hopedale, Grafton, Upton and Milford as well as a number of sidetracks throughout its territory. Id. From 1894 to 1928, the GU was a significant passenger carrier. Id. In the early 1900's the GU's freight business increased dramatically. Id. By the 1930's, the GU had become a major regional freight carrier moving primarily cattle and motor vehicles. Id.

From its "heyday" in the 1930's and 40's, the volume of the GU's business has until recently steadily declined. Id. Although it has never completely stopped doing business, the GU has until recently been relatively dormant. Id. A number of its tracks have become underutilized, a number of its grade crossings have been paved over, there are a number of encroachers on its property and the customers it services are few in number. Id. However, the GU has recently begun efforts to reestablish itself as a viable and profitable railroad, and has undertaken measures to improve its infrastructure, re-utilize its yards and increase the volume of freight it moves over its tracks. Id. Unfortunately, the GU is not well-capitalized. Id. The future economic health (and very existence) of the GU depends on generating cash flow through

projects which can be carried out on the portions of its infrastructure which can currently support income-generating railroad operations. Id. The GU intends to reinvest income so generated to improve its lines and develop more business. Id.

The prime location for conducting income-generating railroad operations is the GU's Milford Yard (the "Yard"). Exh. A. The GU currently interchanges railcars with CSX Transportation, Inc. ("CSX") at North Grafton. Id. On the Milford side, the GU's tracks terminate at an intersection with a busy CSX freight line known as the "Milford Secondary Branch." Id. The Milford Yard is located immediately west of the point of intersection between the GU's main line and CSX's Milford Secondary Branch. Id.

The GU's main line runs directly through the Milford Yard – the Yard is physically located on both sides of the main line track. Id. The GU has desired to increase its business by developing the Milford Yard and increasing its ability to interchange with CSX. Id. The Yard is a unique and ideal location since it connects almost directly to CSX's line. Id. In order to enable the interchange of cars with CSX at the Yard, the GU (within the last four months) has had an old switch reinstalled at the point where the GU's tracks connect to CSX's Milford Secondary Branch. Id.

The GU has been attempting to develop new business with the assistance of railroad consultants, including Robert Krafty, the former Manager of Real Estate for the Consolidated Rail Corporation (CSX's predecessor in the northeast). Id. Earlier this year, Mr. Krafty contacted Allen Marsh, the principal of a company called Boston Railway Terminal Corporation ("BRT"), with a proposal to move BRT's operations to the Milford Yard. Id. BRT is a terminal railroad company and its principal business is the distribution of steel. Id. BRT currently operates out of a facility located in South Boston which is owned by CSX. Id. BRT accepts

4

6

shipments of steel via railcar at its facility, where the railcars are moved about, the steel is off-loaded and placed onto trucks and then shipped to BRT's customers throughout the region. Id. BRT owns and operates its own locomotive and conducts its own railroad switching operations at and within its South Boston facility. Id. CSX has advised BRT it must vacate the South Boston facility as soon as possible. Id.

The Milford Yard is uniquely located and configured to accommodate BRT's operations – it is connected almost directly to CSX, it is geographically located in the center of BRT's sphere of operations and it has roadway access via Route 140 to Route 495 (a desired route for the trucks which will haul steel to BRT's customers). Exh. A. The BRT also provides a unique opportunity for the GU. Id. The Yard is obviously a significant GU asset, but the GU currently can use it only for activities such as those conducted by BRT. Id. There are few, if any, operating terminal railroads (or any other businesses) in Massachusetts which are currently looking to relocate their operations and which would be able to assist in the improvement, development and use of an entire railroad yard. Id. The BRT represents the only current option available for the GU to increase its financial standing through the use of the Yard. Id.

During this past spring, the GU and BRT reached an agreement that the BRT would move its operations to the GU's Milford Yard.[1] Id. As part of this agreement, the GU was required to reinstall the switch connecting its line to CSX's Milford Secondary Branch, a task the GU has already accomplished. Id. BRT will be required to make physical improvements to the

[1] The original agreement called for BRT to lease the Yard from GU. However, the terms of the agreement have consistently evolved and changed over the last few months. Id.

7

Yard and its tracks. Id. Once this is accomplished, CSX will start delivering shipments of steel via railcars to the GU's account at the Yard, where they will be interchanged to the GU.[2] Id. GU will generate revenue from the interchange of these cars, all of which will have been shipped from other states.[3] Id.

The GU will also be required by its agreement with BRT to perform various operational activities regarding the interchange and movement of the railcars once they have been delivered by CSX. Exh. A. For instance, GU employees will operate a locomotive leased from the BRT and will physically move the railcars from the point of interchange with CSX to locations within the Yard, using both the GU's main line track as well as another track which is also located within the confines of the Yard. Id. BRT employees will then off-load the steel and haul it to customers throughout New England. Id. The GU will then physically move the railcars back to the point of interchange and return them to CSX. Id. The GU will also be required to carry insurance which covers the potential liability exposure presented by these operations. Id. The GU will retain the right to continue to use its main line for other traffic in addition to the BRT's shipments of steel. Id. The proposed GU/BRT agreement is subject to the execution of an acceptable written contract and BRT's being able to commence railroad operations at the Yard.

The GU and BRT began, earlier this year, to negotiate and draft a contract which is intended to memorialize the terms and conditions of the BRT's use of the Yard as well as the

---

[2] The GU will be expected to enter into a separate *Interchange Agreement* with CSX in order to begin accepting cars at the Yard. BRT will not be a party to the *Interchange Agreement*. Exh. A.

[3] Steel shippers will pay the GU $250.00 for its services (the shipment of each railcar and the movement of the railcars at and within the Yard). Exh. A. The terms of the proposed GU-BRT agreement also require BRT to pay the GU $5,000.00 per month for the use of the Yard and the services provided by the GU, against which will be offset a $100.00 credit for each railcar brought into the Yard (not to exceed $5,000.00 per month). Id.

8

charge for the use of the Yard and the charges the GU will be paid for delivering railcars to BRT. Id. The GU and BRT have been ready, willing and able to commence railroad operations, subject to the execution of the written contract, since late spring/early summer [at least as of six (6) months ago]. Exh. A. They have not done so due to the Town's position that the proposed railroad operations cannot legally occur at the Yard. Id. In the early spring, the GU's representatives (including Mr. Krafty and Ms. Lucey) approached the Town to advise it of the GU's proposed use of the Yard. Id. During late spring and early summer, Ms. Lucey and Mr. Krafty met with Town officials, both at the Yard and at Town Hall, to discuss the proposed railroad operations. Id. During those meetings, the GU was repeatedly advised by various Town officials that the Yard was, according to the Town's *Zoning By-Laws*, located in a district classified as "General Residential," the proposed use of the Yard was not allowed in a General Residential district and, therefore, the Town objected to and prohibited the GU and BRT from conducting the proposed railroad operations at the Yard. Id.

After informally attempting to resolve this dispute, the GU retained counsel to present its position to the Town. On September 8, 2003, the GU sent to the Town correspondence advising it that its *Zoning By-Laws* are preempted by federal law, and therefore are inapplicable to the GU, the BRT and the railroad operations planned for the Yard. *See* letter from Attorney Davidson to Town Counsel Gerald Moody, a copy of which is attached to the hereto as Exhibit "B." On October 10, 2003, Town Counsel sent to the GU correspondence in which the Town refuted the substance of the GU's September 8, 2003 letter and asserted that its *Zoning By-laws* were not preempted. *See* letter from Attorney Moody to Attorney Davidson, a copy of which is attached hereto as Exhibit "C." On November 12, 2003, the GU's counsel responded by sending another letter further clarifying its position and refuting the analysis offered by Town Counsel in

7

9

his October 10, 2003 correspondence. *See* letter from Attorney Flynn to Attorney Moody, a copy of which is attached hereto as Exhibit "D."

On November 14, 2003, Ms. Lucey, Mr. Krafty and the GU's counsel met with Town Counsel at Milford's Town Hall in an effort to resolve this dispute. Exh. A. At this meeting, Town Counsel indicated that the Town did not agree with the GU's position concerning the preemptive effect of the applicable federal law, but requested additional information concerning the BRT's assets and present operations, and he also requested an opportunity to speak with the Board of Selectmen concerning the issue. Id. The GU's representatives asked the Town to reconsider its position and get back to them as soon as possible. Id. On November 25, 2003, the GU provided the information requested by Town Counsel. *See* letter from Attorney Davidson to Attorney Moody, a copy of which is attached to the Town's *Petition* as Exhibit "C."

Town Counsel never got back to the GU. Exh. A. Instead, GU's counsel telephoned Town Counsel on December 4, 2003 and was then informed, for the first time, that the Town intended to file a petition with the Board concerning the proposed use of the Yard. Id. On December 8, 2003, the Town filed its *Petition*, seeking a declaratory order that the proposed use of the Yard was prohibited by the Town's *Zoning By-laws*, and was also subject to the *Massachusetts Wetlands Protection Act*, M.G.L. ch. 139 § 40. *See* the Town's *Petition* and related correspondence.

The Town has already delayed [for at least six (6) months] and otherwise prevented the GU/BRT's ability to conduct railroad operations at the Yard.[4] The Town's *Petition* represents a

---

[4] The GU and BRT have been ready, willing and able to commence their use of the Yard since at least July 2003, and would have begun these operations but for the Town's position. Exh. A. Thus, the GU has suffered, and is at this moment continuing to suffer, monetary damages and ongoing lost business opportunities. Six months of payments under the proposed terms of the GU/BRT agreement would have amounted to $30,000.00. *See supra* at n. 3. In addition, at its

further attempt to delay, frustrate and prevent the GU from conducting railroad operations at the Yard. The Town's current position, and its *Petition*, will also likely permanently and irrevocably damage the GU's ability to conduct its business, at the Yard or otherwise, since the BRT will most likely relocate its operations to another location, thereby depriving the GU of this unique business opportunity.[5] The BRT agreement, and the income it is expected to generate, is integral to the GU's economic survival and its ability to finance further development. Exh. A.

## II.    DISCUSSION OF LAW:

### A.    The Town's *Zoning By-Laws* and the State *Environmental Protection Act* Are Preempted By Federal Law:

The Supremacy Clause of the United States Constitution provides that the laws of the United States "shall be the supreme Law of the Land...any Thing in the constitution or Laws of any state to the contrary notwithstanding." Art. VI, cl. 2. "Where a state statute conflicts with or frustrates federal law, the former must give way." CSX Transportation v. Easterwood, 507 U.S.

---

current location, BRT has averaged the receipt of eleven (11) railcars per month for the last twelve (12) calendar months. *See Petition* at Exh. C. Given this same volume of traffic, BRT would have brought sixty-six (66) railcars into the Yard over the last six (6) months. Applying the credits for these railcars as per the proposed agreement, the total monthly payments would have been reduced to $23,400.00. The GU has also lost, and is continuing to lose, the $250.00 fee it is expected to collect from the shipper of each of these railcars. Given the loss of sixty-six (66) shipments over the last six (6) months, the GU has suffered additional lost revenues in the amount of $16,500.00. Thus, the total lost revenue to date amounts to $41,000.00. So long as the Town continues to obstruct the GU's ability to use its Yard, the GU will continue to lose $7,650.00 per month. Finally, the GU has incurred, and continues to incur, attorneys' fees and other costs associated with this dispute. Exh. A.

[5] The proposed agreement with BRT is extremely unique due to the fact that there are no other terminal railroads in the region that are in need of a rail yard and the services that the GU can provide at the Yard. Exh. A. If the GU does not resolve this dispute as soon as possible, and move the BRT into its Yard, then it will lose the BRT as a tenant and lose the income which results from having the BRT at the Yard. Id. During the late summer and into the fall the BRT advised the GU that, unless the GU could resolve its dispute with the Town, it would need to find another location to relocate its operations. Id. It is the GU's understanding and belief that the BRT has been actively looking for another suitable location for its operations due to the GU's inability to resolve its dispute with the Town. Id.

658, 663 (1993), *citing* U.S. Const., Art. VI, cl. 2; *see also* <u>Cipollone v. Liggett Group, Inc.</u>, 505 U.S. 504, 516 (1992); <u>Maryland v. Louisiana</u>, 457 U.S. 7254, 746, (1981).  The Town's *By-Laws*, as well as any other state or local statute or ordinance, conflict with the provisions of the federal *Interstate Commerce Commission Termination Act* ("ICCTA") and are therefore preempted.

    1.       **Expressed Preemption Under The ICCTA:**

In 1887, Congress passed the Interstate Commerce Act ("ICA"), which established a statutory scheme for regulating the nation's railroads. The ICA was originally codified at 49 U.S.C. §1, *et seq*.  The ICA established the Interstate Commerce Commission ("ICC") as the federal regulatory agency responsible for overseeing railroad transportation.  Although the ICA has been changed and amended numerous times since its inception, it continues (in its present form) to govern interstate commerce.  In 1995, Congress abolished the ICC by enacting the ICCTA.  Pub. L. No. 104-88, Dec. 29, 1995, 109 Stat. 803.  The ICCTA established the Surface Transportation Board (the "Board") to take the place of the ICC and granted the Board exclusive jurisdiction over rail functions and proceedings.  *See* 49 U.S.C. §701(a).  Congress' purpose in passing the ICCTA was to substantially reduce the regulation of railroads and other modes of surface transportation.  *See* 49 U.S.C. §10101; *see also* H.R. Rep. No. 104-311, at 82 (1995); Sen. Rep. No. 104-176, at 2 (1995); <u>Pejepscot Industrial Park Ind. Pk. v. Maine Central RR. Co.</u>, 215 F.3d 195 (1st Cir. 2003).

When the statute being construed contains an expressed preemption clause, such as §10501(b), "the task in statutory construction must in the first instance focus on the plain wording of the clause...." <u>Easterwood</u>, 507 U.S. at 664.  The ICCTA contains a clearly

expressed preemption clause which grants to the Board exclusive jurisdiction over all railroad

transportation:

> (b) the jurisdiction of the Board over –
>
> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules...practices, routes, services and facilities of such carriers; and
>
> (2) the construction, acquisition, operation, abandonment or discontinuance of spur, industrial, team, switching, or sidetracks, or facilities, even if the tracks are located, or intended to be located entirely in one state, is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. §10501(b). As one court has observed, "it is difficult to imagine a broader statement

of Congress' intent to preempt state regulatory authority over railroad operations." CSX

Transportation, Inc. v. Georgia Pub. Serve. Comm'n., 944 F. Supp. 1573, 1581 (N.D. Ga. 1996).

Congress and the courts have long recognized a need to regulate railroad operations at the

federal level. Congress' authority under the Commerce Clause to regulate the railroads is well-

established [see, e.g., Houston, E. & W. Tex. Ry. V. United States, 234 U.S. 342, 350-52 (1914);

Pittsburgh v. Lake Erie R.R. v. Railway Labor Executives' Ass'n, 491 U.S. 490, 510 (1989)] and

the Supreme Court repeatedly has recognized the preclusive effect of federal legislation in this

area. See, e.g., Colorado v. United States, 271 U.S. 153, 165-66 (1926) (ICC abandonment

authority is plenary and exclusive); Transit Comm'n v. United States, 289 U.S. 121, 127-128

(1933) (ICC authority over interstates rail construction is exclusive); City of Chicago v.

Atchison, T. & S.F. Ry., 357 U.S. 77, 88-89 (1958) (local authorities have no power to regulate

interstate rail passengers).

13

The broad nature of Congress' preemption under the ICCTA is further evidenced by the

Act's expansive definitions of the terms "railroad" and "transportation." The Act defines

"railroad" as including, in pertinent part:

> (B) the road used by a rail carrier and owned by it or operated under an agreement; and
>
> (C) a switch, spur, track, terminal, terminal facility, and a freight depot, yard and ground, used or necessary for transportation.

49 U.S.C. §10102(6). The tracks, yard and equipment that the GU proposes to use for its joint

operation with BRT will be used for railroad operations, and therefore clearly meet the statutory

definition of "railroad." The ICCTA's definition of "transportation" includes:

> (A) a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use; and
>
> (B) services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling and interchange of passengers and property.

49 U.S.C. §10102(9) (emphasis added). "It is clear...that Congress intended the preemptive net

of the (ICCTA) to be broad by extending exclusive jurisdiction to the Board over anything

included within the general and all inclusive term 'transportation by rail carriers.'" Georgia Pub.

Serv. Comm'n, 944 F. Supp. at 1582. "By preempting state regulation of railroad operations,

and granting exclusive jurisdiction over almost all aspects of railroad operations to the STB,

Congress removes the ability of states to frustrate its policy of deregulating and reviving the

railroad industry." Id. at 1583. Thus, when §10501(b) grants the Board exclusive jurisdiction

over "transportation by rail carriers" it includes the yard, property, tracks, buildings, facilities,

freight yards and any equipment used in connection with the railroad or related to the movement

of property (i.e. freight), including the Yard and the rail cars of steel which will be interchanged to the GU and delivered by rail to the BRT at the Yard.

Consequently the ICCTA, by its clearly expressed terms, preempts the application and/or enforcement of the Town's *Zoning By-laws* with the respect to the railroad operations that the GU and BRT plan to conduct at the Yard. The proposed railroad operations fall under the statutory definition of "transportation." It should be noted, in this regard, that the GU is a railroad company and that it will be moving the steel in and around the Yard, that it will be receiving shipments on railcars, that it will be handling and interchanging these shipments at the Yard, and that the buildings and facilities the BRT plans to construct will be used for the movement of freight.

### 2.    ICCTA Preemption of Local Zoning By-laws and Environmental Protection Laws:

A number of recent decisions have determined that §10501(b) preempts local zoning by-laws and any state environmental protection laws, and that the Board's authority to regulate railroad operations is exclusive. In City of Auburn v. United States, 154 F. 3d 1025, 1027-28 (1999), several cities in the state of Washington sought judicial review of Board decisions which found that state and local environmental review laws were preempted by the ICCTA. The Burlington Northern Santa Fe Corporation ("BNSF") sought approval from the Board to reopen for passenger service a rail line route which it had recently reacquired. Id. In order to restore this route, the BNSF was required to repair and improve the line (including the replacement of track sidings and buildings and the construction of communication towers) and sought Board approval to do so (after taking the position during local proceedings that local by-laws were preempted by the ICCTA). Id. The cities then petitioned the Board for an opinion on the

13

ICCTA's preemptive effect. Id. The Board issued a formal opinion that the local by-laws were preempted and the Court of Appeals for the Ninth Circuit upheld the BOARD determination.

The Ninth Circuit found that Congress' intent to preempt this kind of local regulation of rail lines was explicit in the plain language of the ICCTA and the statutory framework surrounding it: "we find that the plain language of two sections of the ICCTA (§§10501 and 11323-25) explicitly grant the SRB authority over railway projects like (this one)." Id. at 1030. The court noted that "all the cases cited by the parties find a broad reading of Congress' preemption intent, not a narrow one..." and that "[p]re-ICCTA case law addressing federal preemption over railroad operations also supports a broad reading of the statute." Id. Finally, the Ninth Circuit rejected the cities' argument that the ICCTA applies only to "economic" regulation of railroads: "if local authorities have the ability to impose 'environmental' permitting regulations on the railroad, such power will in fact amount to 'economic regulation' if the carrier is prevented from constructing, acquiring, operating, abandoning, or discontinuing a line." Id. at 1031.

In the case of Friberg , et al. v. Kansas City Southern Ry. Co., 267 F.3d 439 (2001), the Court of Appeals for the Fifth Circuit reversed a jury verdict in favor of the plaintiffs, property owners who claimed that the defendant railroad caused them to go out of business by continuously blocking a grade crossing on a road which led to their business, in violation of Texas' Anti-Blocking Statute.    The track in question was a sidetrack which the Kansas City Southern ("KCS") had begun using with more frequency after it was significantly lengthened to accommodate longer trains. In determining that the ICCTA preempted any local ordinances affecting rail operations, the Fifth Circuit stated that "[t]he language of the statute could not be more precise, and it is beyond peradventure that regulation of KCS train operations, as well as

14

16

the construction and operation of the KCS side tracks, is under the exclusive jurisdiction of the

STB…" Id. at 443. Echoing the sentiment expressed by the Ninth Circuit in City of Auburn, the

Friberg court further noted that "[t]he regulation of railroad operations has long been a

traditionally federal endeavor, to better establish uniformity in such operations and expediency in

commerce, and it appears manifest that Congress intended the ICCTA to further that exclusively

federal effort…." Id.

    A trial judge in the United States District Court for the District of Minnesota, in the case

of Soo Line Railroad Co. v. City of Minneapolis, 38 F. Supp. 1096 (D. Minn. 1998), granted

summary judgment in favor of the railroad, where it had sued the City for declaratory judgment

and injunctive relief arising from the City's refusal to grant it demolition permits. The railroad

had, pursuant to the City's "Code of Ordinances," applied for (and were denied) permits to

demolish several buildings in a rail yard. The demolition was a necessary part of the railroad's

redevelopment of the yard. One of the City's departments had denied the permit application on

the grounds that the buildings which had been scheduled for demolition may have had historic

value. Id, at 1097-1098. In granting the railroad's motion, the court determined that the ICCTA

preempted the City's authority to regulate the railroad's proposed activities, finding that:

> [t]he language of the Act expresses Congress' clear intent to
> preempt state and local regulatory authority over the construction,
> development, and operation of railroad facilities…. (The)
> demolition of the five buildings and subsequent construction,
> development, and operation of the proposed bulk transfer facility is
> subject only to such regulations and requirements as may be
> imposed by the STB pursuant to the ICCTA.

Id. at 1101.

    In Village of Ridgefield Park v. N.Y. Susq. & Western Ry. Corp., 163 N.J. 446 (2000),

the plaintiff Village sought to enjoin a nuisance and to regulate the defendant railroad's facility

17

pursuant to, *inter alia*, the Village's zoning by-laws. The railroad had begun construction of a

maintenance facility without first applying for zoning or construction permits. Id. at 450. The

Village ultimately sued the railroad, seeking to require it to apply for permits and to shut down

the facility. A trial judge granted the railroad's motion for summary judgment and dismissed the

Village's lawsuit. The judge's ruling was upheld by New Jersey's Appellate Division and was

ultimately affirmed by the New Jersey Supreme Court. In finding that the ICCTA preempted the

Village's attempts to regulate the railroad, the New Jersey Supreme Court reasoned that:

> [b]ecause zoning regulations imposed by the Village "clearly could
> be used to defeat [the Railroad's] maintenance and upgrading
> activities, thus interfering with the efficiency of railroad operations
> that are part of interstate commerce,"...the Village may not dictate
> the location on its right-of-way of the Railroad's maintenance
> facility.

Id. at 462.

Finally, in Norfolk Southern Ry. Co. v. City of Austell, 1997 U.S. Dist. LEXIS 17236

(Aug. 18, 1997), the federal court in the Northern District of Georgia granted summary judgment

on behalf of the plaintiff railroad where it had brought an action for declaratory relief regarding

the application, to the construction of an intermodal facility, of the City's zoning by-laws. In so

doing, the court determined that the ICCTA preempted the City's by-laws and land use

permitting requirements because they prevented the construction and operation of the railroad's

facility. Id. "Based upon the clear and unambiguous language of the ICCTA, the court

concludes that the instant intermodal facility comes within the ICCTA's definition of

'transportation by rail carriers' over which the STB is given exclusive jurisdiction under...

§10501(b)(1)." Id.

The case that the Town, in its *Petition*, relied on most heavily, Florida East Coast

Railway Company, 266 F. 3d 1324 (2001), is entirely distinct from the case at hand. In Florida

16

East Coast, the arrangement between the railroad and its tenant (Rinker) was essentially a land swap. Rinker leased the railroad's premises in order to conduct its own distribution services. The services provided by Rinker had nothing to do with providing "railroad transportation" as that term is defined in the ICCTA. The Eleventh Circuit held that "Rinker's use of the property...and the activities there performed by Rinker serve no public function and provide no valuable services to FEC; rather, the arrangement between FEC and Rinker merely facilitates Rinker's operation of a private distribution facility on FEC-owned premises." Id. at 1336. Here, the GU will be intimately involved in the joint operations which are proposed for the Milford Yard and the operations, in turn, provide valuable services (such as car movements, revenue and the cash needed for further improvements and expansion) to the GU. In sum, the proposed use of the Milford Yard is much more than a "private distribution facility;" therefore, Florida East Coast simply does not apply.

### 3.    The Board's Own Interpretation of Its Authority and ICCTA Preemption:

The Board's own rulings on the preemptive effect of the ICCTA support the GU's position.[6] The Board has, since its inception, taken the position that it has exclusive authority

---

[6] Although the Board's rulings can be considered by a reviewing court, they are not dispositive, nor are they necessarily entitled to deference in a court of law. See Georgia Pacific Serv. Comm'n, 944 F. Supp. at 1584, n.8. The Board itself has recognized that, in cases such as the GU/BRT situation,

> railroads do not require authority from the Board to build or expand their facilities such as truck transfer facilities, weigh stations, or similar facilities, relating to their railroad operations, or to upgrade an existing line or to construct an unregulated spur or team track. In such cases, we can provide advice about how preemption applies but we have no direct involvement in the process. Thus, the interpretation of the preemption provisions has evolved largely through Court decisions in cases outside of our direct jurisdiction and in which we were not a party.

Borough of Riverdale Petition for Declaratory Order, The New York Susquehanna and Western Railway Corporation, STB Finance Docket No. 33466 at * 7 (Sept. 9, 1999).

over the type of railroad operations that the GU and BRT plan to conduct at the Yard. Shortly

after it was created, the Board issued a public notice which stated "that the authority of certain

states to regulate intrastate rail matters was terminated by the (ICCTA), effective January 1,

1996." *STB Public Notice*, Ex Parte No. 388, April 3, 1996. In the underlying decision which

was ultimately appealed to the Ninth Circuit in <u>City of Auburn</u>, the Board stated that:

> [A] state or local permitting process for prior approval of this
> project, or of any aspect of it related to interstate transportation by
> rail,...is preempted.... The Board now has exclusive authority over
> the construction and operation of rail lines that are part of the
> interstate rail network....Local law is preempted when the
> challenged state statute "stands as an obstacle to the
> accomplishment and execution of the full purposes and objectives
> of Congress."

*Cities of Auburn and Kent, WA, Petition for Declaratory Order*, STB Finance Docket No. 33200,

at *4-6 (July 1, 1997).

Two years later, the Board reiterated its position that the ICCTA preempts local zoning

by laws:

> [I]t is well-settled that...the Borough can not apply its local zoning
> ordinances to property used for NYSW's railroad operations...
> Zoning regulations that the Borough would impose clearly could
> be used to defeat (the railroad's) maintenance and upgrading
> activities, thus interfering with the efficiency of railroad operations
> that are part of interstate commerce... This is the type of
> interference that Congress sought to avoid in enacting §10501(b).

*Riverdale*, at *7. The Board further determined that "local entities...can not require that

railroads seek building permits prior to constructing or using railroad facilities because of the

inherent delay and interference with interstate commerce that such requirements would cause."

<u>Id</u>. at *8. The Board made a similar ruling with respect to environmental laws:

> Recent precedent has made it clear that, to the extent that they

> set up legal processes that could frustrate or defeat railroad operations,
> state or local laws that would impose <u>a local permitting or environmental
> process</u> as a pre-requisite to the railroad's maintenance, use or
> upgrading of its facilities are preempted because they would, of necessity,
> impinge upon the federal regulation of interstate commerce.... actions (of
> local authority) must not have the effect of foreclosing or restricting the
> railroad's ability to conduct its operations or otherwise unreasonably
> burdening interstate commerce.

<u>Id</u>. at *5 - *6.

The Board has, in a case which arises from another Massachusetts dispute, recently

echoed these sentiments. In *Joint Petition for a Declaratory Order -Boston and Maine*

*Corporation and Town of Ayer*, STB Finance Docket No. 33971 (April 30, 2001) at *6, the

Board noted that "[s]everal courts have held that this statutory preemption applies even in cases

– such as the construction of ancillary facilities under (49 U.S.C. §10906)...- where we lack

licensing and ancillary authority and therefore do not conduct our own environmental review."

*See also* <u>Flynn v. Burlington Northern Santa Fe Corp.</u>, 98 F. Supp. 2d 1186 (E.D. Wash. 2000).

The facts of *Boston & Maine* are nearly identical to the case at hand – the Town of Ayer sought

to prevent, through the enforcement of its zoning by-laws and local environmental regulations,

the development of a yard (owned by a railroad) for the purposes of constructing a transloading

facility which would off-load motor vehicles from rail cars to be carried by a trucking company

to new car dealerships. <u>Id</u>. The Board noted that:

> even local environmental regulation is preempted where Congress
> intended to preempt all state and local law. As explained in <u>City of Auburn</u>, 154
> F. 3d at 1030-31, congressional intent to preempt a state or local permitting
> process for prior approval of rail activities and facilities related to interstate
> transportation by rail is explicit in the plain language of §10501(b) and the
> statutory framework surrounding it.

<u>Id</u>. at *6, n. 24. The Board ultimately ruled that "state and local permitting...(including

environmental requirements) are preempted because by their nature they unduly interfere with

interstate commerce by giving the local body the ability to deny the carrier the right to construct

facilities or conduct operations. Id. at *6.

     The case law, as well as the Board's own decisions, hold that the Town's *Zoning By-laws*

and the *Wetlands Protection Act* are preempted, at least to the extent they interfere with the GU

and BRT's ability to conduct "railroad transportation" at the Yard. The Town cannot prevent the

GU and BRT from moving shipments of steel into and through the Yard; it cannot prohibit the

construction activities necessary to improve the Yard in order to accommodate these services;

and it cannot require the GU or BRT to submit to any permitting process in this regard. The GU

does not dispute that the Town's *By-laws*, to the extent they pertain to matters of "public health

and safety," may not be specifically preempted. Nevertheless, the Town cannot use any by-law

or ordinance to delay, obstruct or restrict the GU and BRT's attempts to provide the

contemplated "railroad transportation" services at the Yard.

    **4.**    **The Town Has Essentially Admitted That The ICCTA Prohibits It From Taking Any Jurisdiction Over the Proposed Use of the Milford Yard:**

     The Town has taken the position, in its *Petition*, that its *By-laws* and the *Wetlands*

*Protection Act* are not preempted by the ICCTA because BRT is not a "rail carrier" over which

the Board has jurisdiction. *See Petition*, at p. 9-14. In support of this position, the Town cited

two recent Board decisions, *Hi Tech Trans, LLC – Petition For Declaratory Order*, STB Finance

Docket No. 34192 (Sub-No.1) (Aug. 14, 2003)and *H&M International, Inc. – Petition for*

*Declaratory Order*, STB Finance Docket No. 34277 (Nov. 10, 2003). The Town's reliance on

these decisions is misplaced because it has misrepresented (or perhaps misunderstood) the

22

arrangement contemplated by the GU and BRT.[7]  Simply put, the proposed GU/BRT agreement is completely different from the operations which were the subject of *Hi Tech* and *H&M*.

The Board, in both of these cases, refused to extend its jurisdiction to preempt local ordinances over trucking companies which planned to use railroad yards for nothing more than transloading and trucking purposes. See *High Tech* at \*2 ("High Tech contracts for trucks to transport...debris from the shippers' construction sites to the truck-to-rail transloading facility located in [the railroad's] Yard, where High Tech unloads the...debris from the trucks and later reloads it onto rail cars."); *H&M* at 2 ("H&M primarily loads and unloads trailers and containers on and off railroad flat cars; moves trailers between parking places and ramp tracks for loading and unloading; lifts, stacks, flips and racks trailers and chassis in connection with the ramping process; ties down, secures and releases equipment loaded onto or unloaded from rail cars; and inspects trailers and cargo for safety and inventory purposes.").  In both cases, the Board's decisions were based on a narrow interpretation of the definition of "rail carrier" [*see* 49 U.S.C. §10102(5)] and a finding that the trucking companies were not "rail carriers" subject to the Board's jurisdiction. *See, e.g., H&M* at \*2 ("to fall within the Board's jurisdiction, the transportation activities must be performed by a rail carrier, and the mere fact that H&M moves rail cars inside the Marion facility does not make it a rail carrier.  To be considered a rail carrier under the statute, there must be a holding out to the public to provide common carrier service.").

---

[7] This is likely a function of the Town's "jumping the gun" by prematurely filing its *Petition* before it had gained a complete understanding of the facts and before it had given the parties a full opportunity to reach an amicable resolution. The Town filed its *Petition* while GU and its representatives were still trying to work with the Town and also work out the details of the agreement with BRT.  At the time the *Petition* was filed the GU's representatives were waiting for the Town to take a less formal position and had expressed a willingness to negotiate this dispute.

23

The Board also noted that the determination of whether or not a particular operation falls under the jurisdiction of the ICCTA is a fact-specific determination. *H&M* at *2. Both decisions were based on facts which are not present here. First, the GU, unlike the petitioners in the Board's *High Tech* and *H&M* decisions, is a rail carrier. Second, the petitions in *High Tech* and *H&M* pertained simply to the trucking companies' operation of transloading facilities within a railroad's yard, and did not seek the Board's determination as to whether it would have had jurisdiction over the entire yard itself or the railroad operations which were being conducted within the yard.

Third, the most crucial factor in each of these decisions was that the railroads involved had little (if anything) to do with the operation of the transloading facility. *See, e.g.*, *H&M* at *4 ("Nor is there any evidence that [the railroad] has control over H&M's Tech's business operations. To the contrary, H&M has specifically stated that all car movements within its facility are 'at the direction of, or under the supervision of, and for the convenience of H&M'... Moreover, the record indicates that the [railroad's] obligations and common carrier duty begin and end at the delivery track at the H&M facility."); *Hi Tech* at *4 ("Hi Tech's relationship with [the railroad] is that of a shipper with a carrier.... The parties all but eliminate [the railroad's] involvement in the operation of the transloading facility and its responsibility for it. There is no evidence (the railroad) quotes rates or charges compensation for use of High Tech's transloading facility."). Here, to the contrary, the GU is intimately involved in the joint operation between it and BRT. For instance, the GU will be leasing the BRT's locomotive, operating it with GU employees and moving shipments of steel by rail car over its mainline tracks, its yard tracks and at the portion of the Yard designated for transloading operations. The GU's insurance agreements will cover the potential liability of these operations. In addition, the GU will be

22

receiving significant compensation for the use of its facility. Obviously, the GU's obligations and common carrier duties do not begin and end at the CSX interchange point and instead continue throughout the proposed operation. The Town has, by stating in its *Petition* that "BRT proposes to undertake in Milford the ***same receiving and trucking operations as it currently undertakes in South Boston***" (*see Petition* at p. 10) (emphasis added), simply missed the mark in attempting to draw an analogy between the GU/BRT's joint operation and the operations which were rejected by the Board in *High Tech* and *H&M*.

Finally, the railroads involved in the recent Board decisions are large Class I freight railroads with extensive holdings, large capital reserves and plenty of business opportunities. It was important to the Board that the operations over which it refused to exercise jurisdiction were not "considered an integral part of (the railroad's) common carrier service." Here, in stark contrast, the proposed operations are not only an integral part of the GU's service, but comprise the single most important part of its business operations and crucial components of ensuring the GU's future financial viability.

The Town, in its *Petition*, has inappropriately focused its entire argument on BRT. However, as is clearly described herein, the GU is the truly affected party and the operations proposed for the Milford Yard will be conducted jointly. Moreover, the Town has, by taking this position, essentially admitted that the ICCTA preempts any effort by the Town to prevent the GU/BRT's operations in this case – in its *Petition* (at p. 10) the Town stated that "[b]y the plain language used by Congress, it is the transportation, and related activities, undertaken by ***rail carriers*** that benefit from preemption, not activity which may be related to rail transportation which is provided and undertaken by non-rail carriers like BRT. As was stated in <u>Fletcher Granite Company, LLC</u>..., under the preemption provisions of the ICCTA, '...zoning ordinances

and local land use permit requirements are preempted as to facilities that are an *integral part of the railroad's interstate operations*.'" (citations omitted). Here, the GU's proposed use of the Milford Yard is "railroad transportation" which will be undertaken by a "rail carrier" and is an "integral part" of the GU's operations. By the Town's own reasoning, then, its *By-laws* and any other local land use requirements are preempted.

### III.  CONCLUSION:

WHEREFORE, for all the above stated reasons, the Board should deny the Town's request to institute a Declaratory Proceeding, or issue an Order determining that the railroad operations proposed for the Milford Yard are exempt from the application of the Town's *Zoning By-Laws, the Wetlands Protection Act* or any other state or local statute law, statute, ordinance or regulation, and further issue an Order that any such laws, statutes, regulations and/or ordinances are preempted by the *ICCTA* and that the Town is prohibited from enforcing any such laws, statute, ordinances or regulations with respect to the GU's proposed use of the Milford Yard.

Respectfully submitted,
The GRAFTON AND UPTON
RAILROAD COMPANY,
by its attorneys,

Michael B. Flynn                    BBO No.: 559023
Richard A. Davidson, Jr.       BBO No.: 552988
FLYNN & ASSOCIATES, P.C.
189 State Street
Sixth Floor
Boston, MA 02109
(617) 722-8253

DATED: *December 26, 2003*

G:\F & A\CASE FILES\Grafton & Upton RR\milford secondary-allen marsh\response to Town's STB petition.doc

24

26

CERTIFICATE OF SERVICE

I, Gerald M. Moody, Attorney for the Defendant Town of Milford in the above entitled matter certify that I have this 5th day of April, 2005 served the within GU Defendants Response to Plaintiff's Motion in Limine upon counsel for the Plaintiff addressed as follows:

Michael B. Flynn, Esq.
Richard A. Davidson, Jr., Esq.
Flynn & Associates
189 State Street, 6th Floor
Boston, MA 02109

_____
Gerald M. Moody, Town Counsel