United States District Court
District of Massachusetts

|  |  |
|---|---|
| GRAFTON AND UPTON RAILROAD COMPANY,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>TOWN OF MILFORD,<br><br>　　　　Defendant. | Civil Action No.<br>03-40291-NMG |

**MEMORANDUM & ORDER**

GORTON, J.

In the present case, the plaintiff Grafton and Upton Railroad Company ("Grafton") seeks a declaration by this Court that the Interstate Commerce Commission Termination Act of 1995, Pub L. No. 104-88, 109 Stat. 803 (1995)("ICCTA"), preempts state and municipal law as applied to the railroad and its plans for developing its railyard in Milford, Massachusetts. The defendant Town of Milford ("the Town") moves for summary judgment in light of the recent decision by the Surface Transportation Board ("STB") which found that preemption was not warranted in this case. Grafton counters with a motion in limine requesting that this Court decline to give deference to the STB's decision. Having reviewed the memoranda in support of and opposition to the motions, the Court resolves the dispute as follows.

I.  **Background**

Grafton is a Massachusetts railroad corporation with roots in central Massachusetts dating back to 1873. It operates over 15.5 miles of main line track that runs from North Grafton to Milford and also has rail yards in Hopedale, Grafton, Upton and Milford, Massachusetts. From the 1890's to the 1940's, Grafton was a significant carrier, initially of passengers but eventually of freight such as cattle and motor vehicles. The volume of Grafton's business has steadily declined since its peak in the 1930's and 1940's.

To stem the decline, Grafton recently initiated an effort to reestablish itself as a going concern by improving its infrastructure, re-utilizing its rail yards and increasing the volume of freight conveyed over its tracks. Inadequate capitalization has, however, impeded those efforts.

Grafton has identified its Milford Yard as a "prime location" for conducting income-generating, railroad operations. CSX Transportation, Inc. ("CSX"), a Class I freight railroad currently interchanges with Grafton at North Grafton, Massachusetts. CSX operates over tracks it owns in several states and is the primary carrier of freight between Massachusetts and the rest of the country. The Milford Yard is immediately west of the intersection between Grafton's main line and a busy CSX freight line known as the "Milford Secondary

Branch". Grafton's main line runs directly through the Milford Yard and terminates at the CSX intersection.

Grafton seeks to develop the Milford Yard, thereby increasing its ability to interchange with CSX. To that end, Grafton contacted the principal of the Boston Railway Terminal Corporation ("BRT") with a proposal to move BRT's operations to the Milford Yard. BRT is a terminal railroad company, meaning it operates a railroad over a short, fixed distance for a singular purpose such as the movement of freight within an industrial complex. BRT currently operates out of a facility in South Boston which is owned by CSX. At the facility, BRT engages in the transfer and distribution of steel via truck to customers throughout the region.

In the spring of 2003, Grafton and BRT agreed that the BRT would move its operations to the Milford Yard. Grafton anticipates revenue generation from the interchange of those rail cars, arriving from all over the country. Grafton claims that it has been ready, willing and able, since late Spring 2003, to memorialize the parties' agreement in a contract and to begin railroad operations at the Milford Yard.

The operations have not commenced, however, because the Town of Milford has taken the position that the proposed railroad operations are unlawful. During the Spring and Summer of 2003, Grafton informed Town officials of the proposed railroad

operations. During the course of those meetings, Town officials indicated that the Milford Yard was, pursuant to the Town's Zoning By-Law, located in a district classified as "General Residential." The Town thus objected to and prohibited Grafton and BRT from conducting the proposed railroad operations at the Milford Yard.

Following repeated attempts to resolve the dispute, Grafton was informed on December 4, 2003 that the Town intended to file a petition with the STB seeking a declaratory order that the proposed use of the Milford Yard was prohibited by the Milford Zoning By-Law and was also subject to the Massachusetts Wetlands Protection Act, M.G.L. c. 139 § 40.

On December 29, 2003, Grafton filed the instant action against the Town seeking a declaratory judgment that the Milford Zoning By-Law and the Wetlands Protection Act are preempted by federal law as applicable to Grafton and BRT. On February 24, 2004, this Court entered a preliminary injunction preventing the Town from attempting to enforce its Zoning By-Laws or otherwise delay the development of the Milford Yard but stayed further action pending resolution of the Town's petition then pending before the STB.

On August 11, 2004, the STB announced its unanimous decision to deny the Town's petition for a declaratory order that federal preemption does not apply to BRT. The STB reasoned that it

-4-

lacked jurisdiction to enter the order because BRT is not a rail carrier and, therefore, is not within STB jurisdiction. Although the Town's petition was denied, the decision was favorable to the Town because the STB's reason for denial was that BRT is not a rail carrier. If BRT is not a rail carrier, federal preemption does not apply and Zoning By-Laws and state law are applicable.

Although the procedure followed by Grafton here was unorthodox, i.e., filing suit before the STB decision was rendered, this Court's role is now to review that decision. 28 U.S.C. § 1336 (setting forth jurisdiction of district court to review STB decisions). Adding to the peculiarity of the situation, however, was the announcement by counsel for Grafton at a status conference held on February 11, 2005 that BRT is no longer proposing to transfer its operations to Milford, in essence rendering this case moot. Nevertheless, the case remains viable due to Grafton's assertion of a right to damages and attorneys' fees, presumably pursuant to 42 U.S.C. §§ 1983 and 1988. Whether Grafton has a right to damages and attorneys' fees under those statutes has been cast into considerable doubt after the Supreme Court's recent decision in City of Rancho Palos Verdes v. Abrams, 544 U.S. 113 (2005). Nevertheless, the Court leaves that issue unresolved because the present issue can be disposed of on other grounds.

On March 8, 2005, the Town filed a motion for summary

-5-

judgment which was followed a few days later by Grafton's motion in limine requesting that the Court not grant deference to the STB's decision. Because the motions are two sides of the same coin, the Court will address them conjointly.

## II. Discussion

In essence, the Town's motion for summary judgment and Grafton's motion in limine contest the legitimacy and correctness of the STB's decision. The Town's motion for summary judgment is dispositive and will take precedence but both motions concern the same set of issues and facts and, therefore, resolution of the summary judgment motion will simultaneously resolve Grafton's motion in limine.

### A. Town's Motion for Summary Judgment

#### 1. Legal Standard

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Mesnick v. General Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)(quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)). The burden is upon the moving party to show, based upon the pleadings, discovery and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." Id. A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." Id.

Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The Court must view the entire record in the light most hospitable to the non-moving party and indulge all reasonable inferences in that party's favor. O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993). If, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate.

   2. **Analysis**

       a. **Standard for Judicial Deference to the STB's Decision**

As grounds for both its opposition to summary judgment and in support of its own motion in limine, Grafton asserts that the STB's decision lacked "thoroughness in its consideration of the facts and circumstances" of this case and was "fraught with

invalid reasoning" and, therefore, is not due this Court's deference under Chevron U.S.A. v. Natural Resources Defense Council, 467 U.S. 837 (1984), or Skidmore v. Swift & Co., 323 U.S. 134 (1944). Thus, it is necessary to examine the thoroughness and reasoning of the STB's decision.

Despite this Court's review of the STB's decision, it is mindful of the unique expertise of the STB in the field of transportation. In fact, there is a statutory requirement that at least two of the STB's three members "be individuals with professional standing and demonstrated knowledge in the fields of transportation or transportation regulation". 49 U.S.C. § 701(b)(2). Courts have been cognizant of the STB's expertise particularly in the area of determining federal preemption. See Fla. E. Coast Ry. Co. v. City of W. Palm Beach, 110 F. Supp. 2d 1367, 1378 n.5 (S.D. Fla. 2000)("[A]s the agency with authority delegated from Congress to implement the provisions of the ICCTA, the STB is uniquely qualified to determine whether state law or local law should be pre-empted").

Moreover, the Supreme Court has made clear that "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." Chevron, 467 U.S. at 844. See also NRPC v. Boston and Maine Corp., 503 U.S. 407, 417 (1992)("Judicial deference to reasonable interpretations by an agency of a statute

that it administers is a dominant, well settled principle of federal law.").

Specifically, the <u>Chevron</u> doctrine requires a two-step analysis. First, the Court looks to the plain meaning of the statutory text and if that text clearly supports or opposes the administering agency's interpretation, then the Court stops its analysis. <u>Chevron</u>, 467 U.S. at 842043. Nevertheless, if the statute is ambiguous or silent on the particular issue in question, the Court proceeds to the second step in which it determines if the agency's construction of the statute is reasonable. <u>Id.</u> at 843. If it is, the Court will give deference to the administering agency's interpretation. <u>Id.</u> To overcome the great deference given under <u>Chevron</u> to agency interpretations of the statutes they are charged with administering, a party must show that the agency's interpretation is unreasonable. <u>Id.</u> Nevertheless, the Court

> need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding.

<u>Id.</u> at n.11.

In the context of this case, Grafton argues simultaneously that 1) both the statutory scheme set forth at 49 U.S.C. § 10501 and the intent of Congress in adopting that scheme are clear thus rendering the STB's decision superfluous and 2) the STB's

decision is an unreasonable interpretation of the statute not worthy of <u>Chevron</u> deference by this Court. The Court acknowledges that § 10501 is ambiguous and open to more than one interpretation of Congress's intent and therefore will review the STB's decision on the latter ground presented by Grafton.

### b.   Analysis of the STB's Decision

The STB's decision of August 11, 2004 held that, although the Board had discretionary authority under 5 U.S.C. § 554(e) and 49 U.S.C. § 721 to issue a declaratory order to eliminate a controversy or remove uncertainty, it found no need to institute a proceeding on the facts of the present case. The STB stated that: 1) it does not have jurisdiction over steel fabrication activities, 2) it does not have jurisdiction over rail/truck transloading activities that are not performed by a rail carrier, or on behalf of a rail carrier, that holds itself out to offer those services to the public and 3) the broad federal preemption of § 10501(b) does not apply to activities over which the STB's jurisdiction does not extend.

The STB applied a detailed analysis of the issues presented by the parties and reached findings based on that analysis. The STB found that Grafton is a rail carrier and that its activities of transporting rail cars to and from BRT's proposed facility would be protected under § 10501(b). The STB then stated that, in contrast, the BRT's planned steel fabrication activities at

the Milford Yard are not within the definition of "transportation" and its rail/truck transloading activities, while within the definition of "transportation", would not be conducted by or for a rail carrier as is required to fall within the STB's jurisdiction as defined in § 10501(b). Thus, the STB held that it did not have jurisdiction over BRT's planned steel fabrication activities and § 10501(b) preemption would not prevent application of state and local regulations to BRT's proposed activities or facilities.

The statutory scheme relevant to this Court's determination of the reasonableness of the STB's decision was concisely outlined in an earlier STB decision, <u>Hi Tech Trans, LLC - Petition for Declaratory Order</u>, STB Fin. Docket No. 34192 (Sub-No. 1)(Aug. 14, 2003), 2003 WL 21952136. In <u>Hi Tech</u>, the STB stated:

> The Board has jurisdiction over "transportation by rail carrier." 49 U.S.C. § 10501(a). The term "transportation" is defined to include a "facility" related to the movement of property by rail and "services" related to that movement by rail, including receipt, delivery, transfer, and handling of property. 49 U.S.C. § 10102(9)(A),(B). "Rail carrier" is defined as a person providing "common carrier railroad transportation for compensation." 49 U.S.C. § 10102(5). Where the Board has jurisdiction over transportation by rail carrier, that jurisdiction is "exclusive," 49 U.S.C. § 10501(b), and state and local laws and regulations are generally preempted. To come within the preemptive scope of 49 U.S.C. § 10501(b), these activities must be both: (1) transportation; and (2) performed by, or under the auspices of, a rail carrier.

<u>Id.</u> at *3.

Grafton's first argument concerns what it regards as the STB's failure properly to interpret the statutory term of "transportation". The STB interpreted "transportation" to incorporate Grafton's transloading activities but not its fabrication activities. It is curious that Grafton should lead its objection to the STB decision with that argument given that, even if the STB had found that Grafton's fabrication activities were "transportation", the STB would still have been obliged to decline jurisdiction because of its parallel finding that BRT is not a rail carrier. Because the latter issue is the real focus of Grafton's argument against the STB's decision, the Court's analysis properly begins there.

As this Court reads the relevant statutory language, Congress intended the transportation and related activities undertaken by rail carriers to benefit from federal preemption but did not mean such preemption to extend to activity related to rail transportation undertaken by non-rail carriers. It is clear from the record and facts presented to this Court that BRT is not a rail carrier *per se*. Despite that fact, Grafton hastens to point out that it is itself a rail carrier and its own activities of transporting rail cars to and from BRT's proposed facility are protected under § 10501(b), a point on which the STB agreed.

From the apparent point of agreement, Grafton makes the controversial assertion that it would have been "the truly

affected entity and that operations proposed for the Milford yard were to have been conducted jointly" with BRT. Grafton also contends that BRT employees were to be "agents" of Grafton during the transloading activities at the Milford Yard. Thus, Grafton declares that it would have played an integral role in BRT's operations and that, because Grafton is a rail carrier, its involvement would somehow have brought BRT's activities under the auspices of a rail carrier.

One of the several problems Grafton has with the STB's decision is what it regards as the Board's failure to appreciate the relationship between Grafton and BRT and its proposed activities at the Milford Yard. The STB might be forgiven such a perceived misconception by virtue of the fact that Grafton has made that relationship something of a moving target. Over the course of this litigation, Grafton has changed the legal dynamic of its relationship with BRT to suit the circumstances. At the outset the relationship was presented as a straightforward lease agreement. By the time Grafton submitted its position to the STB the relationship was based on an "operating agreement" with alleged involvement by Grafton in moving rail cars. Now, facing the STB's decision and a motion for summary judgment in this Court, Grafton asserts that BRT employees were to be the "agents" of Grafton during the transloading activities at the Milford Yard.

There is no evidence in the record supporting those assertions. Grafton has not offered a single affidavit, draft agreement or other documentation which might support any of its claims regarding an "operating agreement" or agency. The only thing that Grafton can conceivably point to is a brief footnote in its complaint which states:

> The original agreement called for BRT to lease the Yard from [Grafton]. However, the terms of the agreement have consistently evolved and changed over the last few months.

Apparently, the relationship continues to evolve but it is little wonder that the STB focused on BRT as a separate entity from Grafton given that Grafton offered no colorable evidence from which it could assume otherwise.

Instead, the STB evaluated Grafton's proposed relationship with BRT at the Milford Yard and held that BRT's planned activities would not be considered "integrally related" to Grafton's rail carrier service. Specifically, the STB stated:

> Based on the record here, [Grafton's] involvement would be limited to transporting rail cars for BRT and leasing some of its surplus property. [Grafton] would transport loaded rail cars to BRT's facility and return empty cars to the CSXT interchange point. BRT, on the other hand, would control the functions of unloading the rail cars, handling and (in some cases) fabricating the shipped steel, and then trucking it to customers. In doing this, nothing on the record establishes that BRT would be acting on behalf of [Grafton] or that [Grafton] would hold out BRT's transloading services as part of the common carrier services that [Grafton] offers to the public. Rather, BRT would be offering its own services to customers directly (as BRT does today at its Boston location that it is planning to vacate).

<u>Town of Milford, MA - Petition for Declaratory Order</u>, STB Fin.

-14-

Docket No. 34444 (Aug. 11, 2004), 2004 WL 1802301, at *3. Thus, the STB found that Grafton's involvement would have ended when it delivered loaded rail cars to BRT's facility, rendering BRT's activities no different than those of other rail customers or third-party intermediaries whose similar activities do not fall within the STB's jurisdiction.

Similarly, Grafton takes issue with the STB's reliance on <u>Florida East Coast Railway Co.</u> v. <u>City of West Palm Beach</u>, 110 F. Supp. 2d 1367 (S.D. Fla. 2000), aff'd 266 F.3d 1324 (11th Cir. 2001). Grafton contends that the facts of <u>Florida East Coast Railway</u> distinguish it clearly from the facts in the present case and, therefore, the STB should not have relied on that holding. Specifically, Grafton argues that the arrangement in <u>Florida East Coast Railway</u> between the railroad (FEC) and its tenant (Rinker) was essentially a land swap and that Rinker leased the railroad premises in order to conduct its own aggregate distribution services. Grafton asserts that the services provided by Rinker had nothing to do with providing railroad transportation and in no way involved FEC. Moreover, Grafton contends that the Eleventh Circuit Court of Appeal's decision "hinges upon the determination that the arrangement between Rinker and FEC served a 'purely private function'". In contrast, Grafton argues that 1) the facts of the present case demonstrate that Grafton would have remained intricately and closely linked with BRT's

activities at the Milford Yard and 2) the Milford Yard would have continued with its public function.

A review of the decisions in Florida East Coast Railway leads this Court to concur with the STB's reliance on them. To begin, it is worth pointing out that a notable similarity between Florida East Coast Railway and this case is that, like Grafton and BRT, FEC and Rinker changed the legal contours of their relationship at various times throughout the litigation in an effort to support preemption. For example, the parties originally discussed a land exchange agreement but ultimately settled on a "standard lease agreement and a standard trackage agreement". Florida East Coast Railway, 110 F. Supp. 2d at 1371. Later, Rinker sought to adjust that agreement. The Southern District of Florida stated:

> FEC is prepared, if necessary, to run the operations through its employees and contractors. In fact, FEC and Rinker have entered into a contract for FEC to provide rail transport to and transloading of aggregate at the 15th Street yard.

Id. at 1372. Thus, with respect to Grafton's first contention, it appears that its relationship to BRT is about equivalent to the one between FEC and Rinker.

Grafton's second contention that the Milford Yard would have continued its public function unlike the yard in Florida East Coast Railway is belied by the facts of the case. In Florida East Coast Railway, the District Court held that "[a]ctivities and facilities not integrally related to the provision of

-16-

interstate rail are not subject to STB jurisdiction or to federal preemption." 110 F. Supp 2d at 1378 (citations omitted). The Eleventh Circuit followed up by concluding that:

> Rinker's use of the property at the 15th Street yard and the activities there performed by Rinker serve no public function and provide no valuable service to FEC; rather, the arrangement between FEC and Rinker merely facilitates Rinker's operation of a private distribution facility on FEC-owned premises.

266 F.3d at 1336.

Grafton argues that the proposed use of the Milford Yard is "much more than a 'private distribution facility'" and that it never proposed or agreed that the Yard would be exclusively used by BRT and would abandon its public function. Nevertheless, Grafton has offered nothing more than its word that the Milford Yard would be open to other parties and would maintain its public function.

Grafton suggests that the activities that it planned to conduct at the Milford Yard with BRT would have "serve[d] the important public function of facilitating the interstate shipment of steel". Yet the suggestion belies the facts of this case. BRT currently operates in South Boston and, as Grafton readily concedes, is in no way involved in facilitating the interstate shipment of steel. BRT's proposed move to Milford would not have materially changed its process of delivering steel to customers.

In essence, BRT proposed nothing more than transposing its private steel distribution business from South Boston to Milford.

If BRT is not covered now by federal preemption, the move to Milford would not suddenly have made it so. Whatever arrangement BRT would have had with Grafton after its move to Milford, Grafton would still have been facilitating nothing more than BRT's operation of a private distribution facility.

After reviewing the facts of the case at bar, this Court finds that the STB's decision represents a reasonable reading of 49 U.S.C. § 10501(b). The sound reasoning and eminent good sense employed by the STB's analysis of the facts in light of the relevant case law leads this Court to accord it deference. Thus, this Court finds that preemption is inappropriate here and defendant's motion for summary judgment will be allowed.

### ORDER

In accordance with the foregoing, Defendant's Motion for Summary Judgment (Docket No. 14) is **ALLOWED**. Plaintiff's Motion in Limine Requesting That This Honorable Court Not Grant Deference to the STB's Decision Dated August 12, 2004 (Docket No. 16) is **DENIED AS MOOT**.

**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated February 14, 2006